DICKINSON WRIGHT PLLC
RASIKA A. KULKARNI, Cal. Bar No. 321344
2600 W. Big Beaver Road, Suite 300
Troy, Michigan 48084
Telephone: (248) 433-7200
E-mail: rkulkarni@dickinsonwright.com

DICKINSON WRIGHT PLLC
Robert L. Avers (P75396), *to be admitted pro hac vice*
Mark V. Heusel (P47528), *to be admitted pro hac vice*
350 S. Main St., Ste. 300
Ann Arbor, MI 48104
Telephone: (734) 623-7075
ravers@dickinsonwright.com
mheusel@dickinsonwright.com

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JACK BURNS, Cal. Bar No. 290523
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone:  619.338.6500
E mail         jburns@sheppardmullin.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MULLEN TECHNOLOGIES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>QIANTU MOTOR (SUZHOU) LTD., a limited liability company; and DOES 1-50,<br><br>Defendants. | Case No.:  19-CV-1979-W-AHG<br><br>Hon. Thomas J. Whelan<br>Court Room No. 3C<br>Hearing Date: December 23, 2019 at 10:00 a.m.<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>**NO ORAL ARGUMENT PURSUANT TO LOCAL RULE** |

**TABLE OF CONTENTS**

I. Introduction ........................................................................................................... 1

II. Factual Background ............................................................................................. 1

    A. The Parties' Negotiation of the Exclusive Cooperation and Vehicle Assembly Agreement ....................................................................................... 1

    B. Mullen's Immediate Breach of the Amended Agreement ........................ 3

    C. The Mandatory Arbitration Provision ....................................................... 5

    D. Mullen's Claims Stem from Payment Obligations under the Agreement .............. 7

III. Legal Standard ................................................................................................... 8

IV. Argument ........................................................................................................... 10

    A. The Four-Part Inquiry Pursuant to 9 U.S.C. § 206 is Satisfied ............................ 10

        1. The Agreement Satisfies Factor One ................................................. 10

        2. Factor Two is Satisfied because Singapore is a Signatory to the Convention ... 13

        3. Factor Three is Satisfied because the Agreement is Commercial in Nature ..... 13

        4. Factor Four is Satisfied because Qiantu is a Chinese Limited Liability Company .................................................................................................. 14

    B. The Agreement is Enforceable and is not "Null and Void, Inoperative, or Incapable of being Performed" ........................................................................ 14

V. Conclusion ........................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Chloe Z Fishing Co., Inc. v. Odyssey Re (London) Ltd.*
   109 F.Supp.2d 1236 (S.D. Cal. 2000) .......................................... 8, 9, 10, 12, 13, 14, 16

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*
   815 F.2d 840, 846 (2d Cir. 1987) ............................................................................... 12

*Greenberg v. Park Indemnity Limited*
   No. LA CV12-10756 ................................................................................................... 10

*Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982) ..................................... 9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24
   (1983) ............................................................................................................................ 9

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,
   631 (1985) ..................................................................................................................... 9

*Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F.Supp.
   75 (S.D.N.Y. 1985) ..................................................................................................... 14

*Riley v. Kingsley Underwriting Agencies, Ltd.*
   969 F.2d 953 (10th Cir. 1992) ...................................................................................... 9

*Stimula, Inc. v. Autoliv, Inc.*
   175 F.3d 716 (9th Cir. 1999) ........................................................................................ 8

Statutes

9 U.S.C. § 202 ..................................................................................................................... 14

9 U.S.C. § 206 .......................................................................................................... 9, 10, 16

Other Authorities

The Convention on Recognition and Enforcement of Foreign Arbitral
   Awards (1958) ..................................................................................................... passim

## I. INTRODUCTION

Qiantu and Mullen are parties to a certain Exclusive Cooperation and Vehicle Assembly Agreement (the "Agreement"). The Agreement contains an arbitration provision designating the Singapore International Arbitration Centre ("SIAC") as the chosen forum for certain disputes between the parties. Despite having knowledge of its mandatory obligation to arbitrate the claims alleged in its Complaint, Mullen filed this suit in direct contravention of the Agreement.

