**From:**     George Bei <George.Bei@ch-auto.com>
**To:**        Calin Popa <cpopa@mullenusa.com>
**Cc:**        Frank McMahon <fmcmahon@mullenusa.com>, Larry Hata <lhata@mullenusa.com>, Jerry Alban
<jalban@mullenusa.com>, David Michery <david@mullenusa.com>, luqun 陆群 <luqun@ch-auto.com>, "MHeusel@dickinson-
wright.com" <MHeusel@dickinson-wright.com>, jiagang 贾罡 <jiagang@qiantumotor.com>
**Subject:**  Re: Revised Agreement
**Sent:**     Mon, 29 Jul 2019 04:35:09 +0000
ANNARBOR-#262524-3-Exclusive Cooperation and Vehicle Assembly Agreement - DW comments 07-26-2019.docx

Calin,
Based on our conversation, we have worked with our team in China through the weekend. As you knew we have discussed
the project timeline and payment schedule since may. Our team has been worked on the project and deal with our vendor
RLE since June. Here is our works cope in 3rd quarter and 4th quarter:

Since June, Qiantu has internally started to setup the team, initiated the homologation gap analysis. created IT structure and
reach out the vendors/suppliers…etc. We will work with RLE and experts to complete the gap analysis and identify the
changes as necessary in the 3rd quarter. We also need to kick off supplier development works for the long lead changes such
as dual stage airbag and passenger seat changes, lighting changes, and windshield wiper changes… We also need to prepare
the pre test vehicle retrofits and tests for approving the gap severities. Simulation team will support all of engineering
proposals in order meet the aggressive timing.

The 4th quarter, Qiantu will complete all engineering proposals and final directions approval. The verification tests and
simulations will be conducted for approving the changes. Retrofit and muck up will be started for board team review and
final approval. All of over 6 months lead time changes have been assigned for supplier to start development works and issue
the first payment. Second payment may needed for the long lead changes for supplier tooling kickoff. Qiantu will start to
make manufacture changes for supporting build the verification vehicles. Pre US regulation vehicle and components tests
have been conducted for father approved engineering proposals. The short lead changes kick off will be moved to 1st
quarter 2020. Some of homologation work will be moved to 1st and 2nd quarter 2020 for compromising your request.

We have to start the final homologation tests by July 2020, otherwise the SORP date will be father delayed. Qiantu will take
the high risk to removed the soft tooling vehicle confirmation stage in order to match your timeline for vehicle SORP date.
So that we have to reconfirm and reverify all of changes well in the early stage.

Here is the adjust payment schedule and SORP timing per your request:

Move $6,500,000 from 3rd quarter 2019 to 1st and 2nd quarters 2020.
Move the SORP date from 3/31/2021 to 04/30/21.

I have replace the adjust payment schedule and project timing into the latest revised agreement for you review. Let me know
if you have any questions.


 Best Regards,

# George Bei
贝刚

President - CH-AUTO Overseas Division
CEO - QIANTU Motor USA
_____
Tel: 1 (248) 826 7627
     +86 139 171 90357
Email: george.bei@ch-auto.com
Website: www.ch-auto.com
       www.qiantumotor.com



On Jul 26, 2019, at 12:12 PM, Calin Popa <cpopa@mullenusa.com> wrote:

Hi George, as per David's phone message, for cash flow prospective we would like to change the payment schedule.
First payment in 30days from now, second one January 1st and so on...
Please see attached
<image001.jpg>

Thank you

Calin Popa
Mullen Automotive - CEO
**Mullen Technologies**
| mobile: (949) 922 8559
| phone: (714) 707 6285
| email: cpopa@mullenusa.com
| site: www.mullenusa.com
| address: 1405 Pioneer St, Brea, CA 92821

---

**From:** George.Bei <George.Bei@ch-auto.com>
**Sent:** Friday, July 26, 2019 9:34 AM
**To:** Calin Popa <cpopa@mullenusa.com>; Frank McMahon <fmcmahon@mullenusa.com>; Larry Hata <lhata@mullenusa.com>
**Cc:** David Michery <david@mullenusa.com>; luqun 陆群 <luqun@ch-auto.com>; MHeusel@dickinson-wright.com; jiagang 贾罡 <jiagang@qiantumotor.com>
**Subject:** Revised Agreement

Hi Calin,
I'm forwarding the revised contract to you review. Mark has sent it to me yesterday and only change is at article 4.4 that is based on we both agreed the payment process. Could you please review it. If you agreed the changes. Please sign the contract and send the scanned contract to Lu for his signature. Should

Thanks,
George

The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.

Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

**From:** George.Bei <George.Bei@ch-auto.com>
**Sent:** Friday, July 26, 2019 12:34 PM
**To:** Calin Popa <cpopa@mullenusa.com>; fmcmahon@mullenusa.com; lhata@mullenusa.com
**Cc:** david@mullenusa.com; luqun 陆群 <luqun@ch-auto.com>; Mark V. Heusel <MHeusel@dickinson-wright.com>; jiagang 贾罡 <jiagang@qiantumotor.com>
**Subject:** EXTERNAL: Revised Agreement

Hi Calin,
I'm forwarding the revised contract to you review. Mark has sent it to me yesterday and only change is at article 4.4 that is based on we both agreed the payment process. Could you please review it. If you agreed the changes. Please sign the contract and send the scanned contract to Lu for his signature. Should

Thanks,
George

The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.

Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

Message

| | |
|---|---|
| **From**: | Calin Popa [cpopa@mullenusa.com] |
| **Sent**: | 7/23/2019 11:08:43 PM |
| **To**: | George.Bei [George.Bei@ch-auto.com] |
| **Subject**: | FW: Qiantu's Contract critical points |

George, we came down to 2 points, please take a look below.

1) First payment 30 days after the contract is executed and the invoice is received.
2) Qiantu's IP is Qiantu's to keep but Mullen IP is Mullen's. Article 8.3 c should state Mullen not Qiantu

Let me know
Thanks
Calin

## 4.4   <u>Invoicing and Payment</u>

(a)   <u>Invoices for Pre-Launch and Launch Costs and Expenses to be Mutually Agreed and Payable in Advance</u>. ~~On or before the fifteen day of each month before the quarterly month (*i.e.*, February 15, May 15, August 15, and November 15) QIANTU and MULLEN will agree on what work will be done that month and estimate the Costs and Expenses referred to in Sections~~<u>The parties have mutually agreed to the pre-launch and launch Costs and Expenses as set forth in Exhibit F  and as referred to in Articles</u> 4.2(a) and (b) related thereto~~, including any work listed in  a statement of work under Section 4.4(b) below for work and costs to be incurred by~~.   <u>MULLEN shall pay to</u> QIANTU ~~in the following quarter (*e.g.*, June 1 – August 30) and issue an invoice to MULLEN, subject to Section 4.4(b),~~<u>an advance payment against the total estimated Costs and Expenses pursuant to the schedule set forth in Exhibit F and in the amounts described therein (the "Advance Cost and Expense Payment").   ,  The Advance Cost and Expense Payments shall be made on or before the date set forth in the schedule, with the exception that the initial Advance Cost and Expense Payment (July 1, 2019) shall be made within three (3) days after complete execution of this Agreement. The parties further agree that each Advance Cost and Expense Payment shall be</u> adjusted for any difference between ~~actual and~~<u>the actual Costs and Expenses incurred during the relevant installment period for which the Advance Cost and Expense Payment was made and the</u> estimated Costs and Expenses ~~for the preceding quarter (for example, the invoice issued on or before the first day of June  will include estimated costs and expenses for the quarter from June 1 – August 30 of that year and~~<u>set forth in Exhibit F  (for example, the</u>

(c)     If either party, or any person employed by or working under the direction of either party as a result of this Agreement conceives or first reduces to practice:  (a) any invention or any experimental, development or research activities, including engineering related thereto, whether or not patentable; (b) any reduction to practice of any subject matter, application or discovery which could be patented or copyrighted; or (c) any improvement in the design of the Vehicles or any alternative or improved method of accomplishing the objectives of the Agreement (collectively referred to herein as "Inventions"), such Inventions will be owned by MULLEN ifQIANTUif such Inventions are related to or would fall within the definition of the QIANTU Intellectual Property and shall be deemed confidential and proprietary property of MULLENQIANTU, whether such Inventions or any portions thereof can be copyrighted or patented or not ("Jointly Developed IP"). The Parties will immediately disclose their contributions to all Jointly Developed IP.  All Background IP, Foreground IP and Jointly Developed IP shall be part of and included within the term QIANTU Intellectual Property.

# EXCLUSIVE COOPERATION AND VEHICLE ASSEMBLY AGREEMENT

**by and between**

**Qiantu Motor (Suzhou), Ltd. and Qiantu Motor USA, Inc.,**

**and**

**Mullen Technologies, Inc.**

**dated as of**

**July 30, 2019**



## TABLE OF CONTENTS

ARTICLE 1.   DEFINITIONS ........................................................................................1

ARTICLE 2.   VEHICLE   DESIGN,   DEVELOPMENT   AND   PRE-LAUNCH
OBLIGATIONS ....................................................................................7

ARTICLE 3.   SALE AND VEHICLE ASSEMBLY.............................................11

ARTICLE 4.   PAYMENT OBLIGATIONS AND SECURITY THEREFOR..............16

ARTICLE 5.   WARRANTY AND PRODUCT LIABILITY .....................................20

ARTICLE 6.   TERM AND TERMINATION; DEFAULT; REMEDIES ....................23

ARTICLE 7.   OTHER OBLIGATIONS OF THE PARTIES ..................................27

ARTICLE 8.   NONDISCLOSURE; INTELLECTUAL PROPERTY .......................30

ARTICLE 9.   DISPUTE RESOLUTION ............................................................34

ARTICLE 10.  APPROVALS AND COMPLIANCE WITH LAW ..............................35

ARTICLE 11.  GENERAL TERMS.....................................................................37

**EXHIBITS**
EXHIBIT A:    [Left Blank]
EXHIBIT B:    Assumptions for QIANTU's Vehicle Kit Fees
EXHIBIT C:    Assembly Guidelines
EXHIBIT D:    Initial Purchase Order
EXHIBIT E:    Reserved Capacity
EXHIBIT F:    Estimated Launch and Pre-Launch Costs for QIANTU and MULLEN



Exhibit H
Page 68

This EXCLUSIVE COOPERATION AND VEHICLE ASSEMBLY AGREEMENT, dated as of July 30, 2019 (this "Agreement"), is made by and between QIANTU MOTOR (SUZHOU) LTD., a limited liability company registered in the Peoples Republic of China, and QIANTU MOTOR USA, Inc., a California corporation (collectively, "QIANTU"), and Mullen Technologies, Inc., a California corporation ("MULLEN") and amends and restates in its entirety the Cooperation and Vehicle Assembly Agreement the parties executed on May 25, 2019. QIANTU and MULLEN may be individually referred to as a "party" and collectively referred to as the "parties."

## RECITALS

A.    QIANTU MOTOR USA, Inc. is a wholly owned subsidiary of QIANTU Motor (Suzhou) Ltd., (together referred to as "QIANTU"). QIANTU has designed and developed vehicle kits for a pure electric high performance sports car based on QIANTU's vehicle known as the "K50," which is currently being sold in China and will sell kits Exclusively to MULLEN for the Territory, as set forth in this Agreement.

B.    MULLEN is a licensed electric vehicle manufacturer that is in the business of, among other things, providing engineering support, assembling, and distribution of high performance electric vehicles for the Territory.

C.    QIANTU and MULLEN wish to enter into this Agreement under which, among other things,

(i) MULLEN will design, develop, construct and fully equip an assembly facility that will fully accommodate the requirements of this Agreement;

(ii) MULLEN will provide to QIANTU engineering and design support, and participate in the homologation of the K50 vehicle for the Territory;

(iii) QIANTU will provide to MULLEN test vehicles, specifications and related materials for the testing, certification and, redesign of the K50 vehicle to meet United States (including all states therein) and other standards for safety and emissions of vehicles in the Territory;

(iv) MULLEN will assemble the K50 vehicles from kits and component parts sold to MULLEN, and MULLEN will assemble the vehicles in the United States and provide related services to QIANTU according to the terms and conditions set forth herein; and

(v) After successful homologation and assembly of the K50 vehicles in the United States, MULLEN will market and sell the K50 vehicles in the Territory subject to the terms, conditions, rights and other obligations set forth herein.

In consideration of the mutual agreements set forth below, the adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1. DEFINITIONS

1.1    As used in this Agreement, the following capitalized terms have the following respective meanings, including both the singular and the plural forms thereof and shall be construed accordingly:

(a)   "Affiliate" means, with respect to an entity, any other entity directly or indirectly controlling, controlled by or under common control with such entity. Control means, without limitation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity or person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative thereto.

(b)   "Advance Cost and Expense Payment" has the meaning assigned thereto in Article 4.4(a) and Exhibit F to this Agreement.

(c)   "Advance Fee Payment" has the meaing assigned thereto in Exhibit B to this Agreement.

(d)   "As-Required Materials" means Production Materials that are supplied in bulk quantities to be purchased by QIANTU and included in the BOM and used by MULLEN as and when required during the assembly process. Examples of As-Required Materials include paint, e-coat, primer, clearcoat, phosphate, gasoline, engine oil, paint sealer, engine coolant and brake fluid, etc. All Production Materials other than As-Required Materials will be included in the price of a Kit.

(e)   "Assembly Plant" has the meaning assigned thereto in Article 2.2(a)(i).

(f)   "Assembly Processes" means the plant specific processes by which assembly operators will assemble and inspect the Vehicles in accordance with the Assembly Standards.

(g)   "Assembly Standards" means Vehicle assembly and inspection standards developed by MULLEN, including without limitations, any drawings a part thereof, and approved by QIANTU, based on the Vehicle Specifications, and in accordance with which MULLEN will assemble the Vehicles hereunder. In developing the Assembly Standards, MULLEN may incorporate, modify and amend portions of QIANTU assembly guidelines set forth in Exhibit C, which QIANTU uses at its current plant in China for production and assembly of the "K50" for markets outside the Territory. The Assembly Standards may be modified from time to time by the parties' mutual written agreement.

(h)   "Bill of Materials" or "BOM" has the meaning assigned thereto in Article 2.1(b).

(i)   "CARB" means the California Air Resources Board.

(j)   "Change in Control" means, with respect to any party, such party's direct or indirect acquisition by, or merger with, a third party, the sale of all or substantially all of the assets of such party, or a transaction pursuant to which the owners or shareholders of such party that hold more than fifty percent (50%) of such party's equity or other ownership interest prior to the transaction cease to own at least fifty percent (50%) of such interest after the transaction.

(k)   "Change Notice" means a document, in a form reasonably acceptable to MULLEN, used by the parties to mutually approve and implement changes to any of the Specifications, Bill of Materials, Production Materials, suppliers of Production

2

Materials, Kits, QIANTU Tooling or Supplier Component Tooling, as provided in Article 3.2(j).

(l)     "Commercial Operating System" means MULLEN's assembly plant processes and procedures, as the same may be amended from time to time by MULLEN, relevant portions of which, as determined by MULLEN in its reasonable discretion, relating to the assembly of the Vehicles will be reviewed by MULLEN with QIANTU.

(m)    "Copyright Materials" is defined in Article 8.4(b).

(n)     "Costs and Expenses" is defined in Article 4.1.

(o)     "Customer/s" means those customers in the Territory who purchase any Vehicle(s) from MULLEN directly or through intermediaries, dealers or agents of MULLEN as intended in this Agreement.

