**To:**   David Michery[dmichery@aol.com]
**Cc:**   Calin Popa[cpopa@mullenusa.com]; Frank McMahon[fmcmahon@mullenusa.com]; Mark V. Heusel[MHeusel@dickinson-wright.com]; David Michery[david@mullenusa.com]; Weiping Zou[wzou@mullenusa.com]; Larry Hata[lhata@mullenusa.com]; Jerry Alban[jalban@mullenusa.com]; Jason Putnam[jputnam@carhub.com]; luqun 陆群[luqun@ch-auto.com]; jiagang 贾罡[jiagang@qiantumotor.com]
**From:**   George.Bei[/O=CH-AUTO/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=90DC8173FC1143DAA2CEBAC71983B4D3-GEORGE.BEI]
**Sent:**   Wed 9/4/2019 3:24:20 PM (UTC)
**Subject:**   Re: Qiantu / Mullen Exclusive Cooperation and Assembly Agreement

David,
Thank you for replying my email promptly. After the payment over due, Qiantu K50 Mullen team has been on idle and all of homologation works have been postponed. We would like to know the timing so that we will react the situation accordingly. Thanks,

  Best Regards,

# George Bei

贝刚

President - CH-AUTO Overseas Division
CEO - QIANTU Motor USA
_____

Tel: 1 (248) 826 7627
    +86 139 171 90357
Email: george.bei@ch-auto.com
Website: www.ch-auto.com
         www.qiantumotor.com



On Sep 4, 2019, at 9:39 PM, David Michery <dmichery@aol.com> wrote:


George, I spoke to Chairman Lu on the 30th of August. We are working with our bankers to deliver the payment due pursuant to the payment schedule. As for your letter, we will have our legal counsel respond accordingly, regards. David Michery

On Sep 4, 2019, at 6:18 AM, George.Bei <George.Bei@ch-auto.com> wrote:

    Calin and Frank,
    Since your company has failed to pay the first payment, we have not received any email from you to update your position and the payment status yet. Can you reply the email to provide the process and status of the payment? We need to know the situation and your remediation plan. Thanks,

Best Regards,

# George Bei

贝刚

President - CH-AUTO Overseas Division
CEO - QIANTU Motor USA
_____
Tel: 1 (248) 826 7627
      +86 139 171 90357
Email: george.bei@ch-auto.com
Website: www.ch-auto.com
            www.qiantumotor.com

\<UNADJUSTEDNONRAW_thumb_48c4.jpg\>
\<UNADJUSTEDNONRAW_thumb_48c5.jpg\>

Begin forwarded message:

**From:** "Mark V. Heusel" \<MHeusel@dickinson-wright.com\>
**Subject: Qiantu / Mullen Exclusive Cooperation and Assembly Agreement**
**Date:** September 1, 2019 at 10:59:31 PM GMT+8
**To:** Frank McMahon \<fmcmahon@mullenusa.com\>
**Cc:** 'George.Bei' \<George.Bei@ch-auto.com\>

Mr. McMahon,

Attached please find Qiantu's Notice of Default.

**Mark V. Heusel** Practice Group Chair - Intl & Regional Practices

350 S. Main Street
Suite 300
Ann Arbor MI 48104

\<image922d54.JPG\>

\<imagee7ae8c.JPG\>

Phone  734-623-1908
Mobile  734-730-1758
Fax     844-670-6009
Email   MHeusel@dickinsonwright.com

\<imagec713c1.JPG\>

The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail.

Neither this transmission nor any attachment shall be deemed for any purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.

<ANNARBOR-#264803-v1-Notice_of_Default_to_Mullen_-_September_1__2019.pdf>

**From:** luqun 陆群 <luqun@ch-auto.com>
**To:** David Michery <david@mullenusa.com>
**Cc:** George.Bei <George.Bei@ch-auto.com>, "Mark V. Heusel" <MHeusel@dickinson-wright.com>
**Subject:** 回复：Mullen proposal
**Sent:** Thu, 12 Sep 2019 03:06:37 +0000

Dear David,

I have received your email and knew your situations. I did not gain the confidence from your email that we can execute the contract with the payments on time. It is not we expected that you promised to provide a $200 millions security money for K50 into US market when we first met in November 2018. It seems you have to relate on your investors to pay the homologation cost. We can not accept to renegotiate the contract with your payment proposal. Failed to make the payments following the payment schedule by the agreement required will result Qiantu is considering to terminate the contract. My suggestion is:

I would like to delegate to our US lawyer Mark Heusel and US representative George Bei to be involved in learning more about the information you shared. I think it is important that they meet in person with your bankers and to attend your meetings in Washington DC this month. Please contact with George to arrange this.

Work with our US lawyer Mark Heusel and our US representative George Bei to make the first delayed payment and ensure the following payment on time.


Best Regards,

# Lu Qun



发自我的华为手机



-------- 原始邮件 --------
发件人：David Michery <david@mullenusa.com>
日期：2019年9月11日周三 中午12:38
收件人：luqun 陆群 <luqun@ch-auto.com>
主 题：Mullen proposal


Good morning Chairman Lu.


This email is in response to the conversation we had regarding the payments due to Qiantu Motors pursuant to Exhibit F - Article 4 the payment schedule, for US homologation of the Qiantu K-50.
First, let me start by apologizing for the delay in the timing of payments to Qiantu.

Exhibit K
Page 123

To clarify our current position and reiterate what I have stated previously. Mullen is currently engaged in a private equity round with several FINRA regulated bankers. Those bankers are Westpark Capital, Think Equity and Boustead Securities, all of which have been engaged in the capital raise over the last 180 days.

As of today's date the bankers are finalizing investments both debt and equity as part of the private equity around into Mullen. Those funds will be utilized for the first and second payments to Qiantu, as well as other commitments Mullen has made.

In an effort to make you feel comfortable, I propose a conference call between you, myself and all the bankers participating in the private equity round, to give you timing of funds, as well as reassure you of our capability to perform pursuant to our commitments made to Qiantu regarding the K 50 project.

Additionally between September 26 and September 27, 2019 Mullen will be on Capitol Hill in Washington DC., meeting with various division's within the United States Government.

