DICKINSON WRIGHT PLLC
RASIKA A. KULKARNI, Cal. Bar No. 321344
2600 W. Big Beaver Road, Suite 300
Troy, Michigan 48084
Telephone: (248) 433-7200
E-mail: rkulkarni@dickinsonwright.com

DICKINSON WRIGHT PLLC
Robert L. Avers (P75396), *admitted pro hac vice*
Mark V. Heusel (P47528), *admitted pro hac vice*
350 S. Main St., Ste. 300
Ann Arbor, MI 48104
Telephone: (734) 623-7075
ravers@dickinsonwright.com
mheusel@dickinsonwright.com

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JACK BURNS, Cal. Bar No. 290523
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone:  619.338.6500
E mail       jburns@sheppardmullin.com

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MULLEN TECHNOLOGIES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>QIANTU MOTOR (SUZHOU) LTD., a limited liability company; and DOES 1-50,<br><br>Defendants. | Case No.:  19-CV-1979-W-AHG<br><br>Hon. Thomas J. Whelan<br>Court Room No. 3C<br>Hearing Date: January 13, 2020<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**<br><br>**NO ORAL ARGUMENT PURSUANT TO LOCAL RULE** |

# TABLE OF CONTENTS

I. Introduction ..........................................................................................................1

II. Factual Background ............................................................................................1

   A. The Parties' Negotiation of the Exclusive Cooperation and Vehicle Assembly Agreement ..........................................................................................................1

   B. Mullen's Immediate Breach of the Amended Agreement ......................3

III. Legal Standard ....................................................................................................4

IV. Mullen Filed a Complaint Containing Known Factual Misrepresentations ..............5

   1. Mullen's Claims are Based Upon Factual Inaccuracies .......................5

   2. Mullen Violated Rule 11 by Filing a Complaint that Directly Contradicts Known Evidence ..................................................................................................8

V. Conclusion ........................................................................................................10

# TABLE OF AUTHORITIES

**Cases:**

*Holgate v. Baldwin*, 425 F.3d 671 (9th Cir. 2005)……………………………….............4

*Christian v. Mattel, Inc.*, 286 F.3d 1118 (9th Cir. 2002)………………………………….4

*Moore v. Keegan Mgmt. Co*, 78 F.3d 431, 434 (9th Cir. 1996)…………………………...4

*Truesdell v. Southern California Permanente Medical Group*, 209 F.R.D. 169 (C.D. Cal. 2002)…………………………………………………………………………..………8, 10

*Sunday's Child, LLC v. Irongate AZREP BW LLC*, 327 F.Supp.3d 1322 (D. Haw. 2018)……………………………………………………………………………………..10

**Rules:**

Fed. R. Civ. P. 11…………………………………………………………………….passim

## I. INTRODUCTION

On October 11, 2019, Mullen filed with the Court its Complaint in the above-captioned action. (Dkt. 1, Compl.). Mullen's Complaint contains several factual misrepresentations that were known to Mullen and were intended to mislead this Court. In short, Mullen has: 1) misrepresented that the May 25, 2019 Agreement governs the parties' conduct, when the Agreement was subsequently superseded by an Amended Agreement; 2) failed to inform the Court that the parties continued their negotiations through June and July, and signed an Agreement on July 30, 2019 that supersedes the prior Agreement; 3) misrepresented that Qiantu "unilaterally" added terms to the Agreement, when Mullen itself requested any changes to the payment schedule and continued to request such changes during September and October of 2019—mere days before filing its Complaint; and 4) failed to indicate that Mullen acknowledged its payment obligations pursuant to the Agreement on several occasions—and again just days before filing this lawsuit. Mullen's factual misrepresentations warrant sanctions under Rule 11 of the Federal Rules of Civil Procedure. Accordingly, this Court should grant Qiantu's Motion for Sanctions so that Qiantu is not forced to incur the cost of defending Mullen's frivolous Complaint and to deter this type of behavior in the future.