Qiantu respectfully moves this Court to compel arbitration of the claims alleged in Mullen's Complaint as required under Article 9.2 of the Agreement. As demonstrated herein, this Court is authorized to compel arbitration in the parties' chosen forum under the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"), 21 U.S.T. 2517, T.I.A.S. No. 6997 (1970), as incorporated in United States law under 9 U.S.C. §§ 201 *et seq*. Indeed, both the FAA and the Convention compel that Mullen's claims be submitted to arbitration as required under the Agreement. Accordingly, Qiantu respectfully requests under 9 U.S.C. § 206 that this Court enter an order compelling arbitration of Mullen's claims before the SIAC.

## II. FACTUAL BACKGROUND

### A. The Parties' Negotiation of the Exclusive Cooperation and Vehicle Assembly Agreement

Qiantu manufactures and sells a high-performance sports vehicle known as the "K50," which Qiantu currently markets and sells in China. In late 2017, Qiantu foresaw an opportunity to expand sales of the K50 into the United States market by manufacturing and selling "vehicle kits" to be built within the U.S. and eventually marketed and sold here. Thus, Qiantu and Mullen began negotiating an agreement whereby Qiantu would sell to Mullen K50 vehicle kits, and Mullen would subsequently fill the role of assembling the K50 and marketing it for sale in the U.S. Out of these negotiations was born the Exclusive Cooperation and Vehicle Assembly Agreement (the "Agreement").

The first iteration of the Agreement (the "First Agreement" attached hereto as **Exhibit A**), was signed by the parties on May 25, 2019 after months of negotiations between the parties. Shortly after executing the First Agreement, Mullen notified Qiantu, claiming that it had signed the wrong version of the Agreement. (*See* **Exhibit B**; **Exhibit C**). Because Mullen initially claimed that it signed the wrong version of the Agreement due to some sort of error in transmitting the to-be-executed version of the Agreement (*see id.*), Qiantu believed that Mullen would simply replace their executed version of the Agreement with the correct version of the Agreement, and sign the latter. As it turned out, however, Mullen wished to re-negotiate key provisions of the Agreement. (*See* **Exhibit D**). Despite Mullen's untimely request to renegotiate the Agreement, Qiantu agreed to take part in an effort to begin the parties' business relationship on a positive note. Accordingly, the parties restarted the negotiation process, resulting in several weeks of negotiations, evidenced by multiple rounds of revisions to the Agreement and requiring numerous conference calls with the parties and their respective attorneys. (*See* **Ex. D**; **Exhibit E**).

As part of these negotiations, Mullen specifically sought a modification of the payment schedule referred to in Article 4.4 of the Agreement. (*See* **Ex. A**, ¶ 4.4**; Exhibit E**; **Exhibit F; Exhibit G**). Remarkably, and as further explained below, this is the exact payment schedule Mullen now contends in its Complaint that Qiantu pulled out of thin air and snuck into the Agreement. (Dkt. 1, ¶ 16). After making specific revisions to the payment schedule following Mullen's untimely request, the parties entered into an amended version of the Agreement on July 30, 2019, which completely replaced and superseded the earlier version in full. (*See* the "Amended Agreement," attached hereto as **Exhibit H** ("[T]his Agreement…amends and restates in its entirety the Cooperation and Vehicle Assembly Agreement the parties executed on May 25, 2019."); **Ex. A** at 11.7 (providing for amendment of the First Agreement so long as the amendment is signed by each of the parties)). Mullen signed and acknowledged the Amended Agreement and, in fact, initialed each page, including the payment schedule Mullen now asserts it was not

aware of. (**Ex. H**).  Thus, the Agreement is a product of mutual negotiation, much of which took place at the behest of Mullen, and there is no question as to its validity.

### B. Mullen's Immediate Breach of the Amended Agreement

Contrary to Mullen's contention otherwise, the parties' Amended Agreement included a payment schedule, found at Exhibit F to the Amended Agreement (the "Payment Schedule"), at the time the parties signed the Amended Agreement (*see* **Ex. H**, at Exhibit F).  The Payment Schedule in Exhibit F and its operation are explained generally in Article 4 of the Amended Agreement, which governs the parties' "Payment Obligations" (a term defined by the Amended Agreement and explained below in greater detail), and specifically in Article 4.4 of the Amended Agreement, which sets forth the invoicing and payment aspects of the parties' relationship (*see generally* **Ex. H**, at 4.4). In that vein, the parties specifically negotiated the prelaunch and launch costs and expenses as required under Article 4.4, and those Payment Obligations are expressly provided, in great detail, in the Payment Schedule in Exhibit F to the Amended Agreement. (*See* **Ex. H**, at Exhibit F (stating, **"Payment schedule: The parties have agreed to the estimated pre-launch and launch costs, which *shall be reimbursed by Mullen* as set forth according to this schedule and Article 4**," and providing specific payment amounts and due dates for same) (emphasis added)).