(p)     "Delivery Order" means a written firm commitment issued by MULLEN to QIANTU for the purchase of a specified quantity of Vehicles in Kits pursuant to Article 3.2(b)(ii), and which sets forth the options requested for such Vehicles, and the requested delivery dates.  A Delivery Order may also be issued for Replacement Parts.

(q)     "Dispute" has the meaning assigned thereto in Article 9.1.

(r)     "Effective Date" means the date this agreement is executed by both parties.

(s)     "EPA" means the U.S. Environmental Protection Agency.

(t)     "Engineering Process Instructions" mean product-specific instructions related to the assembly of the Vehicles, as developed by QIANTU and transferred to MULLEN, which MULLEN will, in turn, utilize in the development of the Assembly Processes.  Examples include, but are not necessarily limited to, the following: dynamic torque requirements, layering requirements, key product characteristics, dimensional requirements, electrical architecture and protocols, part visual, part numbers, critical sequences, etc.  Engineering Process Instructions may be amended in connection with homologation and as mutually agreed by the parties.

(u)     "Exclusive" means that QIANTU will not contract with or, enter into any transactions with any person or entity (including without limitation any Affiliate of QIANTU) other than MULLEN with regard to the import, sale, marketing, distribution or other rights described in Article 3.1(b) with respect to the Vehicle in the Territory during the Term of this Agreement and for any period thereafter as provided for herein.

(v)     "Expected Volume Curve" means MULLEN's good faith forecast of its projected annual sales of Vehicles referred to in Article 3.2(g)(i).

(w)    "Event of Force Majeure" has the meaning assigned thereto in Article 11.5.

(x)     "Field Service Action" means any recall, quality improvement or service campaign applicable to all Vehicles or a subset of Vehicles, as the case may be, to address

3

a quality issue, safety defect or noncompliance with a governmental safety, emissions control or noise control standard or regulation.

(y) "Fixed Schedule" has the meaning assigned thereto in Article 3.2(b)(ii)

(z) "General Terms and Conditions" means QIANTU's General Terms and Conditions for sale of Vehicle kits to be mutually agreed by QIANTU and MULLEN. Except as otherwise specifically provided for in this Agreement, QIANTU'S sale and supply of Kits shall be govern by the General Terms and Conditions; provided, however, to the extent that the General Terms and Conditions and this Agreement are in conflict, this Agreement shall take priority and shall supersede any inconsistent terms in QIANTU's General Terms and Conditions.

(aa) "GD&T" means geometric dimensioning and tolerancing.

(bb) "Indemnifying Party" has the meaning assigned thereto in Article 5.4.

(cc) "Indemnitee" has the meaning assigned thereto in Article 5.4.

(dd) "Indirect Materials" means any goods used in the Vehicle assembly process that are not described in the Bill of Materials and will not be incorporated into a Ready-to-Ship Vehicle, such as gloves, hand tools, wrenches, aprons, and personal protective equipment.

(ee) "Initial SOP Date" means the first date on which MULLEN (i) begins assembling saleable Vehicles (start of production) and (ii) begins to increase the rate at which MULLEN assembles Vehicles in order to achieve Steady-State Assembly.

(ff) "Initial SORP Date" means the first date on which MULLEN begins Steady-State Assembly.

(gg) "Intellectual Property" means discoveries and inventions (patentable or not), issued patents and patent applications, designs (registered or not), trademarks (registered or not), trade dress (registered or not), copyrights (registered or not), mask works, trade secrets (including, without limitation, specifications, designs, plans, computer programs in source and object code, flowcharts, diagrams, drawings, marketing data, financial data, testing data and other competitively sensitive information), moral rights, author rights, Internet domain names, database rights, utility models, statutory invention registrations, invention disclosures, industrial designs, innovations, ideas, applications or improvements, continuations, continuations-in-part, divisional, rights in trade dress and packaging, goodwill and other intellectual property rights, and all divisions, continuations, reissues, renewals, and extensions thereof, regardless of whether any such rights arise under the laws of the United States or any other state, county or jurisdiction, or whether they arise under applicable international laws, treaties and conventions.

(hh) "Kits" means a complete but unassembled set of component parts, chassis, engine parts, transmission and suspension parts, wheels and tires, which are intended to be assembled into a fully operational Vehicle that is compliant with U.S. safety and emissions standards. Kits shall include the Production Materials as defined herein.

4



(ii)     "Logistics Management Services" means the purchased services which provide the inbound and outbound freight activities for the Vehicles (including Pre-Launch Vehicles) and Production Materials, including, without limitation, the services of a lead logistics provider and its associated activities (e.g., inbound and outbound freight, container management and return, customs brokerage, warehousing, sequencing, bulk metering, fuel surcharges, expedited transportation, parts tracking and follow-up, and rack tracking and return), but excluding Vehicle delivery to customers, distributors or other intermediaries.

(jj)     "MULLEN Tooling" means Tooling required for assembly of the Vehicles at the Assembly Plant, which for clarity, does not include QIANTU Tooling or Supplier Component Tooling, and the cost of which is funded solely by MULLEN.

(kk)    "MULLEN Warranty" has the meaning assigned thereto in Article 5.1.

(ll)     "MULLEN Warranty Period" has the meaning assigned thereto in Article 5.1.

(mm)   "Mutual Nondisclosure Agreement" or "NDA" has the meaning assigned thereto in Article 8.1.

(nn)    "NHTSA" means the U.S. National Highway Traffic Safety Administration.

(oo)    "Operations Committee" has the meaning assigned thereto in Article 7.2.

(pp)    "Overhead" of a party means the internal costs of QIANTU directly attributable to the Vehicles.

(qq)    "PPAP" means Production Part Approval Process.

(rr)     "Pre-Launch Vehicles" means any Vehicle assembled prior to the Initial SORP Date.

(ss)    "Production Materials" has the meaning assigned thereto in Article 2.1(b).

(tt)     "Production Material Specifications" means, with respect to any item of Production Material, the designs, drawings, data, descriptions, quality standards, GD&T, calibration requirements, engineering instructions, test protocols, variation simulation analysis, joint analysis on critical joints, and other specifications for such item of Production Material.

(uu)    "Program Manager" has the meaning assigned thereto in Article 7.1.

(vv)    "Prohibited Person" has the meaning assigned thereto in Article 11.3(e).

(ww)   "QIANTU Fee" has the meaning assigned thereto in Article 4.3(a).

(xx)    "QIANTU Tooling" means manufacturing Tooling that (i) is used in the manufacturing of component parts for the Vehicles, but not in the assembly of any vehicles at the Assembly Plant, and (ii) the cost of which is funded solely by QIANTU.



(yy)   "Ready-to-Ship Vehicle" means a Vehicle that has been inspected, tested and confirmed by MULLEN as having been assembled in accordance with the applicable Assembly Standards and ready for resale and delivery to a customer pursuant to Article 3.2(f).

(zz)   "Replacement Parts" means all parts that are to be installed in or upon a Vehicle so as to replace components of that Vehicle (as described in the BOM), irrespective of whether those parts were defective, damaged, made by QIANTU or supplied to QIANTU by third parties; however, Replacement Parts do not include any equipment, accessories, non-standard items or other parts added to a Vehicle that are not described in the BOM (without limitation, wheels, tires, custom paint, spoilers, audio equipment, carpet, performance meters, etc.).

(aaa)  "Reserved Capacity" has the meaning assigned thereto in Article 3.2(g)(ii).

(bbb)  "Specifications" means, collectively, the Vehicle Specifications and the Production Material Specifications. Examples include, but are not necessarily limited to, the following: vehicle technical specifications, dimensional technical specifications, geometric dimensioning and tolerances, variation simulation analysis, the Engineering Process Instructions, weld drawings, sealer drawings, joint analysis on critical joints, vehicle calibration requirements, performance requirements and any other information required to develop the Assembly Standards (for clarity, the Specifications do not include the Assembly Processes or Assembly Standards).

(ccc)  "Steady-State Assembly" means the uninterrupted assembly or running rate of assembly of Vehicles at the Assembly Plant a rate capable of achieving a volume of Vehicles as determined by MULLEN time to time with reference to its customer's orders and Kits received from QIANTU pursuant to accepted Delivery Orders. The parties acknowledge that the volume and rate of assembly of Vehicles will be based upon a build-to-order business model and may fluctuate based upon Mullen's Customer's orders.

(ddd)  "Supplier Component Tooling" means Tooling that is (i) required for the production and supply of the Production Materials but not in the assembly of any vehicles at the Assembly Plant, and (ii) the cost of which is funded solely by QIANTU or the applicable Supplier of the Production Materials produced through use of such tooling.

(eee)  "Target SOP Date" has the meaning assigned thereto in Article 3.2(a).

(fff)  "Term" has the meaning assigned thereto in Article 6.1.

(ggg)  "Territory" shall mean the United States, Canada, Mexico and all of their territories..

(hhh)  "Tooling" means all tools, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds, and related documentation (including engineering specifications, PPAP books, and test reports), together with any accessions, attachments, parts, accessories, substitutions, replacements and appurtenances.

6



(iii)   "Total Capacity" means the estimated maximum number of Vehicle assemblies that can be carried out at the Assembly Plant per year, less commitments for other automobile assemblies that MULLEN has or may enter into from time to time consistent with its obligations under this Agreement, including as such capacity may be adjusted from time to time by MULLEN in its discretion.

(jjj)   "Vehicle" or "Vehicles" means the electric vehicles to be assembled by MULLEN for the Territory pursuant to this Agreement from Kits to be sold by QIANTU to MULLEN and which vehicle will be based upon QIANTU's pure electric high-performance sports car, commonly known as the "K50" (including, without limitation, any and all vehicle mid-cycle refreshes or enhancements) and any such modifications, additions and changes needed to achieve U.S.A. and other certifications in the Territory for such Vehicles as will be mutually agreed by the parties; and (ii) will include such other modifications, additions, changes, variations and Territory specific changes to the Vehicle that are mutually agreed by the parties during the Term.  The parties will cooperate to identify if and when to introduce or phase out certain modifications, or changes to Vehicles, but QIANTU shall have final decisional authority as to if and when such modifications or changes are made to the Vehicle.

(kkk)   "Vehicle Specifications" means collectively, the designs, drawings, data, descriptions, quality standards, GD&T, engineering instructions (including Engineering Process Instructions), test protocols and other specifications for the Vehicles and their assembly, which specifications have been verified by engineering simulation models.

### ARTICLE 2.   VEHICLE DESIGN, DEVELOPMENT AND PRE-LAUNCH OBLIGATIONS

**2.1**   **QIANTU's Obligations**

(a)   **Specifications**

(i)   QIANTU will develop, update and maintain the Vehicle Specifications and the Production Material Specifications in accordance with this Agreement, including without limitation, Article 2.1(d) and 3.2(j).  QIANTU agrees that the Assembly Standards and Assembly Processes Vehicle Specifications must in all respects conform to the approved Specifications.

(ii)   QIANTU will validate that the Vehicle product design is capable of achieving target vehicle performance and technical specifications as well as final audit specifications.  If, however, variation analysis results in any inconsistencies, QIANTU will be responsible for either changing the Vehicle design to meet the specifications or changing the Vehicle technical or final audit specifications.

(iii)   In connection with its development and maintenance of the Specifications, QIANTU will (1) undertake all product portfolio planning and development activities; (2) provide product assembly drawings from QIANTU's current assembly plant in China and Engineering Process Instructions; (3) provide routine maintenance of the Specifications to support Production Material

7

suppliers and Assembly Plant operations; (4) develop and implement the primary and any alternate powertrains and related components; (5) provide ongoing product engineering support and (6) carry out other activities needed for development and maintenance of the Specifications.

(iv) Because MULLEN has exclusive rights in the Territory, MULLEN may contribute input to the final Specifications and any changes or modifications thereto, and MULLEN may request changes to Specifications (as provided in Article 3.2(j)) in connection with, among other things, marketing and customer perception or demand in the Territory. Notwithstanding these contributions, QIANTU reserves sole discretion to make changes to the Specifications for the Vehicles.

(b) Bill of Materials. For each Vehicle, QIANTU will develop and maintain the bill of materials (each, the "Bill of Materials" or "BOM"), which will include all assemblies, sub-assemblies, components, parts, stampings, accessories, As-Required Materials, Replacement Parts and all other parts that are to be incorporated into each such Vehicle (collectively, the "Production Materials"). QIANTU is responsible in all respects for the Bill of Materials' contents, including all errors or omissions contained therein. The parties agree that MULLEN or its dealers may install equipment, accessories, non-standard or custom items and other parts on or to a Vehicle that will not be required to be described in the BOM (without limitation, certain types of wheels, tires, custom paint, spoilers, custom audio equipment, carpet, performance meters, etc.) (herein "Aftermarket Parts"). To the extent that such Aftermarket Parts are to be installed on such Vehicles at the offering of MULLEN or its dealers, MULLEN agrees to obtain approval from QIANTU prior to offering such Aftermarket Parts to customers. QIANTU's approval shall not be unreasonably withheld, and shall be granted assuming such Aftermarket Parts are consistent with QIANTU's branding of the K50. MULLEN further agrees that it shall take reasonable measures to inform cutomers that such Aftermarket Parts are solely offered through and by MULLEN, and are not products of QIANTU, and that QIANTU does not warrant against any damages or loses associated with such Aftermarket Parts.

(c) Production Materials. QIANTU is solely responsible for developing Specifications in accordance with this Article 2.1 and for and implementing and ensuring the uninterrupted supply of all Production Materials.

(d) Testing, Validation and Certification; Homologation. QIANTU, in coordination with MULLEN, will contract with a third party/ies to manage all testing, validation and obtain all certifications and licenses required under applicable law ("homologation") for the assembly, marketing, distribution and sale of the Vehicle to Customers in the Territory, including as required under Article 10 (Approvals and Compliance with Law) and as to any changes, enhancements or modifications requested during the Term by MULLEN for the Vehicle in the Territory. QIANTU and MULLEN agree to cooperate (i) to develop and complete any enhancements or modifications that may be required to obtain such certifications and licenses as soon as reasonably possible, and (ii) to conduct all appropriate feasibility and other testing needed to obtain such certifications and licenses. All changes to any Vehicle Specifications or any BOM related to homologation must be mutually agreed by QIANTU and MULLEN. MULLEN, however, shall remain responsible

8

for the Costs and Expenses of such testing and homologation of the Vehicle, and shall pay in accordance with Article 4.2. To the extent the parties mutually agree that QIANTU employees or contractors will provide services at the MULLEN research and development facility or Assembly Plant, QIANTU agrees such employees and contractors will comply with all safety, security and other requirements and procedures of MULLEN as set forth in Article 7.3.

(e)     <u>QIANTU Tooling and Supplier Component Tooling</u>.  QIANTU will coordinate and fully fund (or cause the supplier of related Production Material to fund) all costs and expenses associated with the acquisition, maintenance, repair and replacement of all QIANTU Tooling and Supplier Component Tooling.  Such QIANTU Tooling and Supplier Component Tooling for Production Materials will meet all standards necessary to comply with the Specifications. MULLEN shall not be responsible for QIANTU Tooling or Supplier Component Tooling for manufacturing of the component parts or Production Materials, unless otherwise mutually agreed to in writing by the parties.