As you know we are working towards a substantially complete application with the United States Department of Energy, which will net Mullen US$450 million. We are also working with K&L Gates LLP on an (OZ) opportunity zone fund which will net Mullen US$150 million, all of which will come in this year and will be used for the homologation, assembly facility and all required expenses to get the K 50 to market.

We will be with The House of Representatives while in  Washington DC, meeting with several  Congressional Appropriation Committee's.
We will also sit with the State of Washington Governor Jay Inslee's office on the 1.3 million square-foot facility we will go vertical on to support the K-50, in the city of Spokane.

We will also be sitting with Farouk Ophaso (majority) and Angie Giancarlo (minority) leaders.

Lastly, we will be at the White House with the White House administration going over all our plans.
I will assure you Mullen will meet all its financial commitments to Qiantu.

All I ask, is that you are patient with us and give us the bandwidth to get all of this done in a timely manner. I would like to propose, with the upmost of respect to you, the following plan.

Please see Exhibit F – Article 4 payment schedule terms.

In lieu of current financing status I am proposing the following plan be submitted and reworded by our collective legal teams.

The first payment originally due July 1st for roughly $3.7M be pushed to October 1st, 2019.
The second payment originally due October 1st for roughly $19M be pushed to post IPO date of February 1st, 2019.
The third quarterly payment due January 1st , 2020 be moved to April 1st.

All payments thereafter be pushed out B-O from the original schedule

Again –  I am looking for any possible solution in keeping you happy and managing Qiantu's expectation.

I look forward to your favorable response.

Sincerely.
DAVID MICHERY
CEO
Mullen Technologies, Inc.
1405 Pioneer Street, Brea, CA 92821
Work: 714-613-1900
Cell: 562-565-9967
david@mullenusa.com
www.mullenusa.com
This e-mail message may contain confidential and/or privileged information. If you are not an addressee or otherwise authorized to receive this message, you should not use, copy, disclose or take any action based on this e-mail or any information contained in the message. If you have received this material in error, please advise the sender immediately by reply e-mail and delete this message.

WILLIAM L. MILTNER

WALTER E. MENCK

ROBERT C. HARVEY

AUTUMN S. FRYE

MONICA PADILLA

# MILTNER
# & MENCK, APC

EMERALD PLAZA
402 W. Broadway
Suite 800
San Diego, CA 92101
(619) 615-5333
(619) 615.5334 Fax

WWW.MILTNERLAW.COM

September 20, 2019

Mark V. Heusel
Dickinson Wright, PLLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104

**Re:** **Exclusive Cooperation and Vehicle Assembly Agreement**

Dear Mark,

By introduction, the undersigned has been retained by Mullen Technologies, Inc. in connection with a current dispute between it and Qiantu Motors USA, Inc. ("Qiantu") arising from the Exclusive Cooperation and Vehicle Assembly Agreement ("ECVAA") executed by the parties. Be further advised that I am in receipt of your correspondence dated September 1st, 2019 and this shall serve to respond to the same.

Initially, be advised that my client intends to fully perform all its obligations under the ECVAA. As with any new venture such as this one, there are complicating factors that can impact the respective parties ability and mutual intent to reach the final goals contemplated by the ECVAA.

As Qiantu has been advised over the past few weeks by Mullen, they have already expended tens of millions of dollars in working capital moving this project forward, but before they continue with the payment of all of the Homologation, Engineering Development, Pre-Launch and Launch costs contemplated in Exhibit F to the ECVAA, they need reasonable assurances that those costs are being expended and will require verification of the same. As I am sure you are aware, that is contemplated by the ECVAA, and is specifically addressed in Paragraph 4.4 of the Agreement. To date, Mullen has not received confirmation of the actual expenses of Qiantu.

Mr. Michery has been abundantly transparent about Mullen's efforts to obtain the requisite approvals from the appropriate governmental agencies, and in that regard, has currently scheduled meetings with members of the U.S. House of Representatives, the White House staff, and the Governor of Washington later this month in order to obtain the remainder of the requisite approvals to ensure the success of both Mullen and Qiantu going forward. Your client's representatives have been invited to attend those meetings in Washington DC and Olympia, Washington. Obviously, the financing to complete this project is contingent on the same.

Exhibit L
Page 126

MILTNER & MENCK, APC
Mark V. Heusel
Dickinson Wright, PLLC
July 31, 2019
Page 2

     Please make no mistake. Mullen is fully committed to this project. They remain ready, willing and able to facilitate their obligations under the ECVAA, but are requesting a modification of the payment schedule called out for in Exhibit F to ensure the success of the project. In that regard, my client is prepared to immediately wire the $3,674,426.40 to your client's account upon execution of an appropriate amendment to facilitate the future success of the project.

     If this is not an acceptable agreement, then we need to follow the letter of the Dispute Resolution provision of the ECVAA, which is called out for in Article 9. In that regard, please advise as to when an appropriate reference to the Operations Committee ( as defined in Section 7.2 ) can be conducted.

     As I am sure you are aware, if that is unsuccessful and after a period of 10 day, the dispute is then referred to the respective President and/or CEO of the Companies. The parties are require to meet within 5 days to attempt to resolve the dispute. If a resolution is not reached, then after the passing of 15 days, then and only then, the parties are entitled to commence proceedings for Binding Arbitration pursuant to Section 9.2 of the ECVAA.

     In the interim, it would be in all parties best interests to attempt to reach an appropriate and mutually beneficial resolution to move this dispute forward. In that regard, we would request that all parties refrain from making veiled threats of potentially damaging press releases, and disparaging social media references, which could result in extraordinary damages.

     As stated, we look forward to working through these issues with your client and moving the joint venture between our parties forward.

     As time is of the essence, your earliest response would be greatly appreciated.

Sincerely,

MILTNER & MENCK, APC

By: _____
William L. Miltner, Esq.