## II. FACTUAL BACKGROUND

### A. The Parties' Negotiation of the Exclusive Cooperation and Vehicle Assembly Agreement

Qiantu manufactures and sells a high-performance sports vehicle known as the "K50," which Qiantu currently markets and sells in China. In late 2017, Qiantu foresaw an opportunity to expand sales of the K50 into the United States market by manufacturing and selling "vehicle kits" to be built within the U.S. and eventually marketed and sold here. Thus, Qiantu and Mullen began negotiating an agreement whereby Qiantu would sell to Mullen K50 vehicle kits, and Mullen would subsequently fill the role of assembling the K50 and marketing it for sale in the U.S.

Out of these negotiations was born the Exclusive Cooperation and Vehicle Assembly Agreement (the "Agreement"). The first iteration of the Agreement (the "First Agreement," attached hereto as **Exhibit A**), was signed by the parties on May 25, 2019. Immediately following execution of the First Agreement, Mullen notified Qiantu claiming that it had signed the wrong version of the Agreement. (See **Exhibit B; Exhibit C**). Because Mullen initially claimed that it signed the wrong version of the Agreement due to some sort of error in transmitting the to-be-executed version of the Agreement (see *id.*), Qiantu believed that Mullen would simply replace their executed version of the Agreement with the correct version of the Agreement, and sign the latter. As it turned out, however, Mullen wished to re-negotiate key provisions of the Agreement. (See **Exhibit D**). Despite Mullen's untimely request to renegotiate the Agreement, Qiantu agreed to take part in re-negotiation in an effort to begin the parties' business relationship on a positive note. Accordingly, the parties restarted the negotiation process, resulting in several weeks of negotiations, evidenced by multiple rounds of revisions to the Agreement and requiring numerous conference calls with the parties and their respective attorneys. (See **Ex. D; Exhibit E**).

As part of these negotiations, Mullen specifically sought a modification of the payment schedule referred to in Article 4.4 of the Agreement. (See **Ex. A**, ¶ 4.4**; Exhibit E**; **Exhibit F; Exhibit G**). Remarkably, this is the exact payment schedule Mullen now contends in its Complaint that Qiantu pulled out of thin air and snuck into the Agreement. (Dkt. 1, ¶ 16). Nonetheless, after making specific revisions to the payment schedule following Mullen's untimely request to renegotiate the Agreement, the parties entered into an amended version of the Agreement on July 30, 2019, which completely replaced and superseded the earlier version in full. (See the "Amended Agreement," attached hereto as **Exhibit H** (expressly providing in the preamble that "this Agreement…amends and restates in its entirety the Cooperation and Vehicle Assembly Agreement the parties executed on May 25, 2019."); **Ex. A** at 11.7 (providing for amendment of the First Agreement so long as the amendment is signed by each of the parties)). Mullen signed

and acknowledged the Amended Agreement and, in fact, initialed each page, including the payment schedule Mullen now asserts it was not aware of. (**Ex. H**).

### B. Mullen's Immediate Breach of the Amended Agreement

As identified, the parties entered into the Amended Agreement on July 30, 2019, which contained a payment schedule at the time of signing (contrary to Mullen's assertions) outlined in Article 4.4. (**Ex. H.** at 4.4). Article 4.4 indicates that Mullen was to make the first payment pursuant to the Amended Agreement no later than August 30, 2019. (*Id.* at 4.4(a)). On September 1, 2019, after not receiving Mullen's initial payment, Qiantu sent a Notice of Default to Mullen outlining Mullen's failure to pay pursuant to the agreed upon payment schedule. (Notice of Default, attached hereto as **Exhibit I**). On September 4, 2019, a representative for Mullen responded to the Notice of Default by acknowledging the payment schedule and, specifically, that Mullen was "working with [their] bankers to deliver the payment due." (**Exhibit J**). Then, on September 11, 2019, Mullen sent another email to Qiantu, again acknowledging that it had an obligation to make payments pursuant to the parties' agreed-upon payment schedule and detailing the various reasons for its difficulty in making the payment. (**Exhibit K**). Moreover, in the same email, Mullen requested modifications to the aforementioned payment schedule, again acknowledging that it was in fact bound to the payment schedule included in the Amended Agreement. (*Id.*). On September 20, 2019, counsel for Mullen sent a letter to counsel for Qiantu again expressly acknowledging Mullen's obligations pursuant to the Amended Agreement and, specifically, Article 4.4. (**Exhibit L**). Through this same letter, Mullen offers to wire payment to Qiantu in exchange for a post-signing amendment to the payment schedule. (*Id.*).