With that in mind, Article 4.4 expressly provides that Mullen was to make the first payment pursuant to the Amended Agreement no later than August 30, 2019. (*Id.*). On September 1, 2019, after not receiving Mullen's first payment due under the Payment Schedule, Qiantu sent a Notice of Default to Mullen outlining its failure to pay Qiantu in the amount of $3,674,426.40 pursuant to the agreed upon Payment Schedule. (Notice of Default, attached hereto as **Exhibit I**).

On September 4, 2019, a representative for Mullen responded to the Notice of Default by acknowledging the Payment Schedule and, specifically, that Mullen was "working with [their] bankers to deliver the payment due." (**Exhibit J**). Then, on September 11, 2019, Mullen sent another email to Qiantu, again acknowledging that it

had an obligation to make payments pursuant to the parties' agreed-upon Payment Schedule and detailing the various reasons for its difficulty in making the payment. (**Exhibit K**). Moreover, in the same email, Mullen requested modifications to the aforementioned Payment Schedule, again acknowledging that it was in fact bound to the Payment Schedule included in the Amended Agreement. (*Id.*). On September 20, 2019, counsel for Mullen sent a letter to counsel for Qiantu again expressly acknowledging Mullen's obligations pursuant to the Amended Agreement and, specifically, Article 4.4. (**Exhibit L**). Through this same letter, Mullen offered to wire payment to Qiantu in exchange for a post-signing amendment to the Payment Schedule. (*Id.*).

Qiantu responded to Mullen's letter on September 24, 2019, making clear that it would not be amending the Agreement because it was under no obligation to do so, and, particularly in light of Mullen's questionable behavior, it had no intention to do so. (**Exhibit M**). Moreover, Qiantu restated that it expected Mullen's payment of the past due invoice by the cure date, and that Qiantu was prepared to exercise any and all rights it possesses under the Agreement, including termination pursuant to Article 6.4(a), in the event that Mullen failed to cure. (*Id.*).

Counsel for Qiantu sent another letter to Mullen on October 2, 2019, again providing notice that Mullen had defaulted under the terms of the Agreement. (**Exhibit N**). Specifically, Qiantu notified Mullen that it had defaulted again by failing to make the second installment payment by October 1, 2019, this time in the amount of $19,160,219.49 pursuant to Article 4.4(a) and the Payment Schedule in Exhibit F (and notwithstanding Mullen's ongoing default arising from its failure to make the first payment in the amount of $3,674,426.40 pursuant to the Payment Schedule). (*Id.*).

On October 4, 2019, counsel for Qiantu sent to Mullen another notice, outlining the current state of Mullen's defaults under the Agreement. Specifically, that letter 1) reiterated that Mullen defaulted on the first invoice despite being provided an additional 30 days to cure; 2) reiterated that Mullen defaulted on the second invoice as of October 1, 2019; 3) expressly notified Mullen of Qiantu's intent to exercise its right to termination

pursuant to Section 6.4(a) of the Agreement; and, 4) demanded that Mullen begin the process of removing the Qiantu brand name and other intellectual property from any communications to the public. (**Exhibit O**).

To date, Mullen has not made the payments required under the Payment Schedule despite its own repeated acknowledgement of its obligation to do so and the multiple opportunities extended by Qiantu to allow Mullen to perform. Instead, Mullen filed this suit on October 11, 2019 in an effort to race to the courthouse and prevent Qiantu from simply pursuing arbitration of what is truly a dispute regarding Mullen's failure to abide by its Payment Obligations, which, under the express terms of the Amended Agreement, must be submitted to arbitration rather than litigated before this Court. All the while, Mullen continues to use Qiantu's brand name and other intellectual property as though it is Mullen's own, and despite Qiantu's termination of the Agreement. (*See generally* Cease and Desist Letter from Qiantu to Mullen, dated November 11, 2019, and attached hereto as **Exhibit Q**).