## 2.2     <u>MULLEN's Obligations</u>

(a)     <u>Pre-Launch Development and Launch</u>

(i)     MULLEN shall establish a research and development center at which it and QIANTU will, among other things, carry out engineering and other development work related to the launch and of sale of the Vehicle in the Territory in accordance with applicable laws and the Specifications and Assembly Standards. In addition, MULLEN shall commission the construction and renovation of a fully equipped plant (which Mullen anticipates will be located in the state of Washington, United States of America (U.S.A.)), which will be utilized by MULLEN to assemble and inspect the K50 Vehicle ("<u>Assembly Plant</u>").  The Assembly Plant shall become operational for assembly of the Vehicle in accordance with Article 3.2, in order to assemble Vehicles according to the Assembly Standards from Kits sold by QIANTU or the Production Materials' suppliers direct to MULLEN in accordance with this Agreement. The Assembly Plant shall be used to assemble the Vehicles for sale to Customers in the Territory. All costs and expenses associated with obtaining, commissioning and operating the research and development center and the Assembly Plant shall be borne by MULLEN, and QIANTU shall not have any responsibility for costs or expenses associated with obtaining, commissioning or operating such facilities. If pursuant to Article 3.1(b) or otherwise MULLEN obtains or constructs replacement or additional assembly capacity at the original or any additional location(s) for assembly of Vehicles in the Territory, such capacity and location(s) also shall be deemed an Assembly Plant. Neither QIANTU, any of its Affiliates or any third party will have the right to take possession or exercise control over the research and development center or any Assembly Plant or any part thereof, without MULLEN's written approval in MULLEN's sole discretion.

(ii)     MULLEN will cooperate with and assist QIANTU in connection with pre-launch development and launch work by, among other things, assigning technical personnel (qualified engineers, technicians or other specialists)



and assembly personnel employed by MULLEN, upon QIANTU's request, to work at the MULLEN research and development center or Assembly Plant with QIANTU or any third-parties that it contracts with for homologation and other work pursuant to Article 2.1(d), which MULLEN employees work may be on a full-time or part-time basis, as the parties mutually agree. Any issues QIANTU may have with respect to the performance of such personnel will be referred by QIANTU to MULLEN's Program Manager to be addressed by MULLEN. MULLEN will cause such assigned technical personnel to cooperate fully with QIANTU and its consultants, contractors, and employees in achieving the objectives of their assignment.

    (iii)    All personnel assigned by MULLEN to QIANTU for this project in accordance with the foregoing Article 2.2(a)(ii) will at all times and for all purposes remain employees of MULLEN.

    (iv)    MULLEN will assemble Pre-Launch Vehicles that will be used for testing, verification and compliance with all laws and regulations to operate the Vehicles on public roads in the Territory.

    (v)    MULLEN shall be responsible for its own costs and expenses incurred in all work and associated activities with respect to the obligations described in this Article.

(b)    <u>Assembly Standards and Processes</u>. MULLEN will develop, update and maintain the Assembly Standards and the Assembly Processes. Upon receipt of the Initial Specifications, MULLEN will begin to develop the Assembly Standards and the Assembly Processes in accordance with the Assembly Standards and submit them to QIANTU for written approval.

(c)    <u>Development and Procurement of Mullen Tooling</u>. MULLEN will develop the requirements for, and will acquire, test, verify, own and pay for all Mullen Tooling and will arrange for the timely fabrication of such Mullen Tooling at prices, on terms determined by MULLEN and in accordance with specifications that are approved in advance by QIANTU. MULLEN will review with QIANTU the bid packages for all Mullen Tooling, but MULLEN will retain discretion over the sources and final acceptance of Mullen Tooling. If QIANTU directs any changes in the Vehicles or develops derivative Vehicles that require any modification or replacement of the Mullen Tooling for their assembly, MULLEN will arrange for the timely modification or replacement of such Mullen Tooling as necessary, provided such modification or replacement is feasible and QIANTU pays the costs of such modifications or replacements in full in accordance with Article 4. The parties will agree in advance on a budget for the expenditures and a method to verify costs of such modification or replacement.

(d)    <u>IT Integration</u>. MULLEN is responsible for ensuring information technology systems integration into any of QIANTU's systems, and any other systems as may be determined by joint review between MULLEN and QIANTU.

2.3    <u>Tooling Ownership</u>. All QIANTU Tooling will be and at all times remain the property of QIANTU. MULLEN Tooling is and will remain at all times the property of MULLEN,

10



regardless of whether such Tooling is used in the assembly of the Vehicles. QIANTU Tooling will be used only for the manufacture of parts for Vehicles pursuant to this Agreement.

### ARTICLE 3.   SALE AND VEHICLE ASSEMBLY

3.1   <u>QIANTU's Obligations</u>

(a)   <u>Production Materials.</u>

(i)   QIANTU will contract for the procurement from third-party suppliers of the Production Materials.

(ii)   QIANTU will be responsible for supplier quality and the production part approval process (PPAP) with respect to the Production Materials.

(iii)   Subject to the limitations of Article 3.2(e), upon receiving notification from MULLEN of any failure to timely deliver conforming Production Material pursuant to Article 3.2(e), QIANTU will replace or rework (or will cause the respective supplier to replace or rework) such material at no charge to MULLEN.

(b)   <u>Grant of Exclusive Rights to MULLEN.</u> QIANTU and MULLEN agree that solely with respect to the Vehicle and within the Territory, QIANTU hereby grants and MULLEN hereby accepts during the Term the Exclusive right to (i) operate a research and development center in the Territory with respect to the Vehicle; (ii) import into the Territory and sell and offer for sale in the Territory any Kits, As-Required Materials, Production Material, Replacement Parts related to the Vehicles; (iii) assemble the foregoing in the Territory; (iv) own, lease or operate assembly facilities for the assembly of the Vehicle in the Territory; and (v) market, sell, offer for sale or lease, lease, distribute, and service Vehicles and Replacement Parts in the Territory. MULLEN will have the sole and Exclusive right to expand the Total Capacity at the Assembly Plant or construct or obtain additional facilities for assembly of Vehicles in or for the Territory. During the Term, MULLEN will also have the non-exclusive right to use QIANTU's trademarks and copyrights in accordance with Article 8 (for example, without limitation, to use and reproduce QIANTU's name) solely to exercise MULLEN's rights listed above. During the Term of this Agreement, QIANTU will not directly or indirectly enter into agreements with any party other than MULLEN for assembly, manufacturing, distribution, sale, offering for sale or lease, lease or service of the Vehicle in the Territory. MULLEN agrees that during the Term, it shall not directly or indirectly manufacture, caused to be manufactured, replicate, or copy the Vehicle, the Replacement Parts, and/or the QIANTU Intellectual Property for the purpose of distributing, selling or leasing the Vehicle anywhere in the World, except through QIANTU, and that MULLEN's rights with respect to the Vehicle are only as specifically provided herein and shall be limited to the assembly, distribution, resale, lease or service of the Vehicle in the Territory.

(c)   <u>Outbound Logistics.</u> QIANTU will deliver Vehicle Kits FOB China port. Risk of loss will transfer to MULLEN immediately upon delivery of the Kits to MULLEN'S carrier at the appropriate Chinese port mutually agreed by the parties for exporting

11



such items.  MULLEN will coordinate and have sole responsibility for outbound shipping management, loading, and freight expenses from such port for such items.

(d)     QIANTU Quality Control.   With each delivery of a Kit, Production Materials or As-Required Materials, QIANTU will provide to MULLEN a certificate of quality and conformity with the Specifications.

(e)     Production Losses.

(i)     Process.   QIANTU is responsible for the timely delivery of Production Materials FOB China port.  The parties acknowledge that loss of production may result from incomplete, incorrect or late delivery of Production Material (the effects of which are addressed in Sec. 3.1(a)(iii) above), or from production stoppages or slowdowns at the Assembly Plant or for other reasons.  Minor disruptions in production that are not due to a repetitive cause will be addressed in the ordinary course.  For all other disruptions, MULLEN and QIANTU will jointly develop a recovery plan for the review of the Operations Committee.  The Operations Committee will determine the appropriate operational course of action.  MULLEN will determine the costs to be recovered from QIANTU and will review such costs with the Operations Committee and invoice QIANTU for such cost as provided in Article 4.4(e)(ii).

(ii)     Responsibility.   For those production losses that result from action or inaction of MULLEN, including, but not limited to, production losses that result from a cancellation of Delivery Orders, MULLEN shall be responsible for such production losses and a cancellation fee as provided for in Article 3.2 (c)(ii).

**3.2     MULLEN's Obligations**

(a)     Target SOP Date.   The Initial SOP (i.e., start of production) Date is targeted forMarch 30, 2021 ("Target SOP Date").  MULLEN will notify QIANTU in writing as soon as reasonably practicable if it anticipates that the Initial SOP Date will occur earlier or later than the Target SOP Date and the parties will establish a revised launch schedule and analyze any related effects on planned Vehicle assembly.  MULLEN will use commercially reasonable efforts to achieve the Target SOP Date; provided, however, that under no circumstances shall MULLEN incur any liability or be in breach of this Agreement, in the event of a QIANTU-directed change to the Initial SOP Date.

(b)     Orders.

(i)     Initial Purchase Order. After the Vehicle meets all safety and emission standards and regulations for passenger vehicles in the Territory, QIANTU shall manufacture and supply Vehicle Kits to Mullen. MULLEN and QIANTU mutually agree on the appropriate volume of Kits needed to launch the marketing and sales in the Territory and MULLEN thereafter shall issue to QIANTU an Initial Purchase Order for at least such number of Vehicles that shall be scheduled for delivery during the first 6 months after the Initial SOP Date.  The Initial Purchase Order must be issued no

12



later than 6 months prior to the Initial SOP Date and in the form attached as <u>Exhibit D</u>.

(ii)   <u>Delivery Orders</u>.   Beginning 6 months before the Initial SOP Date and continuing on a monthly basis thereafter, MULLEN will provide to QIANTU a rolling quarterly forecast and monthly fixed schedule (the "<u>Fixed Schedule</u>"). On a monthly basis, following MULLEN's issuance of the initial Fixed Schedule, MULLEN will provide its firm requirements in the form of a Delivery Order. MULLEN's payment obligations for the Vehicle Kits are as described in EXHIBIT B and as provided for in Article 4 herein. MULLEN's Minimum order shall be 20 Kits and Orders are in multiples of 20. As provided in Article 3.2(a), MULLEN will retain sole discretion over production scheduling, except as specifically provided herein, but will use its commercially reasonable efforts to accommodate the scheduling set forth in its Delivery Orders. All Delivery Orders shall be issued to QIANTU no less than 6 months in advance of the date scheduled for delivery according to Articles 3.1(c) and 3.2(d).

(iii)   <u>Logistics Management Services</u>.   MULLEN will be responsible for providing all Logistics Management Services.

(c)   <u>Acceptance of Orders; Cancellation; Delivery Dates</u>.

(i)   <u>Acceptance of Orders</u>. QIANTU will acknowledge acceptance of the Delivery Orders and its intention to fulfill such Order, subject to MULLEN's fulfillment of its obligations herein by written letter of intent.

(ii)   <u>Cancellation of Orders</u>. Upon QIANTU's receipt and acceptance of a Delivery Order, MULLEN shall not cancel such Orders without agreeing to forfeit its Advance Payment to QIANTU, except that MULLEN may cancel a Delivery Order in whole or part within 90 days of placing such Delivery Order if it agrees to cover the costs for component parts that cannot reasonably be reallocated to other Delivery Orders or other products or customers of QIANTU within 90 days of such cancellation.. As provided for herein, if a component part is used for a future Delivery Order, the cost attributable for such part that MULLEN has paid prior to exercising its right to cancel will be treated as a prepayment and credited against that future Delivery Order for which that prepaid part is included. The cost of the part to be credited shall be based on the actual cost paid by QIANTU for such part. QIANTU shall refund MULLEN's advance payment attributed to the cancelled portion of such Delivery Order minus the agreed costs described in the immediately preceding sentence.  If the Delivery Order is cancelled after 90 days from the date of placing the Delivery Order, MULLEN shall forfeit and QIANTU shall retain the Advance Payment attributable to the canceled portion of the Delivery Order.

(iii)   <u>Delivery Dates</u>. QIANTU will advise MULLEN of the expected delivery dates for the Vehicle Kits upon Acceptance of the Delivery

13



Order as provided for herein. .

(d)    <u>Assembly</u>.  MULLEN will assemble the Vehicle Kits supplied by QIANTU in accordance with this Article and the Assembly Standards.  QIANTU will accept MULLEN's Delivery Orders to the extent that such Delivery Orders are consistent with Article 3.2(b)(ii) and MULLEN's Fixed Schedules issued under Article 3.2(b)(ii). MULLEN will use commercially reasonable efforts to assemble such Vehicles, but MULLEN will retain discretion in scheduling production. MULLEN will assemble the Vehicles in accordance with agreed Assembly Standards at its Assembly Plant or at another location of MULLEN located in the continental United States, as determined by MULLEN in its reasonable discretion, provided that assembly at such other location will not inhibit MULLEN's ability to fulfill its obligations under this Agreement and will not cause QIANTU to incur additional fees or freight or other costs or to lose any benefits, that are not reimbursed by MULLEN, either directly or indirectly through an adjustment of the terms of this Agreement. Prior to transitioning assembly of the Vehicles from one Assembly Plant to another, MULLEN will provide written notice to and consult with QIANTU to ensure a smooth transition.

(e)    <u>Inspection</u>. MULLEN will notify QIANTU of any shortages, damages or defects in any Kits, As-Required Materials, or Replacement Parts discovered by MULLEN and will reasonably cooperate with any inspections undertaken by QIANTU and the related supplier to confirm defects in such items; provided, however, that MULLEN will have no obligation to remediate  and QIANTU and its supplier shall be responsible to remedy such defects in Kits, As-Required Materials or Replacement parts, whether caused by design, manufacturing, packaging, transportation, shipping or handling to the China port and consistent with the delivery terms herein. QIANTU will insure (or will cause the respective supplier to insure) the Kits and any As Required Materials to the point of delivery at FOB China port.  Upon the occurrence of any event covered by such insurance, MULLEN will reasonably cooperate with QIANTU's efforts to make any insurance claims.

(f)    <u>Inspection of Assembled Vehicles</u>. Each Vehicle assembled by MULLEN will be inspected by MULLEN upon completion of its assembly in accordance with QIANTU's Specifications and the established Assembly Standards. MULLEN shall permit QIANTU to be present during any such inspections (as QIANTU's sole cost), and will timely notify QIANTU when such inspections shall occur.  If any defects are identified during such inspection, whether attributable to assembly or otherwise, then MULLEN shall notify QIANTU of its findings and allow QIANTU the opportunity to inspect the defects prior to making any corrections. As soon thereafter as reasonably possible, taking into account the nature of the issue and the availability of materials, remedy such defects and shall notify QIANTU when such defects have been remedied.  After completion of any required defect remediation and satisfactory final inspection with respect to a Vehicle, MULLEN will give QIANTU notice stating that the Vehicle is a Ready-to-Ship Vehicle with a certificate of quality and conformity with the Assembly Standards.  MULLEN will provide QIANTU with access to information pertaining to defects in Vehicles and confirmation of the successful repair of such defects. MULLEN will notify QIANTU of its assessment of the cause of the defect and how responsibility should be allocated between the parties. The Operations Committee shall allocate the cost

14



of remediation to party responsible for the defect (with MULLEN responsible to the extent attributable to assembly or losses caused in shipping the Kits from China, and QIANTU responsible for other defects such as a defect in a component of a Kit or the shipment of the Kit to FOB China port). If the Operations Committed cannot agree, the matter will be escalated to the Presidents and CEOs of the parties as provided in Article 9.