Exhibit L
Page 127



350 S Main Street, Suite 300
Ann Arbor, MI 48104-2131
Telephone (734) 623-7075
Facsimile (844) 670-6009
http://www.dickinsonwright.com

Mark V. Heusel
MHeusel@dickinsonwright.com
(734) 623-1908

September 24, 2019

Via Email to:
bill@miltnerlaw.com

William L. Miltner
Miltner & Menck APC
402 W. Broadway, Suite 800
San Diego, CA 92101

Re: **Exclusive Cooperation and Vehicle Assembly Agreement**

Dear Mr. Miltner:

I am in receipt of your letter dated September 20, 2019, and I have spoken with my clients regarding this matter. As you undoubtedly know, on September 1, 2019, and acting on behalf of Qiantu Motor (Suzhou), Ltd. and Qiantu Motor USA, Inc. (together referred to as "Qiantu"), I provided Notice of Mullen Technologies, Inc.'s ("Mullen") default for failure to pay the first invoice provided by Qiantu for pre-launch costs. As my letter first indicated, it is Qiantu's expectation that Mullen, under no exceptions, cure this default by the date set forth in the parties' Exclusive Cooperation and Vehicle Assembly Agreement ("Agreement"), which is October 1, 2019. Notwithstanding your letter of September 20, Qiantu's expectations have not changed, and it fully expects that Mullen pay this invoice by the cure date. If Mullen refuses to do so, Qiantu will have no choice but to exercise any and all rights it possesses under the Agreement including, but not limited to, termination as provided for in Section 6.4(a).

While Qiantu is not unsympathetic to what may be a challenging fundraising environment for Mullen, I should point out that Mullen and its senior leadership on numerous occasions assured Qiantu that it had funding in place to carry through its pre-launch obligations. Candidly, to now default on the very first invoice, literally within weeks after signing the Agreement, is perplexing and reveals problems that were not made known to Qiantu over the last year. At this point, there exists a crisis of confidence in any further representations from your client without real evidence of ability to perform and actual delivery on its contractual obligations.

The fact that you acknowledge Mullen possesses the money to pay this invoice, but now expects Qiantu to verify its costs, is also perplexing and a similar distraction. Let me remind your client that the invoice, which it failed to pay, was a fixed amount based on the parties' Agreement as set forth in Exhibit F of the Agreement. My client is under no obligation to provide you verification of this amount as a condition precedent to receiving payment. The

ARIZONA     CALIFORNIA     FLORIDA     KENTUCKY     MICHIGAN
NEVADA     OHIO     TENNESSEE     TEXAS     TORONTO     WASHINGTON DC

DICKINSON WRIGHT PLLC

William L. Miltner
September 24, 2019
Page 2

parties agreed to the payment schedule attached as Exhibit F, and Qiantu fully expects Mullen to pay the amount invoiced in accordance with the parties' Agreement and their negotiated budget.

Regarding your statement that Mr. Michery has been "abundantly transparent" about Mullen's efforts to raise additional funds through government programs, my client could not disagree with this point more definitely. Only recently was my client informed that Mullen was scheduled to meet in Washington, D.C. and, to this date, it has never been invited to these meetings. In fact, Qiantu specifically asked if it could participate as an observer in these meetings, and your clients have not responded affirmatively. In fact, we have no schedule or understanding of the specifics around any of these meetings, and we certainly have not been invited to attend.

Finally, you offer a very vague and ambiguous statement in the first paragraph of page 2 of your letter that neither I nor my clients understand. You state: "*In that regard, my client is prepared to immediately wire the $3,674,42.40 to your client's account upon execution of an appropriate amendment to facilitate the future success of the project*." Candidly, I have no idea what you mean or what you could be suggesting as the *quid pro quo* for receiving payment. You seem to be suggesting, however, that we amend Exhibit F – literally less than 60 days after the parties signed the Agreement and approved the payment schedule for which Mullen is now in default. Yet, other than a vague statement, you offer no details.

Your suggestion, however, is respectfully, ridiculous. First, Mullen has absolutely no legal or contractual right to withhold payment, and it especially has no right to unilaterally force an amendment of the Agreement as a condition for its making payment of an undisputed amount. Second, Qiantu is not interested in amending the Agreement, and it is not interested in reconsidering the payment schedule, especially in light of Mullen's enigmatic behavior. The dispute resolution provisions you cite thereafter do not apply. For example, I interpret your invoking Section 7.2 (Operations Committee) to mean that should Qiantu not wish to amend the Agreement, the parties must resolve this issue through the Operations Committee and, should that fail, through dispute resolution in Section 9.2. To the extent this is what you are suggesting, this argument is absolutely absurd. Qiantu not wishing to amend an Agreement that was signed just 2 months ago is not a matter for resolution in either Sections 7.2 or 9.2. Qiantu has no legal obligation to renegotiate the Agreement, and Mullen's misguided offer only reinforces Qiantu's concerns that are becoming painfully real.

DICKINSON WRIGHT PLLC

William L. Miltner
September 24, 2019
Page 3


       Therefore, please let me be clear:  Qiantu expects full payment by October 1, and it has no intention to renegotiate the Agreement.

Very truly yours,

Mark V. Heusel

MVH/jkt

ANNARBOR 88052-4 265784v1



DICKINSON WRIGHT PLLC

350 S. MAIN STREET, SUITE 300
ANN ARBOR, MI 48104
TELEPHONE: 734-623-7075
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

MARK V. HEUSEL
MHeusel@dickinsonwright.com
734-623-1908

October 2, 2019

**VIA E-MAIL**

Frank McMahon
fmcmahon@mullenusa.com
Mullen Technologies, Inc.
1405 Pioneer Street
Brea, CA 92821

Re:   Event of Default of Sections 4.2 and 4.4 of the Exclusive Cooperation and Vehicle Assembly Agreement

Dear Mr. McMahon:

As you may know, I serve as General Counsel to Qiantu Motor (Suzhou), Ltd. and Qiantu Motor USA, Inc. (together, "Qiantu") in the United States. I am writing you with respect to Mullen Technologies, Inc.'s ("Mullen") latest default in failing to make the second installment payment towards the pre-launch "Costs and Expenses" described in Sections 4.2 and 4.4 of the Exclusive Cooperation and Vehicle Assembly Agreement (the "Agreement"). As provided for in Sections 4.2 and 4.4, Mullen agreed to pay Qiantu for its budgeted pre-launch "Costs and Expenses" for this project in accordance with Exhibit F to the Agreement in regular intervals as described in Section 4.4 and according to the schedule agreed to by the parties in Exhibit F. Pursuant to Section 4.4(a) and Exhibit F, the second installment of these Costs was to be made by October 1, 2019. As agreed to by the parties, Qiantu issued its second invoice in the amount of $19,160,219.49 (attached) on September 1, 2019, requiring that payment be made no later than October 1, 2019. As of today, payment on this invoice was not made as required by the Agreement.