To date, Mullen has not made the payments required under the payment schedule, despite its own repeated acknowledgement of its obligation to do so and Qiantu's ongoing efforts to keep this business relationship afloat. Instead, Mullen filed this suit on October 11, 2019 in an effort to race to the courthouse and prevent Qiantu from simply pursuing arbitration of what is truly a dispute regarding Mullen's failure to abide by its

Payment Obligations, which, under the express terms of the Amended Agreement, must be submitted to arbitration rather than litigated before this Court.[1]  Nonetheless, and for the reasons outlined herein, the factual misrepresentations alleged in Mullen's complaint warrant sanctions under Rule 11.

### III.  LEGAL STANDARD

Rule 11 sanctions apply when, among other reasons, a party presents to the court "claims, defenses, and other legal contentions [not] warranted by existing law[.]" Rule 11(b)(2); *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005). Where a complaint is the primary focus of Rule 11 proceedings:

> [A] district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it.

*Id.* (citing *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)). Accordingly, a complaint is "frivolous" where it is both (1) legally or factually baseless and (2) made without a reasonable and competent inquiry. *Id.* (citing *Moore v. Keegan Mgmt. Co*, 78 F.3d 431, 434 (9th Cir. 1996)).

---

[1] The Agreement contains an arbitration provision designating the Singapore International Arbitration Centre as the mandatory forum for disputes arising from Payment Obligations as defined under the Agreement, such as all of the claims alleged in Mullen's Complaint.  (See **Ex. H**, at Article 4.1 (defining "Payment Obligation") and Article 9.1-9.2 (requiring arbitration of disputes stemming from Payment Obligations)). Mullen and its counsel were clearly aware of the mandatory nature of the arbitration provision, as evidenced by their letter dated September 20, 2019 (**Ex. L**), yet filed the instant matter with this Court anyway.  As a result of Mullen's blatant contravention of the arbitration provision, Qiantu filed a Motion to Compel Arbitration on November 14, 2019.  (Dkt. No. 5).

## IV. MULLEN FILED A COMPLAINT CONTAINING KNOWN FACTUAL MISREPRESENTATIONS

Mullen's actions warrant the imposition of sanctions under Fed. R. Civ. P. 11. Mullen's Complaint contains numerous allegations that are directly contradicted by evidence that is currently within their possession. This evidence renders Mullen's claims factually baseless, and, had Mullen or its counsel conducted a reasonable inquiry, they would have discovered the inaccuracies contained in the Complaint. Accordingly, both prongs of the Rule 11 inquiry are satisfied and this Court should grant Qiantu's motion for sanctions for the reasons further outlined below.

### 1. Mullen's Claims are Based Upon Factual Inaccuracies

Mullen's Complaint alleges that the parties entered into the Agreement on or about May 25, 2019, which is partially correct. (Dkt. 1, ¶ 14). As previously identified, the parties did enter into the First Agreement on May 25, 2019 (**Ex. A**), however, this is generally the extent of the truth to Mullen's claims. Indeed, Mullen then goes on to allege that "THE PARTIES agreed to do business, and that THE PARTIES agreed to add, at a later date, a mutually agreeable schedule of payments, amount of payments, schedule for delivery of the kits and amount of kits." (*Id.*, ¶ 15). Mullen then, without any basis in fact, asserts that, "on or about August 1, 2019, QIANTU unilaterally added the exhibits to THE AGREEMENT, without the mutual agreement of MULLEN." (*Id.*, ¶ 16). Each one of Mullen's claims arises out of this supposed unilateral alteration of the Agreement, which, again, is a factually baseless and inaccurate representation to the Court.