### C. The Mandatory Arbitration Provision

Article 9 of the Agreement expressly provides the framework of dispute resolution procedures, prescribing specific dispute resolution avenues for specific types of disputes that may arise between the parties.  Under that framework, the nature of the claim in the dispute dictates which dispute resolution avenue that the parties must use under the Agreement.  Article 9.1, for example, provides the avenue for resolving disputes such as design changes, engineering issues, and assembly problems that arise in connection with the overall purpose of the Amended Agreement—that is, importing, assembling, and selling cars.  Indeed, given that the parties' relationship was intended to be about as close to a joint venture as a relationship could be without actually being characterized as a joint venture, the parties anticipated that disputes might arise which, while important, do not arise to the sort of dispute that would require adjudication before a tribunal.  Under the Amended Agreement, those disputes must be submitted, at least initially, to an internal dispute resolution process under Article 9.1.  (*See* **Ex. H**, 9.1 (requiring that certain

disputes be submitted to the Operations Committee, and then to the President or CEO of both parties if not resolved by the Operations Committee).  If those disputes remain unresolved at the conclusion of the internal dispute process, then they may be submitted to arbitration under Article 9.2.  (*See id.*).

Meanwhile, in addition to those disputes referenced above that are not resolved through the internal resolution procedure in Article 9.1 (disputes which *may* be submitted to arbitration under Article 9.2 of the Amended Agreement), the Amended Agreement mandates that <u>all</u> disputes arising out of "Payment Obligations"—a term that, as explained below, is expressly defined under the Agreement—<u>must</u> be submitted to mandatory arbitration under Article 9.2.  To that end, Article 9.1 expressly provides that its internal dispute resolution procedure only applies to disputes *not* relating to a Payment Obligation, expressly limiting its scope as follows:

> Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, or the threatened or alleged or actual breach of this Agreement by either party **other than relating to a Payment Obligation** (each a "Dispute") shall initially be referred to the Operations Committee for a resolution.

(**Ex. A**; **Ex. H**) (emphasis added). Thus, Article 9.1 does not apply to disputes relating to a Payment Obligation.

Meanwhile, the meaning of "Payment Obligations" is explained under Article 4.1, providing in pertinent part:

> Mullen will pay to Qiantu, in accordance with Qiantu's General Terms and Conditions (except as to those terms that are specifically provided for in this Agreement), the invoicing and payment procedures set forth in Article 4.4, (a) the Fee associated with each Vehicle Kit delivered hereunder, as set forth in Article 4.3, and (b) the costs and expenses set forth in Article 4.2 (<u>the "Costs and Expenses", or together with the Qiantu Fee, collectively,</u> "**Payment Obligations**").

(*Id.*) (emphasis added).  In other words, any dispute involving any of the following relates to a "Payment Obligation": the invoicing and payment procedures set forth in

Article 4.4; the Fee associated with the delivery of each Vehicle Kit set forth in Article 4.3; or the costs and expenses set forth in Article 4.2. Thus, any dispute involving the invoicing and payment procedures set forth in Article 4.4, which are expressly defined as Payment Obligations under Article 4.1, fall outside the scope of the internal dispute resolution procedures under Article 9.1 (which expressly excludes "Payment Obligations"), and are therefore subject to mandatory arbitration pursuant to Article 9.2.

To that end, Article 9.2 of the Amended Agreement provides:

> Any dispute, controversy, difference or claim arising out of or relating to the Agreement, including the existence, validity, interpretation, performance, breach or termination thereof…shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Center (SIAC)[.]

(**Ex. H**). Moreover, Article 9.2 also specifies:

> [N]othing in this Article 9.2 shall be construed to prevent either party from seeking injunctive or other interim relief or remedies in any court or other tribunal as such party deems appropriate pending arbitration, which shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(*Id.* at 9.2) The above-stated portion of Article 9.2 makes even more clear that arbitration is a mandatory process with respect to Payment Obligation disputes subject to Article 9.2. Indeed, the above-referenced portion of Article 9.2 provides the only exception to mandatory arbitration for disputes arising from Payment Obligations, that exception being a temporary injunction pending the outcome of arbitration. (*Id.* (permitting either party to seek "injunctive or other <u>interim</u> relief . . . <u>pending arbitration</u>.") (emphasis added)).