(g)   <u>Capacity Commitment</u>.

(i)   <u>Expected Volume Curve</u>.  MULLEN shall provide to Qiantu an Expected Volume Curve setting forth MULLEN's good faith estimate of the Vehicles to be ordered during the period covered by such Expected Volume Curve, which Expected Volume Curve MULLEN will update and provide to QIANTU no less frequently than semi-annually.  Upon QIANTU's receipt of updates to the Expected Volume Curve, QIANTU may request that MULLEN provide to QIANTU for its review documentation, including related sales forecasts that reasonably substantiates the projected sales of Vehicles for the applicable period set forth in the revised Expected Volume Curve.

(ii)   <u>Reserved Capacity</u>.  For the period beginning on the Initial SOP Date and continuing for 36 months thereafter, MULLEN will reserve capacity in the Assembly Plant (the "<u>Reserved Capacity</u>") in an amount equal to the volumes set forth on <u>Exhibit E</u>. Following expiration of the 36-month period referenced in the immediately preceding sentence and continuing on each successive 12-month period thereafter, the Reserved Capacity will be equal to the actual quantity of Vehicles assembled in the preceding 12-month period. Subject to the approval of the Operations Committee, either party may request an increase or decrease, as the case may be, to the applicable Reserved Capacity for that period to the Expected Volume Curve forecast for such successive 12-month period.  If the Operations Committee does not approve an adjustment, the Reserved Capacity will remain unchanged.

(iii)   <u>Additional Volume</u>.  MULLEN further agrees to make commercially reasonable efforts to accommodate the volume in excess of the then applicable Reserved Capacity.  Before implementing any adjustments to the Reserved Capacity, MULLEN will review with the Operations Committee its proposals for adjustments to Reserved Capacity; provided that MULLEN may proceed with any adjustments following such review.  If MULLEN commits to an entity other than QIANTU, all or any portion of the Plant Capacity other than the Reserved Capacity, MULLEN agrees to advise the Operations Committee that MULLEN has committed such capacity; provided that MULLEN shall be under no duty to disclose to whom it committed such capacity or any other details concerning the commitment of such capacity.

(h)   <u>Use of Reserved Capacity</u>.  MULLEN will not solicit other potential customers for any portion of the Reserved Capacity. MULLEN reserves the right to solicit other potential customers for any portion of the available Total Capacity that does not constitute the Reserved Capacity.

(i)   <u>Maintenance of Mullen Tooling</u>.  MULLEN will maintain all Mullen Tooling in proper working condition at MULLEN's expense.

15



(j)     <u>Changes</u>. Either of the parties may request changes to the Specifications, Bill of Materials, Production Materials, suppliers of Production Materials or Replacement Parts, for instance, in order to address or resolve issues or propose new or replacement features. The requesting party must generate a written change request ("<u>Change Request</u>") and send it to the other party and the Operations Committee for review and approval. Upon satisfactory approval of a Change Request by each party, QIANTU will generate a Change Notice that shall become effective when signed by both parties and delivered to both parties and any Suppliers that are impacted. The parties will promptly reach agreement on the allocation of costs for such changes pursuant to Article 4.3(b)(ii) and if they cannot agree, they will escalate the issue to the Presidents and CEOs, and if they cannot mutually agree, QIANTU will make the final decision. Neither MULLEN nor QIANTU shall make or instruct any changes to the Specifications, Bill of Materials, Production Materials, suppliers of Production Materials or Replacement Parts except as set forth in this Article.

(k)     <u>Indirect Materials</u>. MULLEN will supply all Indirect Materials required for assembly of the Vehicles.

### ARTICLE 4.    PAYMENT OBLIGATIONS AND SECURITY THEREFOR

4.1    <u>Payment</u>. MULLEN will pay to QIANTU, in accordance with QIANTU's General Terms and Conditions (except as to those terms that are specifically provided for in this Agreement), the invoicing and payment procedures set forth in Article 4.4, (a) the Fee associated with each Vehicle Kit delivered hereunder, as set forth in Article 4.3, and (b) the costs and expenses set forth in Article 4.2 (the "<u>Costs and Expenses</u>", or together with the QIANTU Fee, collectively, "<u>Payment Obligations</u>"). MULLEN agrees that all of QIANTU's obligations under this Agreement are conditional upon MULLEN satisfying its Payment Obligations as and when due under this Agreement and that QIANTU will have no obligation to incur any financial commitments or incur any such costs or expenses unless and until MULLEN's Payment Obligations are satisfied. If MULLEN fails to satisfy any Payment Obligation as and when due and the applicable cure period, if any, expires (except to the extent of a good faith, *bona fide* dispute relating solely to the invoice due), and MULLEN fails to pay such invoice (less any disputed amount that directly relates to that specific invoice), QIANTU may, at its election and in its discretion, suspend performance, terminate this Agreement, and/or otherwise exercise rights available to it under applicable law and this Agreement.

4.2    <u>Costs and Expenses</u>. MULLEN will pay to QIANTU, in accordance with the invoicing and payment procedures set forth in Article 4.4, the following costs and expenses ("<u>Costs and Expenses</u>, without duplication:

(a)     All Overhead and out-of-pocket costs and expenses reasonably incurred by QIANTU in connection with pre-launch development and launch work pursuant to Article 2.2(a), which will be on a mutually agreed "time and material" basis for salary, benefits, third-party vendor fees and costs, and reasonable and customary travel expenses and invoiced in accordance with Article 4.4. MULLEN and QIANTU have mutually agreed to a written budget for the pre-launch development costs to be incurred by QIANTU and a method to verify and pay for such estimated and final costs. The costs are estimated and described as set out in <u>Exhibit F</u>

16



hereto and may be adjusted to reflect changes in the assumed parameters set out therein from time to time upon the mutual written agreement of the parties.

(b)   All Overhead and out-of-pocket costs and expenses reasonably incurred by QIANTU with respect to inspection and testing of the assembly of Pre-Launch Vehicles, and other costs not accounted for in the estimated budget as described in Exhibit F and pursuant to Article 2.2(a)(iv). The parties have mutually agreed to the estimated costs for pre-launch development and launch work and a schedule for payment of such estimated costs by MULLEN, which is described in Exhibit F, but the parties understand that these estimates are not inclusive of all costs associated with pre-launch development and may be changed from time to time upon the mutual written agreement of the parties.

(c)   All Overhead and out-of-pocket costs and expenses reasonably incurred by QIANTU (i) at MULLEN's request pursuant to Article 3.1(e) and Article 3.2 (c)(ii), and (ii) to the extent allocated to MULLEN by the Operations Committee, all Overhead and out-of-pocket costs and expenses reasonably incurred by QIANTU on account of MULLEN-directed changes to the Specifications, the Bill of Materials, for nonrecurring increased costs of changes directed by MULLEN (including, without limitation, the cost of Production Materials on hand or under a non-cancellable order that become obsolete due to such changes, the cost of disposing all such obsolete Production Material, the cost to modify or replace applicable Mullen Tooling, and the cost incurred to modify the Vehicle Specifications and review MULLEN's modification of Assembly Processes necessary to accommodate the requested changes).

(d)   All out-of-pocket costs and expenses, including reasonable attorneys' fees, incurred by QIANTU in collecting payments not paid when due to QIANTU under this Agreement and/or incurred by QIANTU in enforcing its rights as a secured creditor.

**4.3   QIANTU Fees**

(a)   For each Vehicle Kit delivered pursuant to Article 3.1(c), 3.2(b) and 3.2(c)(i), MULLEN shall pay to QIANTU the applicable fee (the "QIANTU Fee"), the assumptions for the fee which are described in Exhibit B, and based on the Parties' understanding, as of the date of this Agreement, the costs to supply the Kits to the Territory for the intended purpose.

(b)   Adjustments to QIANTU Fee

(i)   The QIANTU Fee is based on the assumptions set forth in Exhibit B. The QIANTU Fee is subject to change based on variance between actual requirements and such assumptions and the final configuration of the Vehicle determined in accordance with this Agreement.

(ii)   The parties shall cooperate in determining the associated increase or decrease in costs. Such increases or decreases in non-recurring costs shall be paid and/or incurred as mutually agreed to by the Parties. Increases or decreases in recurring costs shall be compensated by adjustments in the fee set out in Exhibit B.



(iii)   The QIANTU Fee shall be subject to annual adjustment on or after January 1, 2022 and on January 1 of each year thereafter, the then-current QIANTU Fee will be increased or decreased as applicable by QIANTU, in consultation with MULLEN.

## 4.4   Invoicing and Payment

(a)   Invoices for Pre-Launch and Launch Costs and Expenses to be Mutually Agreed and Payable in Advance.  The parties have mutually agreed to the estimated pre-launch and launch Costs and Expenses as set forth in Exhibit F and as referred to in Articles 4.2(a) and (b) related thereto, which may increase/decrease from time to time as set forth herein.   MULLEN shall pay to QIANTU advance payments against the total estimated Costs and Expenses pursuant to the schedule set forth in Exhibit F and in the amounts described therein (the "Advance Cost and Expense Payment"). The Advance Cost and Expense Payments shall be made on or before the date set forth in the schedule in Exhibit F, with the exception that the initial Advance Cost and Expense Payment (July 1, 2019) shall be made within thirty (30) days after complete execution of this Agreement. For each Advance Cost and Expense Payment, QIANTU shall issue an invoice to MULLEN at least 30 days before the Payment due date in the amount set forth in Exhibit F. The amount of the invoice shall correspond to the payment schedule in Exhibit F, unless otherwise adjusted in accordance with this Article 4.4, as follows: Beginning January 1, 2020 and continuing thereafter, each invoice for an Advance Cost and Expense Payment shall be adjusted for any difference between the actual Costs and Expenses incurred during the second immediately preceding Payment period and the estimated Costs and Expenses set forth in Exhibit F for that same period  (for example, the January 1, 2020 Advance Cost and Expense Payment will be adjusted dollar for dollar based on  the difference between actual and estimated Costs and Expenses for the Payment period for which the initial Advance Cost and Expense Payment was made  (i.e., July 1 – September 30, 2019), unless a different date for adjustment is agreed in writing between the parties (the "Adjustment Period")). No later than sixty (60) days before any Advance Cost and Expense Payment is due, QIANTU shall provide MULLEN documentary evidence of all Costs and Expenses incurred by QIANTU during the Adjustment Period , and other supporting information as reasonably requested by MULLEN; thereafter, the parties shall agree to the difference between the estimated and actual Costs and Expenses and adjust the amount due for the next Advance Cost And Expense Payment.  For clarification, the reconciliation of any Adjustment Period shall be resolved in the second quarter after the relevant Adjustment Period (i.e. Costs and Expenses incurred in Q3 – 2019 shall be reconciled in the Payment for Q1, 2020; Q4 – 2019 shall be reconciled in the Payment for Q2 – 2020; Q1 – 2020 shall be reconciled in the Payment for Q3 – 2020; and so on.  The final quarter shall be reconciled within sixty (60) days after the end of the final quarter. The parties further agree that adjustments to the actual Costs and Expenses accrued during a relevant installment period shall be considered up to the day before the next Advance Cost and Expense Payment is due.  Any disagreement between the parties regarding the actual Costs and Expenses in an installment period shall not result in any suspension or delay of an Advance Cost and Expense Payment as set forth in Exhibit F, but the parties agree to work diligently to resolve any disputes regarding the actual and estimated Costs and Expenses in a timely manner.

18



(b)     <u>Invoices for Other Costs and Expenses Payable In Advance</u>. Consistent with the parties' mutually agreed budgets, QIANTU will provide a statement of work and estimated cost to MULLEN for all Costs and Expenses referred to in Articles 4.2 and the parties will agree on a related invoicing schedule before QIANTU enters into any binding obligation with respect thereto to cover Costs and Expenses not otherwise provided for in Article 4.4(a). QIANTU will issue invoices to MULLEN in an amount equal to the estimated exposure to QIANTU in making such commitment in accordance with the related invoicing schedule. For example, such invoice would include, but is not necessarily limited to, any required deposit and an amount equal to applicable cancellation cost. QIANTU will issue invoices to MULLEN for such estimated amounts in accordance with the related invoicing schedule. If the actual costs for such work differ from the estimated costs, MULLEN and QIANTU will reconcile the costs no later than 30 days after the actual costs are known with payment made by the appropriate party with respect to such difference.

(c)     <u>Invoices for Costs and Expenses Payable In Arrears</u>. QIANTU will accrue expenses actual Costs and Expenses and/or issue invoices for Costs and Expenses arising under Article 4.2 on a "pass through" basis in the amounts such Costs and Expenses were incurred by QIANTU.

(d)     <u>Invoices for QIANTU Fees</u>. QIANTU will issue invoices for QIANTU Fees upon acceptance of the Delivery Order as provided for in Article 3.2 (c) and shall be paid in accordance with the schedule described in Exhibit B, and subject to cancellation charges as provided for in Article 3.2 (c).

(e)     <u>Payment</u>.

(i)     For invoices that are issued to MULLEN pursuant to Articles 4.4 (b), unless otherwise specifically provided for herein, MULLEN will remit payment of all invoices issued by QIANTU to MULLEN within 15 days of the invoice date. MULLEN will pay all invoices in U.S. dollars via wire or other bank transfer of immediately available funds to an account specified by QIANTU. MULLEN will pay the undisputed amount of QIANTU's invoices in the full amount due regardless of any claim asserted by MULLEN against QIANTU. MULLEN hereby waives all rights of offset, deduction, and recoupment. MULLEN agrees that (i) QIANTU will have no obligation to incur any Costs and Expenses unless and until such Costs and Expenses have been fully agreed by MULLEN in accordance with this Article 4.4 and (ii) the impact of any delay caused by late payment will be borne solely by MULLEN. QIANTU will assure that all amounts owing to third party suppliers of Production Materials, QIANTU Tooling, Supplier Component Tooling and other goods and services provided by QIANTU (including MULLEN Tooling to the extent MULLEN purchases such tooling through QIANTU) are paid when due in accordance with the terms of the agreements with such suppliers. QIANTU will provide such supporting documentation as MULLEN may reasonably request.

(ii)    MULLEN will send invoices to QIANTU for costs payable by QIANTU under this Agreement (pursuant to Article 2.2(c), 3.1(d), 3.2(f), etc.) and QIANTU will remit payment of all invoices issued by MULLEN to QIANTU within 15



19

days of the invoice date. QIANTU will pay all invoices in U.S. dollars via wire or other bank transfer of immediately available funds to an account specified by MULLEN. QIANTU will pay the undisputed amount of MULLEN's invoices in the full amount due regardless of any claim asserted by QIANTU against MULLEN. QIANTU hereby waives all rights of offset, deduction, and recoupment. MULLEN will provide such supporting documentation reasonably requested by QIANTU and in accordance with Article 2.2(c).

**4.5** **Other Considerations**

    (a)   <u>Taxes</u>. Each party will be responsible for the payment of all federal, state and local taxes for which such party is legally responsible, based upon ownership of property, services performed, revenue or receipts received, or net worth, as determined by the applicable taxing authority. The parties will cooperate with each other to reduce or eliminate such tax obligations to the extent possible.