Please accept this letter as notice pursuant to Section 6.4(a) that Mullen is currently in default of its Payment Obligations under the Agreement for its failure to pay $19,160,219.49 on or before the date provided for in Exhibit F of the Agreement (*i.e.,* October 1, 2019). This is an undisputed amount and payment shall be forthcoming in accordance with this Agreement. In no event shall Mullen's failure to pay this amount exceed 30 days after the date of this letter.

ARIZONA       CALIFORNIA     FLORIDA      KENTUCKY      MICHIGAN
NEVADA    OHIO     TENNESSEE     TEXAS     TORONTO     WASHINGTON DC

Frank McMahon
August 31, 2019
Page 2

DICKINSON WRIGHT PLLC

 

Your attention to this matter is urgently required in order to cure this default. Failure to do so in a timely manner may result in Qiantu exercising further rights under the Agreement. Nonetheless, it is disappointing that Mullen is already in breach of an Agreement that it signed just over two months ago. It is equally disappointing that Mullen has chosen to not cure its default in failing to pay the first invoice issued to Mullen, which was previously brought to your attention. Mullen's actions evidence a serious breach of trust, not to mention that Mullen seems comfortable simply ignoring its contractual obligations.

Qiantu reserves any and all other rights it may have under the parties' Agreement, whether expressly stated herein or not. Notwithstanding any rights that Qiantu may have under the Agreement, it does expect Mullen to remedy these defaults immediately.

Sincerely,

Mark V. Heusel
Senior Partner
Dickinson Wright, PLLC



350 S. MAIN STREET, SUITE 300
ANN ARBOR, MI 48104
TELEPHONE: 734-623-7075
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

MARK V. HEUSEL
MHeusel@dickinsonwright.com
734-623-1908

October 4, 2019

**VIA E-MAIL**

Frank McMahon
fmcmahon@mullenusa.com
Mullen Technologies, Inc.
1405 Pioneer Street
Brea, CA 92821

Re:   Notice of Intention to Terminate the Exclusive Cooperation and Vehicle
Assembly Agreement

Dear Mr. McMahon:

As you may know, I serve as General Counsel to Qiantu Motor (Suzhou), Ltd. and Qiantu Motor USA, Inc. (together, "Qiantu") in the United States.  I am writing you with respect to Mullen Technologies, Inc.'s ("Mullen") defaults in failing to make the installment payment for the pre-launch "Costs and Expenses" described in Sections 4.2 and 4.4 of the Exclusive Cooperation and Vehicle Assembly Agreement (the "Agreement").  As provided for in Sections 4.2 and 4.4, Mullen agreed to pay Qiantu for its budgeted pre-launch "Costs and Expenses" for this project in regular intervals as described in Section 4.4 and according to the schedule agreed to by the parties in Exhibit F to the Agreement. Pursuant to Section 4.4(a) and Exhibit F, the first and second installments of these Costs were to be made on August 30, 2019 and October 1, 2019, respectively.  As agreed to by the parties, Qiantu issued timely invoices in the amounts set forth in Exhibit F.  As of today, neither invoice has been paid.

Accordingly, Qiantu provided you written notice of Mullen's default with respect to the first invoice, on September 1, 2019 and, with respect to the second invoice, on October 2, 2019.  Although not required to provide Mullen additional time to remedy these defaults, Qiantu gave Mullen an additional 30 days to remedy its first default, *i.e.*, October 1, 2019.  Mullen, however, failed to pay the first invoice, even with this additional time.  Now, Mullen is in default of its second invoice and, again, Qiantu has given Mullen an additional 30 days to remedy the most recent default, *i.e.*, November 1, 2019.

Notwithstanding Qiantu's patience in this regard, it is clear that Mullen has breached the parties' Agreement and is clearly unable to fulfill the promises and

---

ARIZONA        CALIFORNIA        FLORIDA        KENTUCKY        MICHIGAN

NEVADA        OHIO        TENNESSEE        TEXAS        TORONTO        WASHINGTON DC

Frank McMahon
October 4, 2019
Page 2

DICKINSON WRIGHT PLLC

commitments both it and its Executive Team continually made to Qiantu's leadership over the last year.  Candidly, it is confounding that after spending nearly three (3) months negotiating a very comprehensive Agreement with a detailed budget and payment schedule for pre-launch Costs and Expenses, all of which was memorialized by July 2019, Mullen could so badly miss the mark immediately out of the gate.  It is also stunning that after providing countless assurances to Qiantu that Mullen was positioned to cover the pre-launch Costs and Expenses, it has been unable or unwilling to pay the initial installments.  This all leads to one of two conclusions:  either Mullen misrepresented its ability to carry through on its promises, or it has encountered barriers that it did not make known to Qiantu prior to final execution of the Agreement in July 2019.

Regardless of the cause for Mullen's failure to pay the initial installment payments as required by Exhibit F, any trust that Qiantu had in Mullen and its Executive Team has now been fractured, and Mullen has offered no credible assurance that it can meet its obligations.  Consequently, pursuant to Section 6.4(a) of the Agreement, please accept this letter as notice that Qiantu intends to terminate the Agreement effective November 2, 2019.  This time will provide Mullen ample opportunity to take all necessary measures to remove, de-mark, and dis-associate any references to cooperation between Qiantu and Mullen.  Importantly, please proceed with removing the Qiantu brand, logo, name, likeness, and any images regarding Qiantu or its products—including but not limited to the K50—from all communications to the public, including electronic and print materials, websites, radio and television advertisements, sponsorships, and any other form of communications wherein Mullen has referred to Qiantu or the K50 vehicle.

Qiantu reserves any and all rights it may have under law or equity, including its rights under the parties' Agreement, whether expressly stated herein or not.  Notwithstanding any rights that Qiantu may have under the Agreement, it does expect Mullen to pay the sum of the two outstanding invoices in the amount of $22,834,645.89 USD on or before November 2, 2019.