Mullen's account is obviously untrue for a multitude of reasons. First and foremost, Qiantu did not unilaterally add any terms to the Agreement. As illustrated by the emails attached hereto as **Exhibits B** and **C**, Mullen experienced issues transmitting the First Agreement, resulting in the wrong version of the Agreement being signed. The parties then re-entered the negotiation process in order to reach terms agreeable to both Mullen and Qiantu. (See **Ex. D** (indicating that on June 3, 2019, Mullen sent to Qiantu their latest contract draft); **Ex. E**). These negotiations included several requests on the

part of Mullen to change the payment schedule to reflect Mullen's needs. (See **Ex. E** (indicating that on July 26, 2019 Mullen requested modifications to the payment schedule set forth in Article 4.4 of the Amended Agreement); **Ex. F** (indicating that Qiantu made the changes to Article 4.4 requested in Ex. E based on the parties' discussion); **Ex. G**).  In fact, an email dated July 23, 2019, sent by Mullen's representative to Qiantu's representative, includes a track-changes (*i.e.*, redlined) version of Article 4.4 reflecting Mullen's revisions to the very payment schedule that Mullen now disputes. (**Ex. G**). Moreover, as shown by the Amended Agreement, Mullen's representative initialed all pages of the Amended Agreement, including Exhibit F and Page 18, which contains Article 4.4. (**Ex. H**).

Mullen's Complaint conveniently omits the fact that the parties formalized the Amended Agreement on July 30, 2019 and, instead, alleges untruthfully that Qiantu added a payment schedule to the First Agreement without informing Mullen. The evidence before Mullen and its counsel, including the Amended Agreement itself, illustrates that these accusations are patently untrue and without factual basis. Moreover, each one of Mullen's claims relies upon these false assertions, and each claim lacks merit due to their falsity, leaving Mullen's Complaint baseless as a whole.

As if the Amended Agreement itself and the negotiations leading up to the Amended Agreement were not enough to illustrate the factual inaccuracy of Mullen's Complaint, there is more. Mullen asserts that it "discovered that QIANTU unilaterally added these terms and conditions on or about August 1, 2019." (Dkt. 1, ¶ 16). However, there is no record of any communication on or after August 1, 2019 in which Mullen challenges the payment schedule, or accuses Qiantu of unilaterally adding said schedule unbeknownst to Mullen. Rather, Mullen has continuously acknowledged their obligations under the Amended Agreement and, specifically, the payment schedule while repeatedly asking Qiantu to make concessions with respect to that same schedule. (**Ex. J**; **Ex. K**). For example, on September 4, 2019, following Mullen's failure to make the first required payment, and in response to the Notice of Default (**Ex. I**), David Michery, CEO and

majority shareholder for Mullen ("Michery") stated in an email sent to Qiantu, "[w]e are working with our bankers to deliver the payment due **pursuant to the payment schedule**." (**Ex. J**). On September 11, 2019, Michery himself again sent an e-mail to Qiantu directly referencing payments due to Qiantu "pursuant to Exhibit F – Article 4 the payment schedule" and "apologizing for the delay in the timing of payments to Qiantu." (**Ex. K**). In that same email, Michery goes on to request a post-signing modification to that payment schedule, which Qiantu subsequently rejected. (*Id.*).

On September 20, 2019, also in response to the Notice of Default (**Ex. I**), counsel for Mullen sent to counsel for Qiantu a letter again acknowledging the existence of the Amended Agreement and Mullen's obligations pursuant to the payment schedule in Article 4.4. (**Ex. L**). Counsel for Mullen stated, "make no mistake, Mullen is fully committed to this project," and added:

> **[Mullen] remain[s] ready, willing and able to facilitate their obligations under [the Agreement], but are requesting a modification of the payment schedule called out for in Exhibit F** to ensure the success of the project. In that regard, **my client is prepared to immediately wire the $3,674,426.40 to your client's account upon execution of an appropriate amendment** to facilitate future success of the project.