**D.     Mullen's Claims Stem from Payment Obligations under the Agreement**

Because the claims alleged in Mullen's complaint arise from the Payment Schedule referenced in Article 4.4 of the Agreement and, more specifically, their obligation to submit payments pursuant to that Payment Schedule—each of their claims stems from Payment Obligations, and are therefore subject to mandatory arbitration under Article

9.2. (Dkt. 1, Compl. ¶¶ 21-23, 26-28, 30-31, 33-34, 36-40, 43-44). As explained below in greater detail, each of Mullen's claims relates directly to the Payment Schedule found in Article 4.4 of the Agreement or the Exhibit thereto. More specifically, the common thread in each claim alleged in Mullen's Complaint is the premise that they are not required to make payments pursuant to the terms and Payment Schedule provided under the Agreement. And, true to form, Mullen has thus far refused to make the payments required under the Agreement. Regardless, however, of the labels Mullen has attached to them, these claims fall squarely in the province of a Payment Obligation as that term is defined in the Agreement. Thus, had Mullen wished to pursue the claims alleged in the Complaint, the Amended Agreement expressly requires Mullen to do so through arbitration—not by commencing the instant action before this Court.[1] Counsel for Mullen was clearly aware of this concept, as evidenced by his letter dated September 20, 2019. (**Ex. L**). Yet, despite their knowledge that arbitration is the only option for resolving this dispute, Mullen filed this suit anyway.

### III.     LEGAL STANDARD

Section 2 of the FAA provides that an agreement to arbitrate under a commercial contract "shall be valid, irrevocable and enforceable, save upon such grounds as exist in law or in equity." 9 U.S.C. § 2. The Court's role under the FAA is limited to determining whether a valid agreement to arbitrate exists and, if it does, whether the agreement encompasses the dispute at issue. *Stimula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999).

Arbitration is also mandated pursuant to the Convention (attached hereto as **Exhibit P**), where, as here, the arbitration provision is contained in an international commercial contract. *Chloe Z Fishing Co., Inc. v. Odyssey Re (London) Ltd.*, 109

---

[1] While Article 9.3 permits parties to seek other rights and remedies under applicable law, a party may only do so "[i]f all applicable time periods have expired under Article 9.1 and if the Dispute is not resolved pursuant to Article 9.1 or Article 9.2[.]" (**Ex. H**)

F.Supp.2d 1236, 1241 (S.D. Cal. 2000). Specifically, Article II, Section 3 of the Convention "imposes a mandatory duty on the courts of a Contracting State to recognize and enforce an agreement to arbitrate." *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 959 (10th Cir. 1992). When a party in a suit subject to the Convention moves to compel arbitration pursuant to 9 U.S.C. § 206, "the substantive provisions of Chapter 2 of the FAA direct a court to perform a two-step analysis before referring the dispute to arbitration." *Chloe Z*, 109 F.Supp.2d at 1241 (citing *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982)).

Under that two-step process, the Court first "makes a limited inquiry based on four preliminary questions to determine the existence of an arbitration agreement which falls under the Convention." *Id.* There must be: 1) an agreement, in writing, to arbitrate; 2) that is commercial in nature; 3) designating arbitration in a country that is party to the Convention; and 4) to which a foreign citizen or entity is a party. *Id.* at 1243. If the court finds these four factors are satisfied, it must order arbitration unless it finds the agreement "null and void, inoperative or incapable of being performed" under Article II, § 3 of the Convention. *Id.* at 1241.

The Court must conduct the above-referenced two-step inquiry in light of "both the federal policy favoring arbitration and the underlying principles of the Convention and its adoption." *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (noting that strong policy favoring arbitration "applies with special force in the field of international commerce")). The goal of the Convention, as implemented by Congress, is "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are enforced." *Chloe Z*, 109 F.Supp.2d at 1241.

# IV. ARGUMENT

Arbitration of Mullen's claims is mandatory pursuant to the Federal Arbitration Act, and the Convention on Recognition and Enforcement of Foreign Arbitral Awards. To that end, this Court is expressly authorized to compel arbitration before the Singapore International Arbitration Centre ("SIAC") under 9 U.S.C. § 206. In light of the FAA, the Convention, and the national policy favoring arbitration, particularly with respect to disputes arising out of commercial contracts of an international nature, this Court should grant Qiantu's Motion and compel the arbitration of Mullen's claims before the SIAC as expressly required under the Agreement.