<h3 style="text-align:center">ARTICLE 5.   WARRANTY AND PRODUCT LIABILITY</h3>

**5.1** **MULLEN Warranty.** MULLEN agrees that it shall warrant to its Customers of the K50 Vehicle in the Territory that its assembly of the Vehicles will be free of defects in assembly workmanship and in accordance with the Assembly Standards (the "<u>MULLEN Warranty</u>"). It shall be in the form of a limited written warranty or other warranty allowed by applicable law and approved by MULLEN. The term of the MULLEN Warranty shall extend for a period of at least 36 months from the date the respective Vehicle is a Ready-to-Ship Vehicle, or the first 36,000 miles of use of the Vehicle, whichever shall first occur (the "<u>MULLEN Warranty Period</u>"). The exclusive remedy for any breach of the MULLEN Warranty shall be MULLEN's payment or reimbursement to QIANTU of the reasonable direct costs incurred by QIANTU for all Replacement Parts (and related parts shipping costs) and labor reasonably required to repair a defect covered by the MULLEN Warranty. Without limiting the foregoing, MULLEN shall not be responsible or have any liability for (i) damage to any vehicle, (ii) travel and/or towing expenses, or (iii) failure of or damage to any vehicle resulting from abuse or neglect (as jointly determined by MULLEN and QIANTU based on QIANTU presenting proof substantiating the root cause of the incident).

**5.2** **QIANTU Customer Warranties; MULLEN Support**

    (a)   QIANTU warrants that all Kits, Productions Materials, As-Required Materials and Replacement Parts will be free from defects, whether patent or latent, in design, materials and workmanship, and in compliance with this Agreement and the Specifications. QIANTU also will provide a Vehicle warranty to MULLEN and its Customers the same as QIANTU's China customer warranty, except to the extent an item is covered by the MULLEN Warranty, as well any any additional Vehicle warranties that QIANTU in its sole discretion may grant to MULLEN (collectively, "<u>QIANTU Warranty</u>"). The QIANTU Warranty may be assigned to the Customers. Such QIANTU Warranty may provide broader coverage or longer term coverage than the MULLEN Warranty (for example, the battery warranty is currently 8 years or 150,000 miles). QIANTU retains full financial and administrative responsibility and control with respect to such Customer warranties. QIANTU will be solely responsible for any costs or expenses that arise as the result of any warranty issued by QIANTU that exceeds the MULLEN Warranty. QIANTU will maintain

20



adequate warranty reserves (as determined with reference to generally accepted accounting principles) on its balance sheet with respect to such warranties.

(b) In connection with the QIANTU Warranty, QIANTU will obtain relevant field data (including component warranty costs) and other information with respect to Customer warranty claims. QIANTU will share relevant field data with MULLEN and MULLEN will provide such support as QIANTU may reasonably request in analyzing such claims

(c) MULLEN will maintain systems for collecting and administering warranty and claims data and will provide such data in written form to QIANTU as required for joint quality improvement activities or with respect to claims under the MULLEN Warranty and QIANTU Warranty as applicable.

**5.3**   **Product Liability**

(a) If MULLEN or any of its Affiliates and their respective officers, directors, employees, contractors, agents and representatives (collectively, "MULLEN Parties") is named as a defendant in a product liability lawsuit involving any Vehicle, QIANTU will indemnify, defend and hold harmless MULLEN Parties from and against all losses, damages and expenses resulting from such lawsuit except to the extent such losses, damages and, expenses were caused in whole or part by MULLEN Parties' failure to assemble the applicable Vehicle in accordance with the Assembly Standards, the Specifications, any defects in assembly workmanship, or contrary to any of the terms of this Agreement.

(b) If QIANTU or any of its Affiliates and their respective officers, directors, employees, contractors, agents and representatives (collectively, "QIANTU Parties") is named as a defendant in a product liability lawsuit involving any Vehicle, MULLEN will indemnify, defend and hold harmless the QIANTU Parties from and against all losses, damages and expenses except to the extent such losses, damages and expenses were caused in whole or part by the QIANTU Parties' negligent design of the Vehicle.

(c) For purposes of this Article 5.3, the term "product liability lawsuit" will mean any claim or demand, including a claim or demand made before a lawsuit is filed, asserted by a third party that seeks damages for death, bodily injury or property damage alleged to have been caused in any part by a defect in a Vehicle or in its Production Materials or any failure to warn.

(d) During the Term of this Agreement, and thereafter as provided herein, MULLEN will obtain a policy or policies of product liability insurance coverage in an amount and on such terms reasonably acceptable to QIANTU and naming QIANTU as an additional insured thereunder. The policy term will commence no later than the initial SOP Date and continue in full force and effect through 10 years after the date on which QIANTU delivers to MULLEN the last Vehicle Kit under this Agreement. QIANTU will have the right to review the terms of any such product liability insurance policy. MULLEN agrees that it will use its commercially reasonable efforts to maintain all such insurance coverage in full force and effect and will not make changes to such coverage, including the amount thereof or the named insureds thereunder, that could adversely affect QIANTU. MULLEN will

21



from time to time provide to QIANTU such information regarding such insurance coverage as reasonably requested by QIANTU. If, despite MULLEN's best efforts, MULLEN is unable to obtain or maintain such insurance, QIANTU will use its commercially reasonable efforts to assist MULLEN in obtaining or maintaining such insurance at MULLEN's expense, which efforts may include covering such risks under a policy of insurance obtained by QIANTU.

(e) QIANTU may maintain a policy or policies of product liability insurance coverage and, if feasible and at no cost to QIANTU, will name MULLEN as an additional insured thereunder. MULLEN will have the right to review the terms of any such product liability insurance policy. QIANTU agrees that it will use its best efforts to maintain all such insurance coverage in full force and effect and will not make changes to such coverage, including the amount thereof or the named insureds thereunder that could affect adversely MULLEN. QIANTU will from time to time provide to MULLEN such information regarding such insurance coverage as reasonably requested by MULLEN.

**5.4** **Indemnification Procedures.**  To the extent a party (the "Indemnitee") makes a claim against the other party (the "Indemnifying Party"), for indemnification in accordance with Articles 5.3, 8.3(e) or 8.3(f), Indemnitee agrees that the following will apply:

(a) The Indemnifying Party's indemnity obligations will be secondary to any applicable insurance coverage or indemnities from third parties. In addition, the Indemnifying Party's indemnity does not include any losses, liabilities, claims, or damages or expenses to the extent the same are determined in a final, non-appealable judgment of a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of Indemnitee.

(b) If the Indemnitee becomes aware of any claims, demands, actions, or proceedings for which it may seek indemnification, it must use its reasonable efforts in good faith to promptly notify the Indemnifying Party in writing of same; failure to provide such notice will only affect the Indemnifying Party's liability to the extent that the Indemnifying Party actually suffers damage or injury as a result of the failure to give such prompt notice. The Indemnifying Party after acknowledging its obligation to defend will have the right, at its expense, to assume the defense of such indemnified claims (retaining counsel of its choosing). If the Indemnifying Party thereafter fails to assume the defense of the indemnified claim within a reasonable period of time, the Indemnitee shall be entitled to assume control of such defense and the Indemnifying Party shall be bound by the results obtained by the Indemnitee with respect to the indemnified claim. The Indemnifying Party will not agree to any settlement of, or the entry of any judgment arising from, any third-party action without the prior written consent of the applicable Indemnitee, which consent shall not be unreasonably withheld, conditioned, or delayed; provided, however, that if such settlement (i) includes a written, unconditional release of such Indemnitee from any and all liability relating to or arising out of such third-party action, (ii) relates solely to monetary damages for which the Indemnifying Party has agreed in writing to indemnify in its entirety, and (iii) does not involve any finding or admission of any violation of legal requirements, then such consent shall not be required. If the Indemnifying Party elects to assume the defense of such matter, the Indemnitee may but is not required to engage, at its expense, separate counsel of its choice in connection with any matters to which the Indemnifying

22

Party's indemnification relates. Unless the parties agree to other arrangements, if a claim, demand, action or proceeding is made or commenced against both QIANTU and MULLEN arising from the same set of facts and circumstances, MULLEN shall assume the duty to defend and assume the defense thereof (retaining counsel of its choosing) with respect to both parties, and liability for costs and expenses, including without limitation legal fees and expenses, between MULLEN and QIANTU will be allocated between the parties based on their comparative fault of such claim, demand, action or proceeding or settlement thereof.

(c)     Indemnitee agrees that it must: (i) refrain from any action or inaction that may have a material adverse impact on the ability of the Indemnifying Party to defend such claim; and (ii) cooperate fully with and provide reasonable assistance to the Indemnifying Party with the defense of any claims made hereunder at the Indemnifying Party's cost and expense.  Such cooperation and assistance shall include the prompt provision to the Indemnifying Party of all available information regarding the circumstances giving rise to the claims and copies of any court notices and pleadings that may have been served with respect to such claims and furnishing the Indemnifying Party with any information or documentation and making available knowledgeable witnesses as the Indemnifying Party may request.

### ARTICLE 6.   TERM AND TERMINATION; DEFAULT; REMEDIES

6.1     **Term.**  The term of this Agreement ("Initial Term") shall commence as of the Effective Date and, unless terminated pursuant to this Article 6, shall continue in effect for 10 years thereafter. Upon either party gives written notice to the other party at least 180 days before the end of the then effective Term that it would like to extend the Term, and the other party giving written acceptance thereof, within 30 days of receiving such notice, the Term shall terminate on July 30, 2029. If, however, timely notice of an intent to extent and acceptance thereof has been provided, the Agreement shall extend for an additional 10-year term ("Renewal Term"). The Initial Term and any Renewal Term shall be collectively referred to as the "Term". The notifying Party must specifically identify and describe any changes, modifications, or additions (collectively, "Alterations") that it proposes for the Renewal Term. Unless and until the Parties mutually agree in writing to any Alterations proposed, the Term shall not be extended.

6.2     **Restrictive Covenant.**  Unless this Agreement terminates pursuant to either Articles 6.3 or 6.4, QIANTU agrees that for one-year following the termination of the Agreement for any other reason, it shall not enter into any agreement with any person or entity including without limitation, another contract manufacturer, assembler or distributor that would conflict with the rights or obligations of MULLEN in the Territory to grant rights or perform the same or similar services as those provided for by MULLEN in this Agreement.

6.3     **Early Termination.**  Either party may terminate this Agreement immediately by notice to the other party if, within ninety (90) days after the date on which such party has given written notice of the applicable circumstances and without incurring liability on account of such termination, the following occurs:

(a)     the other party is prevented from performing its material obligations under this Agreement for more than six (6) months due to an Event of Force Majeure and has

23

not complied with the obligations provided in Article 11.5 upon an occurrence of an Event of Force Majeure;

(b) the other party files a voluntary petition in bankruptcy, or if an involuntary petition in bankruptcy is filed against the other party and is not being contested in good faith, or if the other party is liquidated or dissolved;

(c) the other party has a Change in Control during the term of this Agreement that required prior approval under Article 11.3 and such prior approval was not obtained; or

(d) at any time during the homologation process, MULLEN and QIANTU mutually agree that they are unable or unwilling to make engineering changes to the Vehicle to comply with or obtain certifications and licenses under applicable law in the Territory after attempting to resolve disputes as required by Article 3.2(j).

6.4 **Early Termination by QIANTU**.  QIANTU may terminate this Agreement immediately and without incurring liability on account of such termination by delivering written notice to MULLEN after the occurrence of any of the following circumstances, which notice is given within ninety (90) days after the date on which QIANTU has actual notice of the applicable circumstances:

(a) MULLEN has defaulted in any of its Payment Obligations under this Agreement and fails to pay such amounts within thirty (30) days after receipt of notice by MULLEN specifying the amount due; provided, however, that in the event MULLEN disputes in good faith whether all of the applicable amounts in respect of the invoices to which the Payment Obligations relate are due and owing to QIANTU and MULLEN has timely paid to QIANTU all undisputed amounts under such invoices then due and owing to QIANTU under this Agreement, QIANTU may terminate pursuant to this Article 6.4(a) only after QIANTU submits the unpaid and disputed amounts to the dispute resolution process set forth in Article 9, and MULLEN thereafter fails to pay such amount determined by such dispute resolution process to be due within the time period specified by such dispute resolution process. For the avoidance of doubt, the dispute resolution process will not apply to any of the undisputed amounts that MULLEN fails to timely pay in accordance with this Agreement and QIANTU may exercise its rights immediately in accordance with this Article 6.4(a) without referral to such dispute resolution process; or

(b) MULLEN has defaulted in any of its obligations (other than Payment Obligations) under this Agreement that arise prior to the Initial SORP Date and fails to cure such failure within one hundred twenty (120) days after receipt of written notice by QIANTU specifying the nature of the default; provided, however, that if the default cannot be cured within such 120 day period, MULLEN may submit a plan to cure the default, and if such plan is acceptable to QIANTU, in the reasonable exercise of its discretion, the cure period shall be extended for the period required to cure the default set forth in such plan. Any agreed to extension shall be contingent on MULLEN taking affirmative and documented steps to cure the default within 30 days after the parties agree on a plan to cure the default, and MULLEN diligently and in good faith proceeding with curing the default in accordance with the plan; provided, that in the event MULLEN disputes in good faith whether a default has

24

occurred, QIANTU may terminate pursuant to this Article 6.4(b) only after conclusion of the dispute resolution process set forth in Article 9 with respect to such default; provided, further such default was not due to a material failure of QIANTU to perform its obligations under this Agreement; or

(c)     Except as provided in sub Article (a) above, after the Initial SORP Date, MULLEN defaults in any of its material obligations (other than Payment Obligations) under this Agreement and fails to remedy such default within 120 days after receipt of written notice by MULLEN specifying the nature of the default; provided, however, that if the default cannot be cured within such 120 day period, QIANTU may submit a plan to cure the default, and if such plan is acceptable to MULLEN, in the reasonable exercise of its discretion, the cure period shall be extended for the period required to cure the default set forth in such plan. Any agreed to extension shall be contingent on QIANTU taking affirmative and documented steps to cure the default within 30 days after the parties agree on a plan to cure the default, and QIANTU diligently and in good faith proceeding with t curing the default in accordance with the plan; provided, that in the event QIANTU disputes in good faith whether a default has occurred, MULLEN may terminate pursuant to this Article 6.4(c) only after conclusion of the dispute resolution process set forth in Article 9 with respect to such default; provided, further such default was not due to a material failure of MULLEN to perform its obligations under this Agreement .

**6.5    Early Termination by MULLEN.**

(a)     MULLEN may terminate this Agreement immediately and without incurring liability on account of such termination by delivering written notice to QIANTU after the occurrence and during the continuance of any of the following circumstances, which notice is given within ninety (90) days after the date on which QIANTU has actual notice of the applicable circumstances:

(i)     QIANTU has defaulted in any of payment of its obligations to pay or reimburse MULLEN pursuant to any invoices MULLEN has delivered to QIANTU in accordance with this Agreement or fails to refund any amounts to MULLEN in accordance with this Agreement, and fails to pay such amounts within thirty (30) days after receipt of notice by MULLEN specifying the amount due; provided, however, that in the event QIANTU disputes in good faith whether all of the applicable amounts in respect of such invoices or refund are due and owing to MULLEN and QIANTU has timely paid to MULLEN all undisputed amounts under such invoices or refunds then due and owing to MULLEN under this Agreement, MULLEN may terminate pursuant to this Article 6.5(a) only after MULLEN submits the unpaid and disputed amounts to the dispute resolution process set forth in Article 9, and QIANTU thereafter fails to pay such amount determined by such dispute resolution process to be due within the time period specified by such dispute resolution process. For the avoidance of doubt, the dispute resolution process will not apply to any such undisputed amounts that QIANTU fails to timely pay in accordance with this Agreement and MULLEN may exercise its rights immediately in accordance with this Article 6.5(a)(i) without referral to such dispute resolution process; or

(ii)    QIANTU defaults in any of its material obligations under this Agreement

25



and fails to remedy such default within one hundred twenty (120) days after such default has been called to its attention by written notice from MULLEN.