Sincerely,

Mark V. Heusel
Senior Partner
Dickinson Wright, PLLC

# Convention on the Recognition and Enforcement of Foreign Arbitral Awards

(New York, 1958)





UNITED NATIONS

The United Nations Commission on International Trade Law (UNCITRAL) is a subsidiary body of the General Assembly. It plays an important role in improving the legal framework for international trade by preparing international legislative texts for use by States in modernizing the law of international trade and non-legislative texts for use by commercial parties in negotiating transactions. UNCITRAL legislative texts address international sale of goods; international commercial dispute resolution, including both arbitration and conciliation; electronic commerce; insolvency, including cross-border insolvency; international transport of goods; international payments; procurement and infrastructure development; and security interests. Non-legislative texts include rules for conduct of arbitration and conciliation proceedings; notes on organizing and conducting arbitral proceedings; and legal guides on industrial construction contracts and countertrade.

*Further information may be obtained from:*

UNCITRAL secretariat, Vienna International Centre,
P.O. Box 500, 1400 Vienna, Austria

Telephone: (+43-1) 26060-4060          Telefax: (+43-1) 26060-5813
Internet: www.uncitral.org          E-mail: uncitral@uncitral.org

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

# Convention on the Recognition and Enforcement of Foreign Arbitral Awards
## (New York, 1958)



UNITED NATIONS
New York, 2015

## NOTE

Symbols of United Nations documents are composed of capital letters combined with figures. Mention of such a symbol indicates a reference to a United Nations document.

The publication reproduced here is a revised version in which part three of the original publication of 2009 has been removed.

Material in this publication may be freely quoted or reprinted, but acknowledgement is requested, together with a copy of the publication containing the quotation or reprint.

# Contents

*Page*

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Part one.   United Nations Conference on International Commercial Arbitration, New York, 20 May–10 June 1958** . . . . . . . . . . . . . . . 5

Excerpts from the Final Act of the United Nations Conference on International Commercial Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Convention on the Recognition and Enforcement of Foreign Arbitral Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Part two.   Recommendation regarding the interpretation of article II, paragraph 2, and article VII, paragraph 1, of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

General Assembly resolution 61/33 of 4 December 2006 . . . . . . . . . . . . . 15

Recommendation regarding the interpretation of article II, paragraph 2, and article VII, paragraph 1, of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done in New York, 10 June 1958, adopted by the United Nations Commission on International Trade Law on 7 July 2006 at its thirty-ninth session . . . . . . . . . . . . . . . . . . 17

# Introduction

## *Objectives*

Recognizing the growing importance of international arbitration as a means of settling international commercial disputes, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention) seeks to provide common legislative standards for the recognition of arbitration agreements and court recognition and enforcement of foreign and non-domestic arbitral awards. The term "non-domestic" appears to embrace awards which, although made in the state of enforcement, are treated as "foreign" under its law because of some foreign element in the proceedings, e.g. another State's procedural laws are applied.

The Convention's principal aim is that foreign and non-domestic arbitral awards will not be discriminated against and it obliges Parties to ensure such awards are recognized and generally capable of enforcement in their jurisdiction in the same way as domestic awards. An ancillary aim of the Convention is to require courts of Parties to give full effect to arbitration agreements by requiring courts to deny the parties access to court in contravention of their agreement to refer the matter to an arbitral tribunal.

## *Key provisions*

The Convention applies to awards made in any State other than the State in which recognition and enforcement is sought. It also applies to awards "not considered as domestic awards". When consenting to be bound by the Convention, a State may declare that it will apply the Convention *(a)* in respect to awards made only in the territory of another Party and *(b)* only to legal relationships that are considered "commercial" under its domestic law.

The Convention contains provisions on arbitration agreements. This aspect was covered in recognition of the fact that an award could be refused enforcement on the grounds that the agreement upon which it was based might not be recognized. Article II (1) provides that Parties shall recognize

written arbitration agreements. In that respect, UNCITRAL adopted, at its thirty-ninth session in 2006, a Recommendation that seeks to provide guidance to Parties on the interpretation of the requirement in article II (2) that an arbitration agreement be in writing and to encourage application of article VII (1) to allow any interested party to avail itself of rights it may have, under the law or treaties of the country where an arbitration agreement is sought to be relied upon, to seek recognition of the validity of such an arbitration agreement.

The central obligation imposed upon Parties is to recognize all arbitral awards within the scheme as binding and enforce them, if requested to do so, under the lex fori. Each Party may determine the procedural mechanisms that may be followed where the Convention does not prescribe any requirement.

The Convention defines five grounds upon which recognition and enforcement may be refused at the request of the party against whom it is invoked. The grounds include incapacity of the parties, invalidity of the arbitration agreement, due process, scope of the arbitration agreement, jurisdiction of the arbitral tribunal, setting aside or suspension of an award in the country in which, or under the law of which, that award was made. The Convention defines two additional grounds upon which the court may, on its own motion, refuse recognition and enforcement of an award. Those grounds relate to arbitrability and public policy.

The Convention seeks to encourage recognition and enforcement of awards in the greatest number of cases as possible. That purpose is achieved through article VII (1) of the Convention by removing conditions for recognition and enforcement in national laws that are more stringent than the conditions in the Convention, while allowing the continued application of any national provisions that give special or more favourable rights to a party seeking to enforce an award. That article recognizes the right of any interested party to avail itself of law or treaties of the country where the award is sought to be relied upon, including where such law or treaties offer a regime more favourable than the Convention.

## Entry into force

The Convention entered into force on 7 June 1959 (article XII).

## How to become a party

The Convention is closed for signature. It is subject to ratification, and is open to accession by any Member State of the United Nations, any other

2

State which is a member of any specialized agency of the United Nations, or is a Party to the Statute of the International Court of Justice (articles VIII and IX).

## *Optional and/or mandatory declarations and notifications*

When signing, ratifying or acceding to the Convention, or notifying a territorial extension under article X, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Party to the Convention. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration (article I).

## *Denunciation/Withdrawal*

Any Party may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of the receipt of the notification by the Secretary-General (article XIII).

# Part one

## UNITED NATIONS CONFERENCE ON INTERNATIONAL COMMERCIAL ARBITRATION, NEW YORK, 20 MAY–10 JUNE 1958

*Excerpts from the Final Act of the United Nations Conference on International Commercial Arbitration*[1]

"1.   The Economic and Social Council of the United Nations, by resolution 604 (XXI) adopted on 3 May 1956, decided to convene a Conference of Plenipotentiaries for the purpose of concluding a convention on the recognition and enforcement of foreign arbitral awards, and to consider other possible measures for increasing the effectiveness of arbitration in the settlement of private law disputes.