(*Id.*) (emphasis added)

Thus, it is clear that Qiantu did not unilaterally alter the First Agreement as Mullen falsely claims in its Complaint. Moreover, Mullen never challenged the validity of the payment schedule, and never accused Qiantu of unilaterally adding the payment schedule to the Agreement. Rather, Mullen did just the opposite. On multiple occasions during September of 2019, Mullen expressly acknowledged their obligations under the specific clause they now challenge, including acknowledgement by their own CEO and majority shareholder David Michery. (**Ex. J**; **Ex. K**; **Ex. L**). Indeed, Mullen provided several excuses for why they could not meet the payment schedule and requested a modification to that same schedule, further indicating where the true problem lies. (**Ex. K**; **Ex. L**). Moreover, Mullen's own counsel, who affixed his signature to the Complaint, has

previously acknowledged the payment obligations of his client pursuant to the payment schedule and the Agreement, and has made several representations that his client recognizes those obligations as well. (**Ex. L**).

Mullen's Complaint is nothing more than an effort to mislead this Court by setting forth factual assertions it knows to be false due to the evidence of the parties' negotiations—evidence that is in the possession of both Mullen and its counsel. Therefore, sanctions are an appropriate remedy in this case. *Truesdell v. Southern California Permanente Medical Group*, 209 F.R.D. 169, 177 (C.D. Cal. 2002) (finding that imposition of Rule 11 sanctions is independently justified where plaintiff's counsel made factual misrepresentations in the Complaint, and awarding fees/costs to defendant).

### 2. Mullen Violated Rule 11 by Filing a Complaint that Directly Contradicts Known Evidence

Fed. R. Civ. P. 11(b)(3) requires that, "allegations and other factual contentions have evidentiary support." Here, Mullen has set forth a series of allegations that not only lack evidentiary support; they directly contradict evidence in Mullen's possession. The many factual inaccuracies contained in the Complaint not only render its allegations entirely baseless, these inaccuracies would have been discovered upon a reasonable inquiry into the claims themselves. Accordingly, the two-prong test under Rule 11 is satisfied and sanctions are appropriate in this case.

As identified above, there is little more than a shred of truth to Mullen's allegations. The parties did in fact enter into the First Agreement, however, any of Mullen's assertions with respect to either party's actions following the execution of the First Agreement are blatantly false. The ongoing communications between the parties and the Amended Agreement itself, which bears both Mullen and Qiantu's signatures, illustrates the falsity of Mullen's allegations. (**Ex. H**). Qiantu did not unilaterally add any terms to the Agreement and, in fact, the Amended Agreement is a product of Mullen's request to renegotiate the Agreement and, specifically, the payment schedule. Accordingly, each one of Mullen's claims are baseless because each relies upon the

factually baseless and inaccurate assertion that Qiantu somehow "snuck" the payment schedule into the Agreement.

Count I asserts a breach of contract claim based upon Qiantu's alleged failure to communicate with Mullen to reach a schedule for payments and deliveries, and its alleged unilateral imposition of an accelerated payment schedule. (Dkt. 1, ¶ 23). Count II seeks a declaration that there is no enforceable agreement between the parties because of Qiantu's alleged unilateral modifications. (*Id.* ¶ 28). Counts III and IV seek a reformation of the contract following Mullen's alleged discovery of additional terms and conditions "mistakenly or fraudulently" added to the Agreement. (*Id.* ¶¶ 30, 33). Count V alleges Qiantu made a false assertion with respect to the Agreement and "intended to unilaterally add" essential terms and conditions following its execution. (*Id.* ¶ 40). Count VI asserts that Qiantu's alleged unilateral addition of the terms constitutes a violation of the California Business & Professions code. (*Id.* ¶ 43). Accordingly, because Mullen has entirely fabricated the series of events following the execution of the First Agreement, including Qiantu's unilateral addition of contract terms, not one of these claims possesses any merit.