## A. The Four-Part Inquiry Pursuant to 9 U.S.C. § 206 is Satisfied

As discussed above, where a party in a suit subject to the Convention moves to compel arbitration, the first step of the Court's analysis is to consider four factors:

> (1) Is there an agreement in writing to arbitrate the subject of the dispute?; (2) Does the agreement provide for arbitration in the territory of a signatory of the Convention?; (3) Does the agreement arise out of a legal relationship, whether contractual or not, which is considered commercial?; and (4) Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states?

*Chloe Z*, 109 F.Supp.2d at 1243. For the reasons outlined below, each of those four factors are present in the instant matter.

### 1. The Agreement Satisfies Factor One

Under the first factor, the Court must determine whether there is an agreement in writing to arbitrate the subject of the dispute. *Id*. Article II, section 2 of the Convention provides:

> The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

(**Ex. P**). The Agreement clearly satisfies this definition, as it constitutes a contract signed by the parties containing an arbitration provision. (**Ex. H**); *See Greenberg v. Park*

*Indemnity Limited*, No. LA CV12-10756; 2013 WL 12123695 (C.D. Cal. Oct. 8, 2013) (arbitration provision contained in a contract between the parties satisfies the 'agreement in writing' requirement)).

Likewise, the subject of the instant dispute falls comfortably within the scope of the arbitration provision under the Agreement because each of the claims alleged in Mullen's Complaint stems from Mullen's Payment Obligations under the Agreement. Indeed, as discussed in Section II(C) *supra*, any dispute arising out of a "Payment Obligation" as defined by the Agreement is subject to mandatory arbitration before the SIAC. (**Ex. H**, § 9.2). Article 4 defines Payment Obligations:

> Mullen will pay to Qiantu, in accordance with Qiantu's General Terms and Conditions…the invoicing and payment procedures set forth in Article 4.4, (a) the Fee associated with each Vehicle Kit delivered hereunder…and (b) the costs and expenses set forth in Article 4.2 (the "Costs and Expenses", or together with the Qiantu Fee, collectively, "Payment Obligations")

Thus, any dispute involving: the payment procedures set forth in Article 4.4, the Fee associated with the Vehicle Kits delivered or the costs and expenses set forth in Article 4.2 (paid pursuant to the Article 4.4 Payment Schedule), is subject to mandatory arbitration pursuant to Article 9.2 because it arises out of a Payment Obligation.

Mullen has asserted six causes of action: (1) breach of contract arising out of Qiantu's alleged addition of the Payment Schedule to the Agreement (Dkt. 1, Compl. ¶¶ 21-23); (2) a claim for declaratory relief seeking a declaration that, because Qiantu allegedly added the Payment Schedule, the Agreement is unenforceable (*Id.* at ¶¶ 26-28); (3) a claim to reform the Agreement as a result of Qiantu's alleged addition of the Payment Schedule to the Agreement (*Id.* at ¶¶ 30-31); (4) a claim for rescission of the Agreement and reformation as a result of Qiantu's alleged addition of the Payment Schedule to the Agreement (*Id.* at ¶¶ 33-34); (5) fraud arising out of alleged misrepresentations with respect to the Payment Schedule (*Id.* at ¶¶ 36-40); and violations of the California Business and Professions Code arising out of Qiantu's alleged addition of the Payment Schedule to the Agreement (*Id.* ¶¶ 43-44).

Each of Mullen's claims in its misguided Complaint arises out of Qiantu's alleged efforts to unilaterally modify Article 4 and the corresponding Exhibit F (that is, the Payment Schedule)—all of which constitute Mullen's Payment Obligations under the Agreement. Cutting through Mullen's efforts to disguise their claims as arising from something other than Payment Obligations as defined by the Amended Agreement (perhaps with the intention of circumventing the arbitration provision), the common issue in all of Mullen's claims is whether Mullen is required to make payments pursuant to the terms and Payment Schedule provided under the Agreement. Where the "allegations underlying the claims 'touch matters' covered by the contract at issue then those matters must be arbitrated, whatever the legal labels attached to them." *Chloe Z*, 109 F.Supp.2d at 1243, 1256-57 (citing *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987)). In other words, the issue of determining whether Mullen's claims fall within the scope of the arbitration provision is one of substance over form, and, because all of Mullen's claims arise from its Payment Obligations under the Agreement, those claims all must be submitted to arbitration before the SIAC pursuant to the Agreement—no matter how Mullen characterizes or labels those claims in its Complaint.