6.6 **Effect of Termination or Expiration.** Upon termination or expiration of this Agreement:

(a) MULLEN shall immediately cease all activities pursuant to this Agreement, including assembly of the Vehicles; provided, however, MULLEN may continue assembly of the Vehicles and other activities under this Agreement for a period of up to twelve (12) months after such date of termination or expiration in order to complete assembly of Kits then at the Assembly Facility or in transit at or from the China port, and to complete sale and delivery of such Vehicles to Customers;

(b) Each party will return to the other party all Confidential Information (as defined in the NDA) that is required to be returned to the other party under the terms of the NDA;

(c) Subject to QIANTU's performance of its obligations under this Article 6.6, MULLEN will:

(i) immediately pay to QIANTU all amounts due or to become due under any invoice that has been issued by QIANTU under Article 4.4 and all other financial obligations of MULLEN due to QIANTU under this Agreement; and

(ii) immediately take such other actions as may be reasonably required to accomplish an orderly winding up of the business relationship created by this Agreement.

(d) Subject to MULLEN's performance of all of its obligations pursuant to this Article 6.6, QIANTU will:

(i) immediately pay to MULLEN all amounts due or to become due under any invoice that has been issued by MULLEN under Article 4.4 and all other financial obligations of QIANTU due to MULLEN under this Agreement including without limitation any obligation to refund payments as described in Article 3.2(c); and

(ii) immediately cooperate with MULLEN in effecting an orderly wind down of the Vehicle assembly operations; and

(iii) immediately take such other actions as may be reasonably required to accomplish an orderly winding up of the business relationship created by this Agreement.

6.7 **Certain Obligations Continue.** The termination or expiration of this Agreement will not release either party from any liability for damages arising from the breach of this Agreement and will not release any then-existing Payment Obligations or amounts payable with respect to any period of time prior to the termination or expiration. Those provisions of this Agreement that by their meaning and context are intended to have continuing effect after the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement, including, without limitation, Articles 5

26



(Warranty and Product Liability) and 9 (Dispute Resolution) and Articles 8.1 (Nondisclosure), 8.3 (Intellectual Property), and 10.5 (Campaigns, Investigations and Recalls).

6.8     **Remedies**.

(a)     Subject to any limitations set forth in this Agreement, the parties' remedies under this Agreement shall be cumulative and in addition to any other remedies provided herein or by law or in equity. NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON OR ENTITY, INCLUDING, WITHOUT LIMITATION, ANY INVESTOR, CREDITOR OR SUPPLIER OF THE OTHER PARTY, FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, EXEMPLARY OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, FOR LOST PROFITS, LOST SALES, BUSINESS INTERRUPTION, LOST OR IMPAIRED INVESTMENT, DAMAGES BASED UPON ANY MULTIPLE, INJURY TO PROPERTY, OR INJURY OR DEATH TO PERSONS, REGARDLESS OF WHETHER SUCH DAMAGES ARISE DIRECTLY OR INDIRECTLY FROM THE DESIGN, ASSEMBLY, DELIVERY, SALE OR USE OF VEHICLES ASSEMBLED OR DELIVERED UNDER THIS AGREEMENT (AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES). THE FOREGOING LIMITATIONS SHALL APPLY TO ALL CLAIMS ASSERTED AGAINST EITHER PARTY OTHER THAN FOR INDEMNIFICATION PURSUANT TO ARTICLES 5.3 (PRODUCT LIABILITY), 8.3(e) AND (f) (INTELLECTUAL PROPERTY), AND 10.1 AND 10.2 (APPROVALS AND COMPLIANCE WITH LAW) OF THIS AGREEMENT AND OTHER THAN FOR FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, REGARDLESS OF WHETHER SUCH CLAIMS ARISE UNDER CONTRACT OR LAW (INCLUDING, WITHOUT LIMITATION, TORT, PRODUCTS LIABILITY, STRICT LIABILITY, AND CONTRIBUTION).

(b)     In the event of the expiration of this Agreement at the end of Term pursuant to Article 6.1 or the early termination of this Agreement pursuant to Article 6.3, , neither party will be liable to the other for compensation or damages; provided, however, that such expiration or termination of this Agreement will not release either party from any outstanding obligations to pay money accruing prior to such expiration or termination or from any obligations arising under Article 6.6 upon such expiration or termination.

(c)     In the event of the expiration or early termination of this Agreement the parties acknowledge and confirm that the performance of the parties' respective obligations under Article 6.6 shall not be delayed or withheld for any reason and such rights and obligations are independent of and are not conditioned upon the resolution of any claims arising out of termination.

## ARTICLE 7.   OTHER OBLIGATIONS OF THE PARTIES

7.1     **Program Managers**. MULLEN and QIANTU will each assign a program manager (each a "**Program Manager**"), who will coordinate their respective efforts and assume the following responsibilities:



(a) Conduct progress meetings and establish ongoing agenda, outlines, and procedures;

(b) Track the overall status (including all program costs) and performance of the parties' obligations under this Agreement and report the progress to their respective management; and

(c) Carry out such other responsibilities as the parties may mutually establish.

7.2 **Operations Committee.** MULLEN and QIANTU will each appoint three representatives to a committee which shall meet on a regular basis to review and, where specifically required by this Agreement, approve various issues related to Vehicle assembly, sales, warranty, modifications, mutually acceptable operating guidelines and similar issues (the "Operations Committee"). Members of the Operations Committee will report back to their respective company parties and each of MULLEN and QIANTU will make final decisions and sign any amendments to statement of work, scope of activities, Change Orders, this Agreement, etc.

7.3 **Access to Premises**

(a) Subject to the parties' respective rights and obligations under the Confidentiality Agreement, the Project Managers may arrange for appropriate employees and representatives of each party to have reasonable access to the premises of the other party for the purpose of carrying out their respective obligations under this Agreement. Such access shall be in accordance with customary industry practice and in a manner that avoids disruption of normal business activity of the other party. Such personnel will be subject to applicable security, safety, and other rules. For example, without limitation, when accessing either Party's physical locations and facilities for any reason, the visiting Party's personnel shall only enter areas of the location premises where they have been expressly authorized to go without an escort, unless otherwise accompanied by an authorized employee of the hosting Party.

(b) For the avoidance of doubt, QIANTU shall have reasonable access in accordance with the foregoing sub Article (a) to the Assembly Plant to inspect Vehicles in the process of assembly, Ready-to-Ship Vehicles, Inventory of Production Materials, and Mullen Tooling. MULLEN will also permit QIANTU to perform quality audits at the Assembly Plant, upon prior request and reasonable notice, and to perform such reasonable tests (including road tests) as QIANTU may deem appropriate for that purpose.

(c) As a condition to being granted access to MULLEN's property and facilities, QIANTU accepts full responsibility and assumes the risk of any and all injury to person or property as a result of, connected with, or arising out of, QIANTU and its employees being on MULLEN's property or in MULLEN's facilities. To the extent not prohibited by applicable law, QIANTU waives any claim against MULLEN and its Affiliates and their respective present and former directors, officers, shareholders, agents, representatives, employees, successors and assigns, that QIANTU may later have as a result of any and all injury to QIANTU, its employees or its property as a result of, connected with, or arising out of, QIANTU or its employees being on MULLEN's property or in MULLEN's facilities.

28



(d)     As a condition to being granted access to QIANTU's property and facilities, MULLEN accepts full responsibility and assumes the risk of any and all injury to person or property as a result of, connected with, or arising out of, MULLEN and its employees being on QIANTU's property or in QIANTU's facilities. To the extent not prohibited by applicable law, MULLEN waives any claim against QIANTU and its Affiliates and their respective present and former directors, officers, shareholders, agents, representatives, employees, successors and assigns, that MULLEN may later have as a result of any and all injury to MULLEN, its employees or its property as a result of, connected with, or arising out of, MULLEN or its employees being on QIANTU's property or in QIANTU's facilities.

**7.4     Records; Audit.**

(a)     The Parties will keep complete and accurate books and records relating to the Kits, QIANTU Fees, Production Materials, Costs and Expenses, Assembly and quality control records and other activities under this Agreement during the Term of this Agreement and the winding up of the business relationship created by this Agreement and for not less than seven (7) years thereafter in accordance with each party's respective record retention policies and procedures. Upon giving five (5) days prior notice, either Party and their representatives shall have the right to examine, audit and copy such books and records. The Parties shall make those books and records readily available during reasonable business office hours whether they are located at the facilities of the Parties, or other mutually agree location. In the event of a dispute between the Parties regarding amounts owing to the other Party under this Agreement, each Party will provide the other with records pertaining to the dispute, or extracts or summaries thereof; provided, however, that the Parties will have no obligation to disclose any record, or extract or summary thereof, that is determined in such Party's reasonable discretion to violate any condition of confidentiality, nondisclosure or privilege, or the disclosure of which would require either party to disrupt its normal business practices or disclose competitively sensitive information.

(b)     Document Control. Each Party agrees to maintain at a single location one copy in either electronic or paper form, of each of this Agreement, all Exhibits and attachments to this Agreement, and all invoices such party generates under this Agreement, together with all amendment and updates to any of the foregoing. Such copies shall be accessible to or retrievable by a Party during normal office hours in order to facilitate the timely handling of issues and questions that may arise between the Parties in connection with this Agreement.

**7.5     Continuous Improvement.**  The parties acknowledge that success in the automotive industry depends on continuously improving the product as measured by value to customers, quality, efficiency and cost. The parties agree that they will establish a joint continuous improvement process to drive improved value for MULLEN, QIANTU and the customer. QIANTU and MULLEN will develop a mutually agreeable process whereby price decreases that may be driven by this process will be shared by an agreed-upon ratio of contribution. In no event, however, will QIANTU incur responsibility for cost increases on account of continuous improvement activities conducted under this Article 7.5. If either party is not in agreement with the implementation or expected results of a joint continuous improvement process, the action will not be incorporated.



7.6   **Insurance.** MULLEN will maintain appropriate casualty, property and liability insurance, in favor of MULLEN as the named insured, insuring against any damage, loss or other claim affecting property of MULLEN or QIANTU in MULLEN's possession or under MULLEN's control, as the case may be, and used in connection with this Agreement (including, without limitation, Vehicles in process, Production Materials and Mullen Tooling). Notwithstanding the above, the liability insurance that MULLEN is required to provide under this Article shall not include products liability insurance for products produced under this Agreement. MULLEN will name QIANTU as an additional insured (with respect to liability insurance) and loss payee (with respect to casualty or property insurance), as its interest may appear, on all such insurance policies and will review such policies with QIANTU. MULLEN will promptly inform QIANTU as soon as it becomes aware of any material damage or loss to any property in the Assembly Plant, whether or not covered by insurance.

7.7   **Other Contract Assembly Programs.** QIANTU acknowledges and agrees that MULLEN may enter into additional contract assembly agreements with other third parties from time to time, provided that MULLEN will not enter into any such agreement that would interfere or conflict with MULLEN's performance of its obligations under this Agreement. In addition, MULLEN specifically agrees that it shall not use any parts, inventory, Kits, in whole or part, Production Materials, or other similar information or parts that are intended for use in assembling the K50 Vehicle.

**Buy America.**   MULLEN will use good faith efforts to maximize United States-manufactured content in facilities and performance of its obligations under this Agreement taking into account availability, cost, technical performance, reliability, efficiency, warranty coverage and related commercial terms.

### ARTICLE 8.   NONDISCLOSURE; INTELLECTUAL PROPERTY

8.1   **Nondisclosure.** MULLEN and QIANTU   have entered into a Mutual Nondisclosure Agreement, dated December 5, 2018 (the "NDA"), pursuant to which, among other things, they have undertaken obligations with respect to certain confidential information of the other Party, which includes certain information related to this Agreement. The Parties hereby ratify and confirm the NDA and its continued effectiveness in accordance with its terms; provided, however, that the terms of the NDA shall be modified for purposes of this Agreement, as follows: (a) the term "Business", as defined in the NDA shall include the relationships and transactions contemplated by this Agreement; (b) the conclusion, validity, interpretation, and performance of the NDA and settlement of disputes in connection therewith shall be governed by the laws of the State of California in accordance with the terms of Article 11.6 of this Agreement; (c) the NDA shall remain in effect and shall not terminate until this Agreement terminates and the obligation to maintain confidentiality shall endure for three years after termination; and (d) the Parties may disclose the "Confidential Information" (as defined in the NDA) of the other party to a supplier of Production Materials or Mullen Tooling to the extent necessary for their manufacture provided that Party making such disclosure obtains the written agreement of such supplier to provide for the protection of such Confidential Information for the benefit of the other Party on terms no less protective than those of the NDA, as modified by this Agreement.

8.2   **Press Releases; Public Announcements; Use of Party Names.** Each Party agrees not to use the other Party's name, likeness, images, brand, trademarks or copyrights in any



30

form of publicity, promotion, or to release to the public any information relating to the work to be performed hereunder, or to otherwise disclose or advertise that such other Party has entered into this Agreement, agreed to the rights and obligations herein, or entered into any business relationship for the sale of the K50 Vehicle in the Territory, except with the specific prior approval in writing of such other Party or as required by applicable laws. The Parties will mutually agree in advance as to the substance of any press release or other public communication to be issued by either Party with respect to this Agreement, the terms herein, or the promotion and sale of the K50 Vehicle in the Territory. Prior to the issuance of any such communication , no Party will issue any other press release, third party communication or make any other public announcement relating to the subject matter of this Agreement, the terms herein, or the promotion and sale of the K50 Vehicle in the Territory. without the prior written consent of the other Party. MULLEN agrees that in no event will MULLEN be represented to any creditor or investor in MULLEN as participating in any manner other than as an independent contractor as defined in Article 11.1. All uses of the other Party's names, likeness, images, brand, trademarks, logos, or copyrights must be approved in writing by the other Party in advance of any communication to the public in any media for any purpose. If MULLEN uses an assembled K50 Vehicle, or its images, for any promotional purpose to the public, it must obtain the prior consent of QIANTU in writing before such distribution. All rights provided to MULLEN herein are subject to the terms and conditions of Article 8.4.

8.3     **Intellectual Property.**

(a)     As between MULLEN and QIANTU, MULLEN acknowledges QIANTU's sole and exclusive ownership of all right, title and interest in all Intellectual Property existing prior to the date of this Agreement and owned or controlled by QIANTU. Subject to rights granted to MULLEN hereunder, as between MULLEN and QIANTU, MULLEN agrees that QIANTU is or will be the sole and exclusive owner of all right, title and interest in all Intellectual Property embodied in or related to the Vehicles, whether existing at the time of this Agreement, or resulting from or out of the parties' performance of their obligations in this Agreement. (including any of the technologies incorporated therein or related thereto, whether patented or not, and any trademarks, copyrights, or other rights of a similar nature that originate under any laws of any country), the QIANTU Tooling and the Specifications (including without limitation the Engineering Process Instructions) (collectively, the foregoing shall be referred to as "QIANTU Intellectual Property"), it being understood that the foregoing shall not include the MULLEN Intellectual Property regardless as to whether such is embodied in or related to the QIANTU Intellectual Property. For the sake of avoiding confusion, QIANTU Intellectual Property includes both existing intellectual property rights as described herein ("Background IP") and any technologies that are developed as a result of introducing the K50 Vehicle into the Territory, and any jointly developed intellectual property ("Foreground IP").