[…]

"12.   The Economic and Social Council, by its resolution convening the Conference, requested it to conclude a convention on the basis of the draft convention prepared by the Committee on the Enforcement of International Arbitral Awards, taking into account the comments and suggestions made by Governments and non-governmental organizations, as well as the discussion at the twenty-first session of the Council.

"13.   On the basis of the deliberations, as recorded in the reports of the working parties and in the records of the plenary meetings, the Conference prepared and opened for signature the Convention on the Recognition and Enforcement of Foreign Arbitral Awards which is annexed to this Final Act.

[…]

"16.   In addition the Conference adopted, on the basis of proposals made by the Committee on Other Measures as recorded in its report, the following resolution:

---

[1]The full text of the Final Act of the United Nations Conference on International Commercial Arbitration (E/CONF.26/8Rev.1) is available at http://www.uncitral.org

"*The Conference*,

"*Believing* that, in addition to the convention on the recognition and enforcement of foreign arbitral awards just concluded, which would contribute to increasing the effectiveness of arbitration in the settlement of private law disputes, additional measures should be taken in this field,

"*Having considered* the able survey and analysis of possible measures for increasing the effectiveness of arbitration in the settlement of private law disputes prepared by the Secretary-General (document E/CONF.26/6),

"*Having given particular attention* to the suggestions made therein for possible ways in which interested governmental and other organizations may make practical contributions to the more effective use of arbitration,

"*Expresses the following views* with respect to the principal matters dealt with in the note of the Secretary-General:

"1. It considers that wider diffusion of information on arbitration laws, practices and facilities contributes materially to progress in commercial arbitration; recognizes that work has already been done in this field by interested organizations,[2] and expresses the wish that such organizations, so far as they have not concluded them, continue their activities in this regard, with particular attention to coordinating their respective efforts;

"2. It recognizes the desirability of encouraging where necessary the establishment of new arbitration facilities and the improvement of existing facilities, particularly in some geographic regions and branches of trade; and believes that useful work may be done in this field by appropriate governmental and other organizations, which may be active in arbitration matters, due regard being given to the need to avoid duplication of effort and to concentrate upon those measures of greatest practical benefit to the regions and branches of trade concerned;

"3. It recognizes the value of technical assistance in the development of effective arbitral legislation and institutions; and suggests that interested Governments and other organizations endeavour to furnish such assistance, within the means available, to those seeking it;

"4. It recognizes that regional study groups, seminars or working parties may in appropriate circumstances have productive results; believes that consideration should be given to the advisability of the convening of

---

[2]For example, the Economic Commission for Europe and the Inter-American Council of Jurists.

Exhibit P
Page 146

such meetings by the appropriate regional commissions of the United Nations and other bodies, but regards it as important that any such action be taken with careful regard to avoiding duplication and assuring economy of effort and of resources;

"5.  It considers that greater uniformity of national laws on arbitration would further the effectiveness of arbitration in the settlement of private law disputes, notes the work already done in this field by various existing organizations,[3] and suggests that by way of supplementing the efforts of these bodies appropriate attention be given to defining suitable subject matter for model arbitration statutes and other appropriate measures for encouraging the development of such legislation;

"*Expresses the wish* that the United Nations, through its appropriate organs, take such steps as it deems feasible to encourage further study of measures for increasing the effectiveness of arbitration in the settlement of private law disputes through the facilities of existing regional bodies and non-governmental organizations and through such other institutions as may be established in the future;

"*Suggests* that any such steps be taken in a manner that will assure proper coordination of effort, avoidance of duplication and due observance of budgetary considerations;

"*Requests* that the Secretary-General submit this resolution to the appropriate organs of the United Nations."

---

[3]For example, the International Institute for the Unification of Private Law and the Inter-American Council of Jurists.

# CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

## *Article I*

 1. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

 2. The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

 3. When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

## *Article II*

 1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

 2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

 3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

8

## Article III

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

## Article IV

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:

*(a)* The duly authenticated original award or a duly certified copy thereof;

*(b)* The original agreement referred to in article II or a duly certified copy thereof.

2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

## Article V

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

*(a)* The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

*(b)* The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

Exhibit P
Page 149

*(c)* The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

*(d)* The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

*(e)* The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2.  Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

*(a)* The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

*(b)* The recognition or enforcement of the award would be contrary to the public policy of that country.

## Article VI

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V (1) *(e)*, the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

## Article VII

1.  The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

10

2.   The Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927 shall cease to have effect between Contracting States on their becoming bound and to the extent that they become bound, by this Convention.

## *Article VIII*

1.   This Convention shall be open until 31 December 1958 for signature on behalf of any Member of the United Nations and also on behalf of any other State which is or hereafter becomes a member of any specialized agency of the United Nations, or which is or hereafter becomes a party to the Statute of the International Court of Justice, or any other State to which an invitation has been addressed by the General Assembly of the United Nations.

2.   This Convention shall be ratified and the instrument of ratification shall be deposited with the Secretary-General of the United Nations.

## *Article IX*

1.   This Convention shall be open for accession to all States referred to in article VIII.

2.   Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

## *Article X*

1.   Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2.   At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3.   With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order

Exhibit P
Page 151

to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

## *Article XI*

In the case of a federal or non-unitary State, the following provisions shall apply:

*(a)* With respect to those articles of this Convention that come within the legislative jurisdiction of the federal authority, the obligations of the federal Government shall to this extent be the same as those of Contracting States which are not federal States;

*(b)* With respect to those articles of this Convention that come within the legislative jurisdiction of constituent states or provinces which are not, under the constitutional system of the federation, bound to take legislative action, the federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of constituent states or provinces at the earliest possible moment;

*(c)* A federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to that provision by legislative or other action.

## *Article XII*

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

## *Article XIII*

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation

Exhibit P
Page 152

shall take effect one year after the date of receipt of the notification by the Secretary-General.

2.   Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3.   This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

## *Article XIV*

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

## *Article XV*

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:

*(a)*  Signatures and ratifications in accordance with article VIII;

*(b)*  Accessions in accordance with article IX;

*(c)*  Declarations and notifications under articles I, X and XI;

*(d)*  The date upon which this Convention enters into force in accordance with article XII;

*(e)*  Denunciations and notifications in accordance with article XIII.