Moreover, had Mullen or its counsel conducted any sort of inquiry into the claims set forth in the Complaint, these obvious errors would have been immediately apparent. The Complaint itself does not even address the Amended Agreement, which the parties clearly signed and initialed on each page. (**Ex. H**). Had counsel for Mullen conducted any inquiry whatsoever into the claims themselves, the existence of the Amended Agreement would have been an undeniable fact, thus, rendering each of Mullen's claims factually baseless. Moreover, Mullen itself knows that these claims are false and directly contradicted by its own acknowledgement of the payment schedule following its alleged "discovery" of these additional terms. On at least three separate occasions **after** August 1, 2019 (the date Mullen alleges it "discovered" the additional terms, *see* Compl. at ¶16), Mullen acknowledged its obligation to pay Qiantu pursuant to the payment schedule. (**Ex. J** (September 4, 2019 email from Michery to Qiantu); **Ex. K** (September 11, 2019 email

from Michery to Qiantu); **Ex. L** (September 20, 2019 letter from Mullen's counsel to Qiantu's counsel)). This includes acknowledgement by Mullen's own CEO and majority shareholder. (**Ex. J; Ex. K**). Moreover, counsel for Mullen, who signed the Complaint, specifically acknowledged his client's obligations pursuant to the payment schedule he now contests. (**Ex. L**). Neither Mullen nor its counsel challenged the validity of the payment schedule in any of those "post-discovery" communications, or at any other time. Nonetheless, Mullen now claims the Agreement is unenforceable because Qiantu added this payment schedule unilaterally and unbeknownst to Mullen.

Based upon the record of evidence, there is no question that this information was available to Mullen at the time of filing the Complaint. It is clear that neither Mullen nor its counsel conducted a reasonable inquiry into Mullen's claims. Moreover, it appears that Mullen filed this Complaint in an attempt to mislead the Court because there is no justifiable excuse for omitting from the Complaint the Amended Agreement and the ongoing negotiations between the parties following the First Agreement. Accordingly, either Mullen or its counsel did not conduct the required inquiry into the basis for their claims, or they blatantly lied to this Court. In either case, Rule 11 sanctions are warranted so that Qiantu is not forced to bear the cost of defending Mullen's frivolous claims. See *Truesdell v. Southern California Permanente Medical Group*, 209 F.R.D. 169, 177 (C.D. Cal. 2002) (finding that imposition of sanctions is independently justified where plaintiff's counsel made factual misrepresentations in the Complaint, and awarding fees/costs to defendant); *Sunday's Child, LLC v. Irongate AZREP BW LLC*, 327 F.Supp.3d 1322, 1344 (D. Haw. 2018) (finding that plaintiff and counsel's certification and filing of pleadings arguing that contract should be interpreted contrary to the undisputed evidence warrants sanctions).

### V.  CONCLUSION

The allegations in Mullen's Complaint seriously mischaracterize the facts of this dispute for the Court and, in some respects, qualify as blatant misrepresentations. At the heart of each of Mullen's claims is the allegation that Qiantu somehow unilaterally

1  altered the Agreement following execution of the First Agreement. As illustrated above,
2  this recounting of events is a blatant falsehood, as Mullen itself possesses evidence of
3  their own request for renegotiation and subsequent execution of the Amended
4  Agreement. Moreover, Mullen itself made several modifications to the payment schedule
5  of which it now claims it was unaware. Mullen has acknowledged its obligations under
6  the Amended Agreement several times following its execution, lending further support to
7  the fact that this lawsuit is entirely unfounded. All of these actions illustrate that the
8  Complaint itself is factually baseless and was filed without conducting a reasonable
9  investigation into its merit. As such, Rule 11 sanctions are warranted in this case.

/s/ Jack Burns
Jack Burns
**Sheppard, Mullin, Richter & Hampton LLP**
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Phone: (619) 338-6500

Rasika A. Kulkarni (321344)
**DICKINSON WRIGHT PLLC**
2600 W. Big Beaver Rd., Suite 300
Troy, MI 48084
(248) 433-7200
rkulkarni@dickinsonwright.com

Robert L. Avers (P75396), *to be admitted pro hac vice*
**DICKINSON WRIGHT PLLC**
350 S. Main St., Ste. 300
Ann Arbor, MI 48104
Telephone: (734) 623-1672
ravers@dickinsonwright.com

Mark V. Heusel (P47528), *to be admitted pro hac vice*
**DICKINSON WRIGHT PLLC**
350 S. Main St., Ste. 300
Ann Arbor, MI 48104
Telephone: (734) 623-1908
mheusel@dickinsonwright.com

Dated: December 13, 2019

DETROIT 89787-4 1521080v1