And, to be clear, it is not as though Mullen claims that arbitration is improper on the grounds that this dispute should be subject to the internal dispute resolution procedures under Article 9.1. Rather, Mullen completely disregarded all of Article 9 in both the Agreement and the Amended Agreement when it commenced this suit. Indeed, Mullen's disregard for all of Article 9 is clear from the fact that, while Qiantu contends that this dispute is subject to mandatory arbitration under Article 9.2, Mullen failed to submit the claims alleged in the instant suit to any dispute resolution mechanism under Article 9, period: Mullen failed to submit its claims to the internal dispute resolution procedure under Article 9.1, and clearly has not sought arbitration before the SIAC under Article 9.2. Mullen further disregarded Article 9 by including in its Complaint a Jury Demand, despite the fact that both the Agreement and Amended Agreement contain a clear and express waiver of the right to a jury trial. (*See* **Ex. A**, at 9.4 ("…EACH OF

MULLEN AND QIANTU . . . KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT."); *see* **Ex. H**, at 9.4 (same)).  Mullen's complete disregard for all aspects of Article 9 of the Amended Agreement are just another example of its failure to adhere to the terms of the Amended Agreement, and, at any rate, Mullen's claims are subject to mandatory arbitration under Article 9.2 because those claims arise from Payment Obligations as defined under the Amended Agreement.

For the reasons outlined above, the first factor is satisfied because all of Mullen's claims arise from its Payment Obligations under the Agreement, and those claims all must be submitted to arbitration before the SIAC under the Agreement—no matter how Mullen characterizes or labels those claims in its Complaint.

### 2. Factor Two is Satisfied because Singapore is a Signatory to the Convention

Under the second factor, the Court must determine whether the Agreement provides for arbitration in the territory of a signatory of the Convention.  *See Chloe Z*, 109 F.Supp.2d at 1243. As discussed above, the Agreement designates the SIAC as the forum for arbitration, with the arbitration itself to be held in Singapore. (**Ex. H**, § 9.2). Singapore is a signatory to the Convention as of 1986,[2] and, therefore, factor two is also satisfied.

### 3. Factor Three is Satisfied because the Agreement is Commercial in Nature

Under the third factor, the Court must determine whether the agreement arises out of a legal relationship that is commercial in nature.  *See Chloe Z*, 109 F.Supp.2d at 1243.

---

[2] A list of signatories to the Convention can be found here.

There is no doubt that the Agreement is of a commercial nature. The parties agreed, essentially, to a manufacturing and distribution business relationship with respect to the K50 automobile. The Agreement requires manufacturing of vehicle kits to be subsequently assembled, marketed, and sold in the United States. Accordingly, the third factor is satisfied because the arbitration provision lies within a commercial agreement.

### 4. Factor Four is Satisfied because Qiantu is a Chinese Limited Liability Company

In order to satisfy the fourth factor, either at least one party to the Agreement must not be an American citizen, or the commercial relationship must have some reasonable relation with one or more foreign states. *See Chloe Z*, 109 F.Supp.2d at 1243. This factor is clearly satisfied because Qiantu is a Chinese company organized under the People's Republic of China. (*See* Compl., at ¶3). Pursuant to the terms of the Convention, "citizenry" in terms of the four-factor inquiry is defined as the place of organization. 9 U.S.C. § 202. As such, Qiantu, a party to the Agreement, is not an American citizen, and factor four is satisfied as a result.

### B. The Agreement is Enforceable and is not "Null and Void, Inoperative, or Incapable of being Performed"

Finally, if the four factors above are satisfied, which is the case here, the Court must compel arbitration so long as the agreement to arbitrate is not "null and void, inoperative, or incapable of being performed." *Chloe Z*, 109 F.Supp.2d at 1258. It is well established that only internationally recognized defenses to contract formation or public policy concerns of the forum nation can render a valid agreement to arbitrate unenforceable under Article II, Section 3 of the Convention. *Id.* at 1258-59 (citing *Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F.Supp. 75 (S.D.N.Y. 1985) (holding an agreement is only "null and void" when susceptible to internationally recognized defenses such as duress, mistake, or waiver, or when it contravenes fundamental policies of the forum nation); *Greenberg*, 2013 WL 12123695 at *7-8 (even where Bermuda law governs contract, arbitration agreement will only be found "null and

void" under the terms of the Convention if an internationally recognized defense applies); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953 (10th Cir.), *cert. denied* 506 U.S. 1021 (1992) (holding that agreement subject to Convention was not null and void since agent never pleaded that specific choice provisions at issue were obtained by fraud or coercion and the agent's claim of fraud could be resolved by the arbitral panel itself)).