(b)     As between MULLEN and QIANTU, QIANTU acknowledges MULLEN's sole and exclusive ownership of all right title and interest in all Intellectual Property existing prior to the date of this Agreement and owned or controlled by MULLEN. As between MULLEN and QIANTU, QIANTU agrees that MULLEN is or will be the sole and exclusive owner of all right, title and interest in all Intellectual Property embodied in or related to the Assembly Processes, Assembly Standards and Aftermarket Parts (collectively, the foregoing shall be referred to as "MULLEN Intellectual Property"), it being understood that the foregoing shall not include the





QIANTU Intellectual Property regardless as to whether such is embodied in or related to the MULLEN Intellectual Property. Each party acknowledges the Assembly Processes will be used in the assembly of the Vehicles by MULLEN.

(c)   If either party, or any person employed by or working under the direction of either party as a result of this Agreement conceives or first reduces to practice: (a) any invention or any experimental, development or research activities, including engineering related thereto, whether or not patentable; (b) any reduction to practice of any subject matter, application or discovery which could be patented or copyrighted; or (c) any improvement in the design of the Vehicles or any alternative or improved method of accomplishing the objectives of the Agreement (collectively referred to herein as "Inventions"), such Inventions will be owned by QIANTU if such Inventions are related to or would fall within the definition of the QIANTU Intellectual Property and shall be deemed confidential and proprietary property of QIANTU, whether such Inventions or any portions thereof can be copyrighted or patented or not ("Jointly Developed IP"). The Parties will immediately disclose their contributions to all Jointly Developed IP. All Background IP, Foreground IP and Jointly Developed IP shall be part of and included within the term QIANTU Intellectual Property.

(d)   MULLEN will not directly or indirectly obtain, attempt to obtain, in any country or the Territory whatsoever, any right, title or interest, by registration, patent, copyright or otherwise, in or to any Intellectual Property embodied in or related to the Vehicles, the Specifications, and the Engineering Process Instructions, in each case, except for those items constituting MULLEN Intellectual Property. MULLEN's obligations to QIANTU under this Article 8.3 will survive the expiration or termination of this Agreement.

(e)   QIANTU agrees to indemnify, defend, and hold harmless MULLEN from and against any and all losses, damages, claims and expenses (including reasonable attorneys' fees) arising out of or relating to any claims, demands, or allegations asserted by a third party that MULLEN has infringed upon the Intellectual Property rights of such third party (i) on account of its use of Intellectual Property owned by QIANTU and provided to MULLEN by QIANTU under this Agreement; or (ii) on account of third party Intellectual Property embodied in or related to the Vehicles, the QIANTU Tooling and the Specifications. The Indemnification procedures in Article 5.4 shall apply to this Article 8.3(e).

(f)   MULLEN agrees to indemnify, defend, and hold harmless QIANTU from and against any and all losses, damages, claims and expenses (including reasonable attorneys' fees) arising out of or relating to any claims, demands, or allegations asserted by a third party that QIANTU has infringed upon the Intellectual Property rights of such third party on account of its use of Intellectual Property owned by MULLEN and provided to QIANTU by MULLEN under this Agreement to the extent that such Intellectual Property is embodied in, or used in connection with: (i) the assembly of the Vehicles that MULLEN delivers to QIANTU hereunder, or (ii) MULLEN's development, testing and procurement of Mullen Tooling in Article 2.2(c) except to the extent that the claim is based on, or is the result of, QIANTU's terms and specifications for such Mullen Tooling, whether in whole or in part. The Indemnification procedures in Article 5.4 shall apply to this Article 8.3(f).



32

**8.4     Quality Control.**

(a)     MULLEN shall faithfully and accurately reproduce the QUIANTU trademarks in such form and manner as used or approved by QIANTU and in accordance with this Agreement. To this end, MULLEN shall permit an authorized representative of QIANTU to inspect the use of the QIANTU trademarks from time to time, to make certain that the high quality image of QIANTU is maintained and that the use of such trademarks otherwise complies with the terms of this Agreement. The quality, appearance, style and use of the QIANTU trademarks shall be subject to the approval of QIANTU prior to any use of such trademarks by MULLEN, such approval not to be unreasonably withheld.  No changes with respect to the use of the QIANTU trademarks, as approved by QIANTU in accordance with this Article, shall be made without the prior written consent of QIANTU, such consent not to be unreasonably withheld.

(b)     All promotional material utilizing or tying in with the QIANTU trademarks shall be submitted for approval to QIANTU's Sales and Marketing Department, which will act in a timely manner. QIANTU and MULLEN agree and intend that all material, including without limitation all artwork and designs, created by MULLEN or any other person or entity retained or employed by MULLEN, and used with the trademarks of QUIANTU (the "Copyright Materials") are works made for hire within the meaning of the United States Copyright Act and shall be the property of QIANTU.  To the extent the Copyright Materials are not works made for hire or rights in the Copyright Materials do not automatically accrue to QIANTU, MULLEN irrevocably assigns and agrees to assign to QIANTU the entire right, title and interest in and to any and all rights, including all copyrights and related rights, in such Copyright Materials, which the MULLEN and the author of such Copyright Materials warrant and represent as being created by and wholly original with the author. Where applicable, MULLEN agrees to obtain any other assignments of rights in the Copyright Materials from the author or third parties to QIANTU.

(d)     MULLEN may not authorize, permit, or grant licenses to third parties to use the QIANTU Intellectual Property.

(e)     Third Party Infringements. QIANTU may, at its own expense, challenge all unauthorized uses of the QIANTU Intellectual Property or colorable imitations thereof and may prosecute infringers who may use or attempt to use the QIANTU Intellectual Property or any trademark confusingly similar thereto. MULLEN shall cooperate with QIANTU's activities in this regard by assisting with the prosecution of any such lawsuits, providing available evidence, and the like. In the event QIANTU finds it necessary to institute legal proceedings affecting the rights acquired by MULLEN under this Agreement, MULLEN may employ counsel at its own expense to assist QIANTU's effort.

(f)     Use of the QIANTU Intellectual Property. Use of the QIANTU Intellectual Property by MULLEN pursuant to this Agreement shall inure solely to the benefit of QIANTU. MULLEN acknowledges and agrees that the QIANTU Intellectual Property are the sole and exclusive property of QIANTU and that MULLEN shall not acquire any right, title, or interest in or to the QIANTU Intellectual Property as a result of this

33



Agreement, and that all use of the QIANTU Intellectual Property by MULLEN and all goodwill generated thereby inures to the benefit of QIANTU. MULLEN agrees to cooperate with QIANTU in the prosecution of any, patent, trademark or copyright application that QIANTU may desire to file for services or in the conduct of any litigation relating to the QIANTU Intellectual Property, trademark or Copyright Materials. MULLEN shall supply to QIANTU reasonable samples, advertisements, financial information, and similar material and, upon QIANTU's request, shall provide evidence, give testimony, and cooperate with QIANTU as may reasonably be required in connection with any such application. MULLEN agrees to assign any and all Intellectual Property applications (Federal or state) that it may have already filed for any of the QIANTU Intellectual Property referred to herein. QIANTU shall prepare the assignments at its own expense and MULLEN shall execute them and return them to QIANTU promptly. MULLEN shall not register any patents, trademarks or service marks, or copyrights which include the QIANTU Intellectual Property without the prior written consent of QIANTU.

## ARTICLE 9.   DISPUTE RESOLUTION

9.1   **Dispute Resolution Process**. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, or the threatened, alleged or actual breach of this Agreement by either party other than relating to a Payment Obligation (each a "Dispute") shall initially be referred to the Operations Committee for a resolution. After the Dispute is properly referred to the Operations Committee, and if a resolution has not been reached by 10 business days after the referral to the Operations Committee, the Dispute will be referred to the President or CEO of both parties for a resolution. Such President or CEO shall not be a member of the Operations Committee. Within 5 business days thereafter, the parties will meet and negotiate in good faith to reach a mutually agreeable resolution of the Dispute. If a resolution has not been reached by 15 business days after the referral to the President or CEO of both parties, thereafter, either party may exercise all rights and remedies under applicable law, including, without limitation, submitting such dispute to binding arbitration pursuant to Article 9.2, subject to the agreement of both parties.

9.2   **Arbitration**. If resolution has not been reached in accordance with Article 9.1, in addition to exercising any other rights or remedies available under applicable law, the parties may elect by mutual written agreement to resolve the Dispute by binding arbitration. Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre (SIAC) under the SIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The controlling law for resolution of any disputes herein shall be the law of the state of California, U.S.A. The seat of arbitration shall be Singapore. The number of arbitrators shall be one (1) and the proceedings shall be conducted in the English language.

Notwithstanding the foregoing, nothing in this Article 9.2 shall be construed to prevent either party from seeking injunctive or other interim relief or remedies in any court or other tribunal as such party deems appropriate pending arbitration, which shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.



34



9.3 **Other Remedies.** If all applicable time periods have expired under Article 9.1 and if the Dispute is not resolved pursuant to Article 9.1 or Article 9.2, the parties shall be free to exercise all rights and remedies under applicable law.

9.4 **Waiver of Jury Trial.** MULLEN AND QIANTU ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF MULLEN AND QIANTU, AFTER CONSULTING WITH COUNSEL OF ITS CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

### ARTICLE 10. APPROVALS AND COMPLIANCE WITH LAW

10.1 **Compliance with Law**

    (a) MULLEN will be in compliance in all material respects with applicable federal, state and local laws, regulations and codes in the performance of its obligations under this Agreement and otherwise with respect to the Vehicles, including, without limitation:

        (i) the federal Motor Vehicle Safety Act (49 U.S.C. § 30101 *et seq.*), and regulations promulgated and enforced under the Motor Vehicle Safety Act by NHTSA (49 C.F.R. Parts 500-599), including the Federal Motor Vehicle Safety Standards (49 C.F.R. Part 571); and

        (ii) the laws and regulations promulgated and enforced by the EPA, including Corporate Average Fuel Economy reporting as per 49 C.F.R. Part 537; and

        (iii) the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, *et seq.*);

        (iv) state and federal laws and regulations relating to Occupational Safety and Health;

        (v) any other applicable U.S. or foreign federal, state or local laws and regulations; and

        (vi) state and federal laws and regulations relating to Occupational Safety and Health.

    (b) QIANTU will be in compliance in all material respects with applicable federal, state and local laws, regulations and codes in the performance of its obligations under this Agreement and otherwise with respect to the Vehicles, including without limitation:

        (i) the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, *et seq.*); and

        (ii) any other applicable U.S. or foreign federal, state or local laws or regulations.

35



(c)    The parties will cooperate fully with each other in connection with their respective compliance obligations. Without limiting the foregoing, all Ready-to-Ship Vehicles will bear such markings and be labeled and packaged as reasonably specified by QIANTU, which specifications shall be in accordance with all applicable governmental regulations.

10.2    **Licenses and Approvals.**  The parties will maintain all federal, state, local and other approvals, licenses and permits necessary for the operation of their respective business and performance of their respective obligations under this Agreement.

10.3    **Manufacturer of Record.**  MULLEN will take all actions necessary to obtain designation as the "manufacturer of record" and otherwise submit information required of manufacturers of motor vehicles for all Vehicles assembled under this Agreement for purposes of laws or regulations administered by the NHTSA (including the Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act (49 C.F.R. Parts 573, 574, 576, and 579), the EPA, and CARB. MULLEN will submit all reports and filings required by NHTSA, EPA and CARB.

10.4    **Notice of Violation.**  Each party will notify the other of any actual, potential or alleged violations of any laws that may have a material adverse effect upon their respective ability to perform under this Agreement. Such notice will not relieve such party of any of its obligations under the Agreement or prejudice any recourse that the other party might otherwise have.

10.5    **Campaigns, Investigations and Recalls**

(a)    MULLEN assumes the liabilities and obligations as the "manufacturer" of the Vehicle as defined by the applicable government or regulatory agency, except to the extent of QIANTU's liability and obligations under Article 5.

(b)    MULLEN will represent and defend the interests of both QIANTU and MULLEN in connection with any requests for data or information, or any allegations or inquiries, from a government or regulatory agency, other than with respect to requests made directly to QIANTU.

(c)    MULLEN will submit to the applicable government or regulatory agency, all reports, notifications and data submissions required under any applicable law for the Vehicles.

(d)    In the event of a Field Service Action related to the Vehicles arising within the MULLEN Warranty Period that resulted from defects in assembly workmanship or failure to assemble in accordance with the Assembly Standards, MULLEN will be responsible for only the direct costs associated with the Field Service Action to the extent of MULLEN responsibility for the defect or failure to assemble in accordance with the Assembly Standards.

(e)    In the event of a Field Service Action related to the Vehicles arising outside the MULLEN Warranty Period:

(i)    If such Field Service Action involves a safety defect or noncompliance with a governmental standard or regulation and such defect or noncompliance

36



resulted from defects in assembly workmanship or failure to assemble in accordance with the Assembly Standards, MULLEN will be responsible for the direct costs associated with the Field Service Action to the extent of MULLEN responsibility for the defect or noncompliance.

(ii) If such Field Service Action does not involve a safety defect or noncompliance with a governmental standard or regulation and resulted from defects in assembly workmanship or failure to assemble in accordance with the Assembly Standards, MULLEN and QIANTU will consult with each other with respect to the degree of financial responsibility, need and advisability thereof; provided however, that the final decision as to whether or not to conduct a Field Service Action will rest with QIANTU.

(f) Each party agrees to immediately notify and cooperate fully with the other party in respect of all matters relating to any requests for data or information, and any allegations or inquiries, regarding safety defects or noncompliance with a governmental standard or regulation in respect of exchanging information, applicable data, etc.

(g) MULLEN shall have the right to represent itself in proceedings before the applicable government and/or regulatory agency in the event of an inquiry, investigation or other actions by such government or regulatory agency directed to MULLEN, notwithstanding any provision of this Agreement, and MULLEN, in consultation and cooperation with QIANTU, shall have the unfettered right to represent its interests and take all actions which it deems in its discretion appropriate in accordance with applicable law.

(h) In the event of any proceeding that may result in the imposition of a fine or penalty on MULLEN, in consultation and cooperation with QIANTU, shall have the unfettered right to negotiate and enter into agreements relating to such fines, penalties or related fees and costs.

## ARTICLE 11.  GENERAL TERMS

11.1   **Relationship of the Parties.**  MULLEN is an independent contractor engaged to perform the work contemplated by this Agreement. Neither this Agreement nor any transaction contemplated hereby will be deemed to establish a joint venture or a partnership among the parties. It is understood that neither party will have any authority to bind the other party by any contract, representation or otherwise.

11.2   **Representations and Warranties.**

(a)   <u>MULLEN's Representations and Warranties.</u>  MULLEN represents and warrants to QIANTU that (i) it has full power and authority to execute and perform its obligations under this Agreement; (ii) the execution and delivery of this Agreement by MULLEN does not, and the performance of this Agreement by MULLEN will not, conflict with or result in any breach of any provision of the organizational documents of MULLEN or any subsidiary, result in a violation or breach of any provision of, constitute a default under, give rise to a right of termination, cancellation or acceleration of any obligation or the loss of any benefit or creation of any other detriment under, or require any consent under, any material contract

37



of MULLEN or its subsidiaries, or violate any statute, law, ordinance, rule, regulation, judgment, decree, order, injunction, writ, permit or license applicable to MULLEN or any subsidiary or affiliate; (iii) no consents or approvals for the execution and performance of this Agreement are required on the part of MULLEN by any third party or governmental or regulatory authority; and (iv) MULLEN's employees, consultants, and representatives involved with the execution and performance of this Agreement are authorized to provide services for and act on behalf of MULLEN hereunder and in so doing are not in violation of any contract or arrangement with any third party.

(b)     <u>QIANTU's Representations and Warranties</u>.  QIANTU represents and warrants to MULLEN that (i) it has full power and authority to execute and perform its obligations under this Agreement; (ii) the execution and delivery of this Agreement by QIANTU does not, and the performance of this Agreement by QIANTU will not, conflict with or result in any breach of any provision of the organizational documents of QIANTU or any subsidiary, result in a violation or breach of any provision of, constitute a default under, give rise to a right of termination, cancellation or acceleration of any obligation or the loss of any benefit or creation of any other detriment under, or require any consent under, any material contract of QIANTU or its subsidiaries, or violate any statute, law, ordinance, rule, regulation, judgment, decree, order, injunction, writ, permit or license applicable to QIANTU or any subsidiary or affiliate; (iii) no consents or approvals for the execution and performance of this Agreement are required on the part of QIANTU by any third party or governmental or regulatory authority; and (iv) QIANTU's employees, consultants, and representatives involved with the execution and performance of this Agreement are authorized to provide services for and act on behalf of QIANTU hereunder and in so doing are not in violation of any contract or arrangement with any third party.

**11.3    <u>Assignment</u>.**

(a)     A party may not assign its rights and obligations hereunder without the prior written consent of the non-assigning party, except as provided in this Article 11.3.

(b)     No written approval will be required if a party is assigning this Agreement to its Affiliate, but the assigning party should provide advanced written notice of such assignment and the non-assigning party shall cooperate in memorializing the assignment.

(c)     A Change of Control shall be considered an assignment of this Agreement that requires prior approval of the non-assigning party. Notwithstanding the foregoing, MULLEN will not be required to obtain QIANTU's prior written approval in connection with a Change of Control of MULLEN if it is proposed to take place after the Initial Term and with an acquiring entity that at the time of such proposed assignment is not engaged in the development, manufacture or assembly or electric vehicles in substantial competition with the Vehicles then being Assembled under this Agreement.

(d)     In the event that either party intends  to assign this Agreement in an assignment that requires approval of the non-assigning party under this Agreement, it shall provide the non-assigning party written notice ("<u>Review Notice</u>") with a description

38



of the proposed assignment and the identity of the proposed assignee, at least 60 days prior to the proposed date of such assignment ("Review Period"). During the Review Period, the assigning party will cooperate fully and timely with all reasonable requests for information from the non-assigning party.

(e) Any purported assignment in violation of this Article 11.3 shall be null and void and, if the non-assigning party has not consented to a purported assignment such purported assignment shall also constitute the purported assignor's material breach of this Agreement in addition to being null and void.

(f) The Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

(g) Notwithstanding any other provision, QIANTU may not assign this Agreement to a "Prohibited Person", which means any person or entity (i) that is named on the most current list of "Specially Designated Nationals and Blocked Persons" maintained and published by the Office of Foreign Assets Control of the United States Department of the Treasury, (ii) that is subject to United States or multilateral economic or trade sanctions in which the United States participates; or (iii) that is owned or controlled by, or acting on behalf of, any governments, corporations, entities or individuals that are subject to United States or multilateral economic or trade sanctions in which the United States participates. Any such attempted or purported assignment shall allow MULLEN to immediately terminate this Agreement upon notice.

11.4 **Notices**. Any notice required or permitted to be given hereunder by any of the parties hereto shall be given in writing. Such notice shall be personally delivered or shall be sent to the address specified below (a) by mail, (b) by commercial courier service, or (c) by electronic mail. Notices will be deemed effectively given (x) in the case of notices given by electronic mail, on the day the notice is sent, and (y) in all other cases, on the date of actual delivery. Any party hereto may change its address or contact information for notice purposes at any time and from time to time by giving written notice of such change to the other party in the manner specified in this paragraph. Until so changed, notices shall be sent to the following individuals with authority to accept on behalf of each Party:

QIANTU:

Qiantu Motor (Suzhou), Ltd.
Attn: George Bei
Building 4, No. 1 Yard
Shijun North Rd.
Shunji District , Beijing
China
George.bei@ch-auto.com



MULLEN:

> Mullen Technologies, Inc.
> Attn: Frank McMahon
> 1405 Pioneer St.
> Brea, CA 92821
> fmcmahon@mullenusa.com

11.5    **Force Majeure.**  Any delay or failure of either Party to perform its obligations under this Agreement shall be excused (and shall not give rise to a claim by the other Party for damages or the right to terminate this Agreement other than in accordance with Article 6.3(a)) if such delay or failure to perform results from an event or occurrence beyond the party's reasonable control, and without its fault or negligence, including, without limitation, acts of God, fires, floods, windstorms, explosions, riots, natural disasters, wars, insurrections, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor, equipment or transportation, court injunction or order, or actions or restrictions imposed by any governmental authority after the date of this Agreement, whether valid or invalid, including the denial or cancellation of any export or other necessary license (in each case, an "<u>Event of Force Majeure</u>").  After an Event of Force Majeure, the affected party must (a) promptly notify the other party of the circumstances and their effect, (b) consult with the other party concerning suitable interim arrangements to be mutually agreed by the parties, (c) exercise due diligence to put in place a plan on steps to be taken to eliminate or remedy the cause of failure or delay within a reasonable period of time (not to exceed six months after the date that performance was required or expected) given the impact of the Event of Force Majeure, and provide such plan to the other party; and (d) continue performance as soon as reasonably possible after such cause of failure or delay is removed.

11.6    **Governing Law.**  This Agreement is a contract made under, and shall be governed by and construed in accordance with, the law of the State of California applicable to contracts made and to be performed entirely within such State and without giving effect to choice of law principles of such State.  The United Nations Convention on the International Sale of Goods is expressly excluded.

11.7    **Entire Agreement; Etc.**  This Agreement, including any Exhibits hereto, sets forth the entire agreement and understanding between the parties on the subject matter thereof, and merges all prior discussions and negotiations among them with respect thereto.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the parties, or in the case of a waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege under this Agreement, nor any course of dealing in connection therewith, will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Subject to any limitations set forth in this Agreement, the rights and remedies provided in this Agreement will be cumulative and not exclusive of, and are in addition to, any rights or remedies provided by law or otherwise. If one or more of the rights or obligations under this Agreement will be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining rights and obligations will not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in one jurisdiction will not affect the validity, legality or enforceability of such rights and obligations under this Agreement in any other

40



jurisdiction.  To the extent of any conflict between the terms set forth in the body of this Agreement and the Exhibits hereto, the terms set forth in the body of this Agreement shall control.  This Agreement may be executed in any number of separate counterparts by the parties and each of which when so executed will be deemed to be an original and all of which counterparts taken together will constitute one and the same instrument.

*[The remainder of this page has been intentionally left blank.]*

41



IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their authorized representatives as of the day and year first above written.

**QIANTU MOTOR (SUZHOU) LTD.**

By: _____

Name: __Lu Qun__

Title: __Chairman__

**MULLEN TECHNOLOGIES, INC.**

By: _____

Name: __DAVID MICHERY__

Title: __CEO__

**QIANTU MOTOR  USA, Inc.**

By: _____

Name: __Lu Qun__

Title: __Chairman__

42



**<u>EXHIBIT A</u>**

**[LEFT BLANK]**



## EXHIBIT B

### *QIANTU Kit Fee Assumptions*

1. The Qiantu Fee for the K50 Vehicle Kit is estimated to be US$80,999.00 FOB China port. The Fee is based on the current costs of raw materials and manufacturing costs experienced by Qiantu within its assembly plant in China, with assumptions of engineering changes to be made to the Territory as provided in this Agreement. The final Qiantu Fee cannot be determined and mutually agreed until after the Parties complete the homologation of the Vehicle.

QIANTU Fee Schedule

1. Within 3 business days of Acceptance of a Delivery Order, MULLEN will issue payment fo 50% of the QIANTU Fee for each Vehicle Kit ordered and accepted by QIANTU (the "Advanced Fee Payment").

2. Simulateously with making the Advanced Payment, MULLEN shall obtain an irrevocable Letter of Credit from a US based bank approved by QIANTU in a form and under terms and conditions mutually agreeable to the Parties for the remaining balance of the QIANTU Fee ("LOC").

3. Upon delivery of a Vehicle Kit/s to the designated facility at a mutually agreeable seaport in China, and before release of the Vehicle Kit, MULLEN shall cause to be approved payment of 35% of the QIANTU Fee.

4. After arrival of the Vehicle Kit in the Territory, and upon clearance of the goods from the applicable customs and border patrol, MULLEN shall cause to be approved payment to QIANTU of the balance of the QIANTU Fee (15%) within 60 days after clearance from customs at the port of entry. MULLEN shall cooperate in providing QIANTU with applicable customs and entry documents to confirm the date that the Vehicle Kits entered the Territory.

## **EXHIBIT C**

### *Assembly Guidelines*

QIANTU and MULLEN mutually agree to make  addendum during the homologation phase to this Cooperation Agreement.





### **EXHIBIT D**

#### *Initial Purchase Order*

*TO BE INCLUDED AFTER EXECUTION*

## EXHIBIT E

QIANTU and MULLEN mutually agree to make addendum during the homologation phase to this Agreement



## EXHIBIT F

### *Estimated Homologation, Engineering Development, Pre-Launch and Launch Costs for QIANTU and MULLEN*



The work scope for QIANTU includes, without limitation, as listed below:

- K50 homologation gap analysis
- Engineering developments and system/components changes to bring K50 to meet all of US regulations as homologation required
- Tooling and manufacture fixture changes. System and component calibration, certification and validations
- Build engineering prototype and validation test vehicles (up to 25 units)
- Components development and verifications
- K50 homologation (in US) include to contract third party to conduct the testing, analysis, and reports
- SKD package engineering development and tryout
- Manufacture engineering support and guidance to assist Mullen to build assembly plant in US in order to assemble K50 in US
- Marketing and brand team support and guidance





- After sales supporting, field investigation, dealer training and spare parts management

Payment schedule:  The parties have agreed to the estimated pre-launch and launch costs, which shall be reimbursed by MULLEN as set forth according to this schedule and Article 4:

## Estimated Expenses and Costs and schedule for payment

Budget and Payment Schedule

| Contents | Subtotal | | 2019 | | 2020 | | | | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| | Cost | % | Q3 | Q4 | Q1 | Q2 – Apr. 1st | Q3 – July 1st | Q4 - Oct. 1st | Q1 - Jan. 1st |
| Payment Receive Date | | | July 1st, 2019 | October 1st, 2019 | January 1st, 2020 | April 1st, 2020 | July 1st, 2020 | October 1st, 2020 | January 1st, 2021 |
| Gap Analysis | 372,070.00 | 0.4% | 372,070.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Engineering Development Proposal | 2,455,791.06 | 2.7% | 924,212.40 | 1,531,578.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Engineering Development Testing & Validation | 17,236,220.57 | 18.6% | 630,000.00 | 3,995,000.00 | 4,770,312.97 | 5,128,047.69 | 2,383,859.91 | 315,000.00 | 14,000.00 |
| Tooling Development | 53,824,534.83 | 58.1% | 1,693,144.00 | 12,393,640.83 | 14,915,000.00 | 8,580,000.00 | 7,224,000.00 | 5,018,750.00 | 4,000,000.00 |
| Homologation | 13,568,022.54 | 14.7% | 55,000.00 | 935,000.00 | 3,588,025.34 | 6,317,101.34 | 1,415,000.00 | 748,644.00 | 509,251.86 |
| Qiantu Manufacturing | 2,593,872.43 | 2.8% | 0.00 | 305,000.00 | 1,237,000.00 | 369,000.00 | 332,806.26 | 249,312.97 | 100,753.20 |
| Aftersales | 360,400.00 | 0.4% | 0.00 | 0.00 | 10,000.00 | 70,000.00 | 90,000.00 | 90,000.00 | 100,400.00 |
| Mullen Plant Supports | 2,170,400.00 | 2.3% | 0.00 | 0.00 | 0.00 | 220,000.00 | 540,000.00 | 770,000.00 | 640,400.00 |
| Total | 92,583,311.43 | 100% | 3,674,426.40 | 19,160,219.49 | 24,524,338.30 | 20,684,149.03 | 11,985,666.17 | 7,191,706.97 | 5,364,805.07 |
| | | 100% | 4% | 21% | 26% | 22% | 13% | 8% | 6% |









350 S. MAIN STREET, SUITE 300
ANN ARBOR, MI  48104
TELEPHONE:  734-623-7075
FACSIMILE:  844-670-6009
http://www.dickinsonwright.com
MARK V. HEUSEL
MHeusel@dickinsonwright.com
734-623-1908

September 1, 2019

**VIA E-MAIL**

Frank McMahon
fmcmahon@mullenusa.com
Mullen Technologies, Inc.
1405 Pioneer Street
Brea, CA 92821

Re:   Event of Default of Sections 4.2 and 4.4 of the Exclusive Cooperation and
Vehicle Assembly Agreement

Dear Mr. McMahon:

As you may know, I serve as General Counsel to Qiantu Motor (Suzhou), Ltd and Qiantu Motor USA, Inc. (together, "Qiantu") in the United States.  I am writing you with respect to Mullen Technologies, Inc.'s ("Mullen") recent default in failing to make the first installment payment towards the pre-launch "Costs and Expenses" described in Sections 4.2 and 4.4 of the Exclusive Cooperation and Vehicle Assembly Agreement (the "Agreement"). As provided for in Sections 4.2 and 4.4, Mullen agreed to pay Qiantu for its budgeted pre-launch "Costs and Expenses" for this project in accordance with Exhibit F to the Agreement in regular intervals as described in Section 4.4.  Pursuant to Section 4.4(a) the first installment of these Costs was to be made "within thirty (30) days after complete execution of this Agreement." The Agreement was entered into and became effective on July 30, 2019, thus requiring Mullen to make its initial payment for pre-launch Costs and Expenses no later than August 30, 2019.  As agreed to by the parties, Qiantu submitted its first invoice in the amount of $3,674,426.40 on August 1, 2019, requiring

Frank McMahon
August 31, 2019
Page 2

DICKINSON WRIGHT PLLC

that payment be made no later than August 31, 2019.  As of today, payment on this invoice was not made as required by the Agreement

Please accept this letter as notice pursuant to Section 6.4(a) that Mullen is currently in default of its Payment Obligations under the Agreement for its failure to pay $3,674,426.40 on or before the date provided for in Section 4.4 (*i.e.,* August 31, 2019). This is an undisputed amount and payment shall be forthcoming in accordance with this Agreement. In no event shall Mullen's failure to pay this amount exceed 30 days after the date of this letter.

Your attention to this matter is urgently required in order to cure this default. Failure to do so in a timely manner may result in Qiantu exercising further rights under the Agreement.  We trust this will not be necessary.  Nonetheless, it is disappointing that Mullen is already in breach of an Agreement that it signed just over one month ago. Therefore, I suggest you rectify this situation as soon as possible.  Qiantu reserves any and all other rights it may have under the parties' Agreement, whether expressly stated herein or not.

Sincerely,

Mark V. Heusel
Senior Partner
Dickinson Wright, PLLC