## *Article XVI*

1.   This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2.   The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

Exhibit P
Page 153

# Part two

RECOMMENDATION REGARDING THE INTERPRETATION
OF ARTICLE II, PARAGRAPH 2, AND ARTICLE VII,
PARAGRAPH 1, OF THE CONVENTION ON
THE RECOGNITION AND ENFORCEMENT
OF FOREIGN ARBITRAL AWARDS

## General Assembly resolution 61/33
## of 4 December 2006

*The General Assembly,*

*Recognizing* the value of arbitration as a method of settling disputes arising in the context of international commercial relations,

*Recalling* its resolution 40/72 of 11 December 1985 regarding the Model Law on International Commercial Arbitration,[1]

*Recognizing* the need for provisions in the Model Law to conform to current practices in international trade and modern means of contracting with regard to the form of the arbitration agreement and the granting of interim measures,

*Believing* that revised articles of the Model Law on the form of the arbitration agreement and interim measures reflecting those current practices will significantly enhance the operation of the Model Law,

*Noting* that the preparation of the revised articles of the Model Law on the form of the arbitration agreement and interim measures was the subject of due deliberation and extensive consultations with Governments and interested circles and would contribute significantly to the establishment of a harmonized legal framework for a fair and efficient settlement of international commercial disputes,

---

[1] *Official Records of the General Assembly, Fortieth Session, Supplement No. 17* (A/40/17), annex I.

*Believing* that, in connection with the modernization of articles of the Model Law, the promotion of a uniform interpretation and application of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958,[2] is particularly timely,

1.    *Expresses its appreciation* to the United Nations Commission on International Trade Law for formulating and adopting the revised articles of its Model Law on International Commercial Arbitration on the form of the arbitration agreement and interim measures, the text of which is contained in annex I to the report of the United Nations Commission on International Trade Law on the work of its thirty-ninth session,[3] and recommends that all States give favourable consideration to the enactment of the revised articles of the Model Law, or the revised Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law, when they enact or revise their laws, in view of the desirability of uniformity of the law of arbitral procedures and the specific needs of international commercial arbitration practice;

2.    *Also expresses its appreciation* to the United Nations Commission on International Trade Law for formulating and adopting the recommendation regarding the interpretation of article II, paragraph 2, and article VII, paragraph 1, of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, 10 June 1958,[2] the text of which is contained in annex II to the report of the United Nations Commission on International Trade Law on the work of its thirty-ninth session;[3]

3.    *Requests* the Secretary-General to make all efforts to ensure that the revised articles of the Model Law and the recommendation become generally known and available.

*64th plenary meeting*
*4 December 2006*

---

[2]United Nations, *Treaty Series*, vol. 330, No. 4739.

[3]*Official Records of the General Assembly, Sixty-first Session, Supplement No. 17* (A/61/17).

Exhibit P
Page 156

RECOMMENDATION REGARDING THE INTERPRETATION OF ARTICLE II,
PARAGRAPH 2, AND ARTICLE VII, PARAGRAPH 1, OF
THE CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF
FOREIGN ARBITRAL AWARDS, DONE IN NEW YORK, 10 JUNE 1958,
ADOPTED BY THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW ON 7 JULY 2006
AT ITS THIRTY-NINTH SESSION

*The United Nations Commission on International Trade Law*,

*Recalling* General Assembly resolution 2205 (XXI) of 17 December 1966, which established the United Nations Commission on International Trade Law with the object of promoting the progressive harmonization and unification of the law of international trade by, inter alia, promoting ways and means of ensuring a uniform interpretation and application of international conventions and uniform laws in the field of the law of international trade,

*Conscious* of the fact that the different legal, social and economic systems of the world, together with different levels of development, are represented in the Commission,

*Recalling* successive resolutions of the General Assembly reaffirming the mandate of the Commission as the core legal body within the United Nations system in the field of international trade law to coordinate legal activities in this field,

*Convinced* that the wide adoption of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done in New York on 10 June 1958,[4] has been a significant achievement in the promotion of the rule of law, particularly in the field of international trade,

*Recalling* that the Conference of Plenipotentiaries which prepared and opened the Convention for signature adopted a resolution, which states, inter alia, that the Conference "considers that greater uniformity of national laws on arbitration would further the effectiveness of arbitration in the settlement of private law disputes",

*Bearing in mind* differing interpretations of the form requirements under the Convention that result in part from differences of expression as between the five equally authentic texts of the Convention,

*Taking into account* article VII, paragraph 1, of the Convention, a purpose of which is to enable the enforcement of foreign arbitral awards to

---

[4]United Nations, *Treaty Series*, vol. 330, No. 4739.

the greatest extent, in particular by recognizing the right of any interested party to avail itself of law or treaties of the country where the award is sought to be relied upon, including where such law or treaties offer a regime more favourable than the Convention,

*Considering* the wide use of electronic commerce,

*Taking into account* international legal instruments, such as the 1985 UNCITRAL Model Law on International Commercial Arbitration,[5] as subsequently revised, particularly with respect to article 7,[6] the UNCITRAL Model Law on Electronic Commerce,[7] the UNCITRAL Model Law on Electronic Signatures[8] and the United Nations Convention on the Use of Electronic Communications in International Contracts,[9]

*Taking into account* also enactments of domestic legislation, as well as case law, more favourable than the Convention in respect of form requirement governing arbitration agreements, arbitration proceedings and the enforcement of arbitral awards,

*Considering that*, in interpreting the Convention, regard is to be had to the need to promote recognition and enforcement of arbitral awards,

1.    *Recommends* that article II, paragraph 2, of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done in New York, 10 June 1958, be applied recognizing that the circumstances described therein are not exhaustive;

2.    *Recommends also* that article VII, paragraph 1, of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done in New York, 10 June 1958, should be applied to allow any interested party to avail itself of rights it may have, under the law or treaties of the country where an arbitration agreement is sought to be relied upon, to seek recognition of the validity of such an arbitration agreement.

---

[5]*Official Records of the General Assembly, Fortieth Session, Supplement No. 17* (A/40/17), annex I, and United Nations publication, Sales No. E.95.V.18.

[6]Ibid., *Sixty-first Session, Supplement No. 17* (A/61/17), annex I.

[7]Ibid., *Fifty-first Session, Supplement No. 17* (A/51/17), annex I, and United Nations publication, Sales No. E.99.V.4, which contains also an additional article 5 bis, adopted in 1998, and the accompanying Guide to Enactment.

[8]Ibid., *Fifty-sixth Session, Supplement No. 17* and corrigendum (A/56/17 and Corr.3), annex II, and United Nations publication, Sales No. E.02.V.8, which contains also the accompanying Guide to Enactment.

[9]General Assembly resolution 60/21, annex.

Exhibit P
Page 158

V.15-05576



350 S. Main Street, Suite 300
Ann Arbor, MI 48104
Telephone: 734-623-7075
Facsimile: 844-670-6009
http://www.dickinsonwright.com

Mark V. Heusel
MHeusel@dickinsonwright.com
734-623-1908

November 11, 2019

**VIA E-MAIL**

Frank McMahon
fmcmahon@mullenusa.com
Mullen Technologies, Inc.
1405 Pioneer Street
Brea, CA 92821

**VIA E-MAIL**

William L. Miltner, Esq.
bill@miltnerlaw.com
Miltner & Menck, APC
402 W. Broadway, Suite 800
San Diego, CA 92101

Re:   Notice to Cease and Desist use of the "K50" Mark

Dear Messrs. McMahon and Miltner:

As you know, I serve as General Counsel to Qiantu Motor (Suzhou), Ltd. and Qiantu Motor USA, Inc. (together, "Qiantu") in the United States. I am writing you with respect to my previous letter dated October 4, 2019 ("Termination Notice"), notifying Mullen Technologies, Inc. ("Mullen") of Qiantu's intention to terminate the Exclusive Vehicle Cooperation and Vehicle Assembly Agreement (the "Agreement") with Mullen and to address several events that have since taken place.

As recounted in the Termination Notice, Mullen defaulted in its performance of the Agreement for failing to make two separate installment payments for the pre-launch "Costs and Expenses" described in Sections 4.2 and 4.4 of the Agreement. Pursuant to Section 4.4(a) and Exhibit F, the first and second installments were to be made on August 30, 2019 and October 1, 2019, respectively. Despite receiving timely invoices, Mullen has not made either payment.

Qiantu provided Mullen an additional 30 days to remedy these defaults despite no obligation to do so under the Agreement; however, it became clear in early October that Mullen would not be upholding its end of the bargain. Accordingly, on October 4, 2019, Qiantu provided the Termination Notice pursuant to Section 6.4(a) regarding its intent to terminate the Agreement effective November 2, 2019.

The Termination Notice was to provide Mullen ample opportunity to remove, de-mark, and dis-associate any references to cooperation between Qiantu and Mullen. Specifically, Qiantu asked Mullen to proceed with removing the Qiantu brand, logo, name, likeness, and any images regarding Qiantu or its products—including but not limited to

the K50—from all communications to the public, including electronic and print materials, websites, radio and television advertisements, sponsorships, and any other form of communications wherein Mullen has referred to Qiantu or the K50 vehicle.

Accordingly, it has come as quite a surprise to those at Qiantu that Mullen has not undertaken any efforts to remove the Qiantu brand from Mullen's website. Rather, as of November 4, 2019, Mullen's website (mullenusa.com) still displays a full-page advertisement displaying an image of the "Qiantu K50." Mullen's website also contains several videos and images describing the K50, and contains a link to "Reserve Now" a K50.

Even more surprising, Mullen has continuously posted images to an Instagram page associated with Mullen's CEO David Michery posing in front of a K50 and containing the caption "[o]ur CEO @davidmichery with the **Mullen K50** at the U.S. Department of Energy in Washington D.C. earlier today." Identifying the vehicle as the "Mullen K50" is an inexcusable misuse of Qiantu's own intellectual property and constitutes a separate breach of the Agreement. Thus, not only is it clear that Mullen intends to disregard Qiantu's request with respect to use of the K50 mark, Mullen appears to have doubled-down on its efforts to market the K50 as its own.

Moreover, this has all taken place on the heels of Mullen's filing of several truly frivolous and false claims in the District Court for the Southern District of California (Case No. 19-cv-0197-W-AHG). This only lends further credence to Qiantu's belief that Mullen intends to completely abandon its various obligations under the Agreement and disregard the months of negotiation and hard work on the part of both parties that led to the formation of this business relationship.

As such, Qiantu is prepared to enforce its rights, both under the Agreement and with respect to Qiantu's intellectual property, specifically, the Qiantu and K50 marks. Following termination of the Agreement on November 1, 2019, any use by Mullen of the Qiantu and K50 marks is strictly prohibited. Accordingly, both Mullen's website and social media outlets now constitute multiple acts of trademark infringement and false and misleading advertisement. Most notably, Mullen's promotion of Qiantu's K50 as the "Mullen K50" would have violated Qiantu's rights even under the terms of the Agreement.

As Qiantu has already notified Mullen of its intention to terminate the Agreement and Mullen, in fact, has now requested the Agreement to be rescinded, it would futile to pursue dispute resolution remedies afforded by Section 9.1 of the Agreement. Mullen's continued use of Qiantu's name, reference to the K50, and any likeness, image, brand or trademark or copyright of Qiantu is forbidden and Mullen's continued abuse is a further breach of the Agreement according to Article 8 of the Agreement

Moreover, each prohibited use represents a separate and distinct violation of California state law, which governs the parties' conduct pursuant to the Agreement. See Cal. Bus. & Prof. Code § 17200 *et seq.*; *Phillip Morris USA Inc. v. Liu*, 489 F.Supp.2d 1119 (N.D. Cal. 2014) (proof of trademark infringement independently constitutes unfair competition under California law); *Lanard Toys Ltd. v. Novelty Inc.*, 511 F.Supp.2d 1020 (C.D. Cal. 2007).

Qiantu will exercise any and all rights it may have under law and under the terms of the Agreement, to obtain payment from Mullen for the two outstanding invoices in the amount of $22,834,645.89 and to insure that Mullen ceases use of Qiantu's marks, including the K50, and its name, likeness, image, brand, etc. It is in the best interests of both parties for Mullen to take these obligations seriously so that both Mullen and Qiantu can avoid incurring additional unnecessary expense moving forward.

Sincerely,

Mark V. Heusel
Senior Partner
Dickinson Wright, PLLC

DETROIT 89787-4 1519853v1