None of the above-referenced defenses apply to the arbitration clause in this case. There has been no duress, mistake, fraud, or waiver associated with the arbitration provision in the Agreement. To that end, it should be noted that, while Qiantu maintains that the Amended Agreement is the only legally binding and enforceable version of the Agreement, both the First Agreement and the Amended Agreement contain the same arbitration provision in Article 9.2. (**Ex. A**; **Ex. H**). Thus, Mullen cannot allege that Qiantu unilaterally changed the arbitration provision in the way that Mullen alleges Qiantu modified the Payment Schedule.

Moreover, as set forth in *Sandford v. MemberWorks, Inc.*, Mullen's claim of fraud with respect to the Payment Schedule should be resolved by the arbitral panel itself. *See Sandford*, 483 F.3d 959, 962 (9th Cir. 2007) (citation omitted) ("issues regarding validity or enforcement of a putative contract mandating arbitration should be referred to an arbitrator).  In fact, under the express language of the Amended Agreement, Mullen's fraud claim *must* be resolved by the arbitral panel itself.  (*See* **Ex. H**, at 9.2 ("Any dispute, controversy, difference or claim arising out of relating to this Agreement, *including the existence, validity, interpretation, performance, breach or termination thereof . . . shall be referred to and finally resolved by arbitration administered by the [SIAC]*.") (Emphasis added).  Accordingly, Mullen's allegations of fraud do not render the arbitration provision null and void.

Further, as illustrated by emails Mullen's own counsel sent to Qiantu, Mullen acknowledges the binding effect of the arbitration provision contained in the Agreement. (**Ex. L,** "If this is not an acceptable agreement, then we need to follow the letter of the Dispute Resolution provision of the [Agreement], which is called out for in Article 9").

Accordingly, there is no doubt that the arbitration provision itself is enforceable and it is certainly not "null and void" under the stringent standard set forth in *Chloe Z* and similar cases interpreting the Convention. As such, the second prong of the Court's analysis is satisfied, and the Court must compel arbitration pursuant to the FAA and the Convention.

## V.  CONCLUSION

Mullen and Qiantu are both parties to the Agreement, and the Agreement contains a binding and enforceable arbitration clause designating the SIAC as the forum for certain disputes between the parties, including all of the claims alleged by Mullen in its Complaint. Because of the nature of the parties' relationship, the Agreement is subject to the terms of the FAA and the Convention. Accordingly, pursuant to 9 U.S.C. § 206, this Court must compel arbitration of Mullen's claims before the SIAC as is required under the terms of the Agreement.

Dated: November 15, 2019

/s/ Jack Burns
Jack Burns
**Sheppard, Mullin, Richter & Hampton LLP**
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Phone: (619) 338-6500

Rasika A. Kulkarni (321344)
**DICKINSON WRIGHT PLLC**
2600 W. Big Beaver Rd., Suite 300
Troy, MI 48084
(248) 433-7200
rkulkarni@dickinsonwright.com

| | |
|---|---|
| 1 | Robert L. Avers (P75396), *to be admitted pro hac vice* |
| 2 | **DICKINSON WRIGHT PLLC** |
| 3 | 350 S. Main St., Ste. 300 |
| 4 | Ann Arbor, MI 48104 |
| | Telephone: (734) 623-1672 |
| 5 | ravers@dickinsonwright.com |
| 6 | |
| 7 | Mark V. Heusel (P47528), *to be admitted pro hac vice* |
| 8 | **DICKINSON WRIGHT PLLC** |
| 9 | 350 S. Main St., Ste. 300 |
| | Ann Arbor, MI 48104 |
| 10 | Telephone: (734) 623-1908 |
| 11 | mheusel@dickinsonwright.com |
| 12 | *Attorneys for Defendant* |

SMRH:4852-9854-9165.1

-17- Case No. 19-CV-1979-W-AHG.
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION